1  LAWRENCE BORYS (SBN 60625)
   ANNA NOVRUZYAN (SBN 278427)
2  ROPERS MAJESKI PC
   445 South Figueroa St, 30th Floor
3  Los Angeles, CA  90071
   Telephone:  213.312.2000
4  Facsimile:  213.312.2001
   Email:      lawrence.borys@ropers.com
5              anna.novruzyan@ropers.com

6  Attorneys for Non-Debtor Defendants and
   Movants DARIUSH ADLI, DREW
7  SHERMAN, JOSHUA EICHENSTEIN, and
   JONATHAN LANDIS

8

9           UNITED STATES BANKRUPTCY COURT

10   CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

11

12  In re: ADLI LAW GROUP, P.C.,          Case No. 2:21-bk-18572-BB

13  Debtor.                              **NON-DEBTOR DEFENDANTS'
                                         NOTICE OF MOTION AND
14                                       MOTION TO EXTEND THE
                                         BANKRUPTCY STAY, OR
15                                       ALTERNATIVELY, FIND
                                         CONTINUING LITIGATION AS
16                                       VIOLATION OF THE STAY**

17
                                         Date: February 15, 2022
18                                       Time: 10:00 a.m.
                                         Courtroom: 1539
19

20        NOTICE IS HEREBY GIVEN THAT Movants Dariush Adli, Drew

21  Sherman, Joshua Eichenstein, and Jonathan Landis ("Non-Debtor Defendants")

22  hereby submit this Motion for entry of an order, pursuant to Section 105(a) of Title

23  11 of the United States Code ("the Bankruptcy Code") extending the automatic stay

24  under Bankruptcy Code Section 362 to stay the following actions against Non-

25  Debtor Defendants:

26        1. *WBS, Inc. v. Adli Law Group, P.C. et al*., Los Angeles County Superior

27  Court Case No. 20STCV34381, filed on September 9, 2020.

28        2. *Gary Topolewski v. Adli Law Group, P.C. et al.*, Los Angeles County

ROPERS
M A J E S K I
A Professional Corporation
Los Angeles

1    Superior Court Case No. 20STCV32929, filed on August 27, 2020.

2         3. *Gary Topolewski v. Adli Law Group, P.C. et al.*, Signature Resolution

3    Arbitration Case ID YRZKG.

4         4. *Steven Hellings v. Andrea Ruth Bird, et al.*, San Diego County Superior

5    Court Case No. 37-2020-00044516-CU-BT-CTL, filed on December 4, 2020.

6         5. *Jonathan Betuel v. Dariush Ghaffar Adli*, *et al.*, Los Angeles Superior

7    Court Case No. 21STCH02730, filed on January 22, 2021.

8         Alternatively, Non-Debtor Defendants seek an order finding the continuation

9    of these actions against the Non-Debtor Defendants as an indirect violation of the

10   existing automatic stay.  This Motion will be heard on February 15, 2022, at 10:00

11   a.m. in Courtroom 1539 at 255 East Temple Street, Los Angeles, CA 90012.

12        This motion is being heard on regular notice pursuant to LBR 9013-1. If you

13   wish to oppose this motion, you must file a written and serve a written response to

14   this motion no less than 14 days before the above hearing and appear at the hearing

15   of this motion.  If you fail to timely file and serve a written response to the motion,

16   or fail to appear at the hearing, the court may deem such failure as consent to

17   granting of the motion.

18

19

20   Dated: January 24, 2022                    ROPERS MAJESKI PC

21

22                                              By: /s/ Anna Novruzyan
                                                   LAWRENCE BORYS
23                                                 ANNA NOVRUZYAN
                                                Attorneys for Non-Debtor Defendants
24                                              and Movants DARIUSH ADLI, DREW
                                                SHERMAN, JOSHUA EICHENSTEIN,
25                                              and JONATHAN LANDIS

26

27

28

4861-4924-6983.5

**ROPERS MAJESKI**
A Professional Corporation
Los Angeles

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3      On November 10, 2021 (the "Petition Date"), Debtor Adli Law Group P.C.

4  (the "Debtor") filed its Chapter 11 Petition with this Court.  Pursuant to 11 U.S.C.

5  Section 105(a) (the "Bankruptcy Code"), this Motion seeks an order imposing a

6  stay under Bankruptcy Code Section 105, effectively extending the automatic stay

7  under 11 U.S.C. Section 362, in order to stay four state court cases and one

8  arbitration ("Litigation"), currently automatically stayed as to the Debtor, as to the

9  non-debtor defendants specified below (the "Non-Debtor Defendants").  Each of

10  the complaints in the Litigation matters, are attached as Exhibits 1-5 inclusive, to

11  the concurrently filed Declaration of Anna Novruzyan. Each of the Non-Debtor

12  Defendants were former and/or current lawyers employed by the Debtor law firm.

13  They are named solely due to their roles as employees of the Debtor. All of them

14  claim they are entitled to indemnification from the Debtor.

15      The Litigation matters relate to activities of the Debtor and Non-Debtor

16  Defendants, and events that occurred prior to the Petition Date. In each of the

17  matters, the Debtor, a law firm, and the certain individuals, are alleged to have

18  committed legal malpractice.  Each of the Non-Debtor Defendants deny the

19  allegations and claim they are entitled to indemnification by the Debtor.

20      The Debtor has insurance policies that provide coverage for both the Debtor

21  and the Non-Debtor Defendants.  The insurance policies are assets of the Debtor.

22  However, under the terms of these policies, both the Debtor and their employees,

23  are entitled to use the proceeds of the insurance policies to satisfy defense costs,

24  settlements, and judgments for claims covered by the policies.

25      Permitting the Litigation to proceed against the Non-Debtor Defendants will

26  cause the Debtor to suffer irreparable harm because (a) each Litigation is in

27  essence, an action against the Debtor itself, due to the Debtor's indemnification

28  requirements to the Non-Debtor Defendants.  In addition, the Non-Debtor

4861-4924-6983.5

MOTION FOR ORDER EXTENDING THE AUTOMATIC STAY TO CERTAIN LITIGATION AGAINST NON-
DEBTOR DEFENDANTS

Defendants, because of vicarious liability and respondeat superior, are entitled to payment of their legal expenses in connection with defending the Litigation, as well as indemnification from the Debtor for certain losses as a result of the Litigation; (b) to the extent insurance is used to fund the defense costs of the individual employees or there is a judgement against the employees and proceeds from insurance are recovered, the insurance otherwise available to the Debtor would be depleted; (c) there is a risk of collateral estoppel as to the Debtor, following an adverse ruling in each or any of the Litigation against the Non-Debtor Defendants while the Litigation is stayed as to the Debtor; and (d) the Debtor, rather than the Non-Debtor Defendants, would be burdened with any discovery that would need to be produced.

In truth, the allegations against the Non-Debtor Defendants acting as agents of the Debtor, make a continuation of the Litigation against the Non-Debtor Defendants an indirect violation of Section 362's automatic stay. Therefore, alternatively, the Motion seeks to recognize that the plaintiffs in the Litigation are violating the automatic stay by continuing litigation against the Non-Debtor Defendants.  This is a point that this Motion seeks to have the Court clarify so that the Litigation against the Debtor, through its employees/agents, ceases.

Therefore, a stay should be extended to the Non-Debtor Defendants, or alternatively the Court should view the continuation of the Litigation against the agents of the Debtor (and its insurance asset) as an indirect violation of the existing automatic stay.

## II.    **BACKGROUND**

The Chapter 11 was filed on November 10, 2021 as to the Debtor only. The Non-Debtor Defendants are not themselves in bankruptcy.

There are five actions involved in the Litigation as against the Debtor and the specified Non-Debtor Defendants:

The Litigation for which the Debtor seeks an extension of the Automatic Stay

- 4 -

MOTION FOR ORDER EXTENDING THE AUTOMATIC STAY TO CERTAIN LITIGATION AGAINST NON-DEBTOR DEFENDANTS

ROPERS MAJESKI

A Professional Corporation
Los Angeles

are:

1. *WBS, Inc. v. Adli Law Group, P.C. et al.*, Los Angeles County Superior Court Case No. 20STCV34381, filed on September 9, 2020. Plaintiffs WBS, Inc. and Robert Blotzer seek to impose joint and several liability for alleged professional negligence and breach of fiduciary duty against Debtor and Drew Sherman, a former employee of Debtor.

2. *Gary Topolewski v. Adli Law Group, P.C. et al.*, Los Angeles County Superior Court Case No. 20STCV32929, filed on August 27, 2020. Plaintiff in this action alleges one cause of action for legal malpractice against Debtor, Dariush Adli, the President and Chief Executive Officer of the Debtor, Joshua Eichenstein, a former employee of Debtor, and Drew Sherman.

3. *Gary Topolewski v. Adli Law Group, P.C. et al.*, Signature Resolution Arbitration Case ID YRZKG. This is the arbitration of Action No. 2 above. Respondents in this action are Debtor, Dariush Adli, Joshua Eichenstein, and Drew Sherman.

4. *Steven Hellings v. Andrea Ruth Bird, et al.*, San Diego County Superior Court Case No. 37-2020-00044516-CU-BT-CTL, filed on December 4, 2020. Plaintiffs Steven and Theresa Hellings allege causes of action for professional negligence and breach of fiduciary duty, among others, against Debtor and Jonathan Landis, a current employee of Debtor.

5. *Jonathan Betuel v. Dariush Ghaffar Adli*, *et al.*, Los Angeles Superior Court Case No. 21STCH02730, filed on January 22, 2021. Plaintiff alleges a legal malpractice cause of action against Debtor, Dariush Adli, and Drew Sherman.

Dariush Adli, Drew Sherman, Joshua Eichenstein, and Jonathan Landis are collectively referred to as the Non-Debtor Defendants.

As set forthe in the concurrently filed Declaration of Anna Novruzyan, and as reflected in Exhibits 1-5 attached thereto, each Litigation involves legal malpractice claims, where the underlying facts, and theories of liability and

ROPERS MAJESKI

A Professional Corporation
Los Angeles

1    damages are asserted against both the Debtor and Non-Debtor Defendants.  Under

2    California Labor Code Section 2802 each of the Non-Debtor Defendants is entitled

3    to indemnification from the Debtor.  Both the Non-Debtor Defendants and the

4    Debtor share the same malpractice insurance policies. Those policies are affording

5    both the Debtor and Non-Debtor Defendants a defense and coverage for a certain

6    amount of liability.  Both the defense and coverage are depleting and will deplete

7    further the insurance resources available to the Debtor.  The creditors of the Debtor

8    are at risk to the extent that there are judgments in excess of any coverage.  If the

9    case proceeds against the Non-Debtor Defendants, the liability and damages issues

10   determined as to the Non-Debtor Defendants could have a collateral estoppel, or

11   even a res judicata effect as to the Debtor. There is also a danger of inconsistent

12   rulings as between the disposition of the claims against the Debtor in the Chapter

13   11, and the disposition of the Litigation as to the Non-Debtor Defendants.

## III.    THE AUTOMATIC STAY SHOULD BE EXTENDED TO THE NON-DEBTOR DEFENDANTS

16          Upon the commencement of this Chapter 11 petition, the Automatic Stay

17   enjoins all entities from, among other things, "the commencement or continuation,

18   …of a judicial, administrative, or other actor or proceeding against the debtor that

19   was or could have been commenced before [the Petition Date]," and from "any act

20   to obtain possession of property of the estate" or "recover a claim against the debtor

21   that arose before the [Petition Date]." 11 U.S.C. § 362(a)(1), (3). One of the

22   purposes of the Automatic Stay is to allow the Debtor to focus its attention on its

23   restructuring without the distraction of having to defend against multiple litigations

24   in non-bankruptcy courts. *CAE Indus. Ltd. v. Aerospace Holding Co.*, 116 B.R. 31,

25   32 (S.D.N.Y 1990) ("the legislative history reveals that [Section 362] was intended

26   to 'permit the debtor to organize his or her affairs without creditor harassment and

27   to allow orderly resolution of all claims.'"). This is in part to relieve the Debtor of

28   the burden of litigating in multiple forums while it focuses on maximizing value for

4861-4924-6983.5

ROPERS MAJESKI
A Professional Corporation
Los Angeles

its creditors as a whole. *In re Colin*, 35 B.R. 904, 907 (Bankr. S.D.N.Y. 1983) ("The design of subsection 362(a)(1) is, in part, to relieve the debtor from the burdens of multi-forum litigation.").

Although the Automatic Stay does not generally extend to non-debtors, in certain recognized situations, to preserve the aforementioned protections of the Automatic Stay, it is necessary, effectively through Section 105, to extend the Automatic Stay to third parties. The plaintiffs should not be allowed to do an end run around the automatic stay by effectively suing the Debtor through its employees.

With regard to the Litigation, the Debtor and its estate also could be irreparably damaged, and the purposes of the Bankruptcy Code will in any event, be frustrated, if the Automatic Stay is not extended to stay the Litigation as to the Non-Debtor Defendants.

**A.    *The Prosecution of the Non-Debtor Defendants Affects the Debtor Estate and Is Really a Violation of the Automatic Stay as an Indirect Action Against the Debtor through Non-Debtor Defendants Acting as Agents***

Judgments against Non-Debtor Defendants in the Litigation could affect property of the estate because, by virtue of the nature of the claims as alleged by the respective plaintiffs/claimant in the Litigation, the Debtor is obligated to indemnify the Non-Debtor Defendants for certain liabilities they may incur in connection with the Litigation as well as payment of expenses in connection with the defense of the Litigation.  The Litigation all share as a common trait the fact that the Non-Debtor Defendants have an identity of interest with the Debtor, to the extent they were merely the agents through whom the respective Debtor entity acted.  Indeed, there appear to be no allegations that any of the Non-Debtor Defendants was acting outside the scope of his employment. Therefore, naming the individuals is effectively a "catch-all" approach to suing the particular Debtor entity, solely for

4861-4924-6983.5

ROPERS
M A J E S K I

A Professional Corporation
Los Angeles

1    alleged Debtor actions.

2    Courts have extended the Automatic Stay pursuant to Bankruptcy Code

3    Section 362(a)(1) "where an action against one party is essentially an action against

4    the bankruptcy debtor, as in the case where a third-party is entitled to

5    indemnification by the debtor for any judgment taken against it." *In re W.R. Grace*

6    *& Co.*, 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004); *A.H. Robins Co. v.*

7    *Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (extension of Automatic Stay to non-

8    debtors, who were employees of the debtor, appropriate where "there is such

9    identity between the debtor and the third-party defendant" that a finding or

10    "judgment against the third-party defendant will in effect be a judgment or finding

11    against the debtor"); *see also Calpine Corp. v. Nev. Power Co. (In re Calpine. Inc.)*,

12    354 B.R. 45, 50 (Bankr. S.D.N.Y. 2006); *In re United Health*, 210 B.R. 228, 232

13    (S.D.N.Y. 1997) (stay extended to debtor's surety where third party's claims against

14    surety were entirely contingent on debtor's liability to third party, where allowing

15    litigation to proceed against surety would result in resolution of issues regarding

16    debtor's liability and defenses that might have collateral estoppel, stare decisis or

17    other prejudicial effect on debtor, where surety would have indemnity claim for any

18    judgment entered against it, and where allowing the other litigation to proceed

19    would distract key personnel from debtor's reorganization efforts). Here, the

20    Automatic Stay should be extended because the Non-Debtor Defendants are

21    entitled to indemnification from Debtor, as employer of the Non-Debtor Defendants

22    in the legal malpractice actions, and because a recovery against the insurance policy

23    covering the Non-Debtor Defendants would also reduce future coverage available

24    to the Debtor.

25    Any judgment against a Non-Debtor Defendant, including former employees

26    in the Litigation, would almost certainly result in an indemnification claim against

27    the Debtor's estates.  Moreover, the Debtor is compelled to pay the expenses in

28    connection with the Litigation on behalf of the Non-Debtor Defendants. Thus, any

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

- 8 -

1  defense costs, judgments, or settlements that Non-Debtor Defendants incur in

2  defending against the Litigation are really costs and expenses to the Debtor and its

3  estate. Moreover, recoveries from the Debtor's insurance policies covering the

4  Non-Debtor Defendants, which similarly provide coverage to the Debtor, will

5  reduce the amount of coverage available to the Debtor - again transforming the

6  Non-Debtor Defendants' costs of the Litigation into costs and expenses of the

7  Debtor.

8      Indeed, as noted, the acts at issue of the Non-Debtor Defendants are

9  inextricably also the acts of the Debtor such that any continuation of any of the

10  Litigation against the Non-Debtor Defendants necessarily violates the automatic

11  stay itself.  A formal extension of the stay however recognizes this reality.

12  **B.      The Prosecution of the Non-Debtor Defendants Might Have**

13  **Collateral Estoppel Effects on Debtor**

14      Additionally, the Debtor could be subject to substantial collateral estoppel

15  risks (due to respondent superior, agency, or similar allegations), which will

16  effectively compel the Debtor to actively participate in the Litigation with

17  substantial cost to the Debtor and distraction of its management.

18      The statutory provisions of Bankruptcy Code Sections 362 and 105(a)

19  preclude the prosecution of litigation against a non-debtor where a finding of

20  liability against the non-debtor, (particularly here were the Debtor can only act

21  through its agent lawyers), effectively could be imputed to the debtor, to the

22  detriment of the estate, by reason of collateral estoppel. Under the doctrine of

23  collateral estoppel, when an issue of ultimate fact has been determined by a final

24  judgment, such issue cannot be relitigated by the same party or parties in any future

25  lawsuit. *See Schiro v. Farley*, 510 U.S. 222, 232 (1994); *Lytle v. Household Mfg.,*

26  *Inc.*, 494 U.S. 545, 553 (1990) ("collateral estoppel protects parties form multiple

27  lawsuits and the possibility of inconsistent decisions, and it conserves judicial

28  resources."). "Courts apply § 105 of the Bankruptcy Code to enjoin litigation

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

4861-4924-6983.5

against non-debtors when an adverse judgment in that litigation will collaterally estop the debtor in subsequent litigation." *Barney's Inc. v. Isetan Co. (In re Barney's. Inc.)*, 200 B.R. 527, 531 (Bankr. S.D.N.Y. 1998).

In the case at bar, allowing the Litigation to go forward presents substantial risk that the Debtor may be collaterally estopped from relitigating the issues adjudicated in the Litigation for which Debtor is a named co-defendant. Moreover, it is possible that certain findings, testimony, and/or statements made in the Litigation will be used against the Debtor in subsequent proceedings. *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) (recognizing the risk that a witness "may be confronted with his prior testimony under oath in a future proceeding directly involving [the debtor], whether or not [the debtor] was a party to the record on which the initial testimony was taken."). The *Johns-Manville* court went on to note that collateral estoppel is even a concern when the debtor is not a co-defendant because an admission by an agent of the debtor in a proceeding, whether or not the debtor is a party, "stands for all time." *Id.*  It would defeat the purpose of the Automatic Stay if the Litigation were not stayed as against the Non-Debtor Defendants because the Debtor, despite the Automatic Stay applying to the Litigation as against Debtor, would be in a position where it would have to become actively involved in the Litigation and expend estate resources in the process, or risk being bound by unfavorable judgments, findings, testimony, and/or statements. Either result would frustrate the purposes of the Automatic Stay and adversely impact the Debtor's efforts to maximize value for creditors in this Chapter 11 petition.

### C.    *The Prosecution of the Non-Debtor Defendants Necessarily Involves Debtor Resources*

Furthermore, the continued prosecution of the claims against the Non-Debtor Defendants in the Litigation will require the Debtor and its limited personnel to expend time and resources participating in the litigation notwithstanding the fact

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

4861-4924-6983.5

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1   that such Litigation may be stayed as against the Debtor, to the detriment of the

2   Debtor's efforts to maximize value for its creditors.

3       "[N]umerous bankruptcy courts have ...stay[ed] the prosecution of actions

4   against non-debtor defendants who were officers and/or directors of the debtor

5   defendants." *In re Am. Film Techs., Inc.,* 175 B.R. 847, 850 (Bankr. D. Del. 1994).

6   The Automatic Stay will be extended to non-debtor third parties "where stay

7   protection is essential to the debtor's efforts" in their bankruptcy cases. *McCartney*

8   *v. Integra Nat'l Bank North*, 106 F.3d 506, 510 (3d Cir. 1997). This is "illustrated

9   by cases where the debtor's key personnel are diverted from the reorganization by

10  demands of discovery related to the third-party suit." *El Puerto de Liverpool S.A.*

11  *de C.V. v. Servi Mundo Llantero, U.S.A., Inc. (In re Kmart Corp.)*, 285 B.R. 679,

12  689 (N.D. Ill. 2002); *see also Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere*

13  *Clubs, Inc.)*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (action against debtor

14  airline's codefendants would also be enjoined, as pursuit of action would involve,

15  burden and directly impact airline and would likely prejudice airline's future

16  defense against identical claims based upon identical facts).

17      The Litigation should be stayed with respect to the Non-Debtor Defendants

18  because continued prosecution of the Litigation will require key personnel to divert

19  attention from their efforts to maximize value for creditors during the wind-down of

20  this Chapter 11 petition.  The Debtor has limited staffing resources to handle

21  administrative and managerial tasks for the Debtor. Any discovery or other

22  information sought from the Debtor will necessarily distract attention from efforts

23  to wind-down the estates in a manner that maximizes value for all creditors. In *In re*

24  *Ionosphere Clubs, Inc.*, the court extended the Automatic Stay to a debtor's

25  chairman based on the fact that he was essential to the debtor's Chapter 11 case,

26  explaining that:

27

28          [s]hould the [creditor's lawsuit] be allowed to proceed against

4861-4924-6983.5

parties key to the reorganization [i.e., the debtor's chairman],
substantial amounts of time will be diverted, to the obvious
detriment of [the debtor's] reorganization. 'The massive drain
on [key officers'] time and energy at this crucial hour of plan
formulation in either defending themselves or in responding to
discovery requests could frustrate if not doom their vital efforts
at formulating a fair and equitable plan of reorganization'…
Because the Chairman is a central actor in [the debtor's]
rehabilitation, 'he must be free …to devote all [his] efforts to
the operation of the business and the formulation of a plan.' *In
re Ionosphere Clubs, Inc.*, 111 B.R. at 435.

Dariush Adli, Debtor's President and CEO, is a named defendant in three of
the five actions. The few parties who remain employed by the Debtor are key to the
successful outcome of this petition.  Further, the few remaining employees are the
same people that would be called upon to decide litigation tactics/strategy for the
Litigation generally and respond to any discovery requests propounded upon the
Non-Debtor Defendants.

Further, even with the Litigation stayed against the Debtor itself, the Debtor
necessarily will be required to be involved in all stages of the litigation pertaining
to the Litigation, including discovery and witness preparation. This will obviate the
intent and purpose of the Automatic Stay and have an adverse effect on the
Debtor's efforts to maximize value for creditors in this Chapter 11 to the detriment
and prejudice of all other parties in interest.

## IV.    <u>CONCLUSION</u>

Debtor respectfully requests that this Court enter an Order pursuant to 11
U.S.C. Section 105, clarifying that the Automatic Stay applies here to the moving
employees, or alternatively extending the Automatic Stay to the Non-Debtor
Defendants in the Litigation.

4861-4924-6983.5

ROPERS
MAJESKI

A Professional Corporation
Los Angeles

1    Dated: January 24, 2022                    ROPERS MAJESKI PC

2

3                                              By:/s/ Anna Novruzyan
                                                  LAWRENCE BORYS
4                                                 ANNA NOVRUZYAN
                                              Attorneys for Non-Debtor Defendants
5                                             and Movants DARIUSH ADLI, DREW
                                              SHERMAN, JOSHUA EICHENSTEIN,
6                                             and JONATHAN LANDIS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4861-4924-6983.5

- 13 -

MOTION FOR ORDER EXTENDING THE AUTOMATIC STAY TO CERTAIN LITIGATION AGAINST NON-
DEBTOR DEFENDANTS

# DECLARATION OF ANNA NOVRUZYAN

1.    I am an attorney licensed to practice law in California and an associate at Ropers Majeski, P.C. I am counsel of record for the following individuals in the following actions:

    a.    Counsel for Defendant Drew Sherman in *WBS, Inc. v. Adli Law Group, P.C. et al.*, Los Angeles County Superior Court Case No. 20STCV34381, filed on September 9, 2020.

    b.    Counsel for Defendants Dariush Adli, Joshua Eichenstein, and Drew Sherman in *Gary Topolewski v. Adli Law Group, P.C. et al.*, Los Angeles County Superior Court Case No. 20STCV32929, filed on August 27, 2020.

    c.    Counsel for Respondents Dariush Adli, Joshua Eichenstein, and Drew Sherman in *Gary Topolewski v. Adli Law Group, P.C. et al.*, Signature Resolution Arbitration Case ID YRZKG.

    d.    Counsel for Defendant Jonathan Landis in *Steven Hellings v. Andrea Ruth Bird, et al.*, San Diego County Superior Court Case No. 37-2020-00044516-CU-BT-CTL, filed on December 4, 2020.

    e.    Counsel for Defendants Dariush Adli and Drew Sherman in *Jonathan Betuel v. Dariush Ghaffar Adli*, *et al.*, Los Angeles Superior Court Case No. 21STCH02730, filed on January 22, 2021.

2.    I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto. I make this declaration in support of Movants' Motion for an Order Extending the Automatic Stay, or Alternatively, Finding Continuing Litigation as a Violation of the Stay.

3.    Attached as **Exhibit "1"** is a true and correct copy of Plaintiffs' Complaint in *WBS, Inc. v. Adli Law Group, P.C. et al.*, Los Angeles County Superior Court Case No. 20STCV34381, filed on September 9, 2020.

4861-4924-6983.5

4.      Attached as **Exhibit "2"** is a true and correct copy of Plaintiff's Complaint in *Gary Topolewski v. Adli Law Group, P.C. et al.*, Los Angeles County Superior Court Case No. 20STCV32929, filed on August 27, 2020.

5.      Attached as **Exhibit "3"** is a true and correct copy of Claimant's Claim for Damages in *Gary Topolewski v. Adli Law Group, P.C. et al.*, Signature Resolution Arbitration Case ID YRZKG.

6.      Attached as **Exhibit "4"** is a true and correct copy of Plaintiffs' First Amended Complaint in *Steven Hellings v. Andrea Ruth Bird, et al.*, San Diego County Superior Court Case No. 37-2020-00044516-CU-BT-CTL, filed on May 4, 2021.

7.      Attached as **Exhibit "5"** is a true and correct copy of Plaintiff's Complaint in *Jonathan Betuel v. Dariush Ghaffar Adli*, *et al.*, Los Angeles Superior Court Case No. 21STCH02730, filed on January 22, 2021.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is executed on 24th day of January, 2022, at Los Angeles, California.


_____
                    Anna Novruzyan

4861-4924-6983.5

MOTION FOR ORDER EXTENDING THE AUTOMATIC STAY TO CERTAIN LITIGATION AGAINST NON-DEBTOR DEFENDANTS

# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 09/09/2020 02:53 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez, Deputy Clerk
20STCV34381

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: David Cowan

1  Grant A. Carlson, Esq. (SBN 155933)
   Friedman, Enriquez & Carlson, LLP
2  401 Wilshire Blvd., 12th Floor
   Santa Monica, California 90401
3  Telephone (310) 273-0777
   Telefax (310) 273-1115
4
   Attorneys for Plaintiff WBS, Inc.
5
   Eric Bjorgum, Esq. (SBN 198392)
6  Karish & Bjorgum, PC
   119 E. Union St., Suite B
7  Pasadena, CA 91103
8  Attorneys for Plaintiff Robert J. Blotzer
9
10            SUPERIOR COURT OF THE STATE OF CALIFORNIA
11                      COUNTY OF LOS ANGELES
12
13  WBS, INC., a California corporation; )    Case No.   20STCV34381
    ROBERT BLOTZER, an individual        )
14                                       )    COMPLAINT FOR LEGAL MALPRACTICE
                  Plaintiffs,            )
15                                       )    (1) PROFESSIONAL NEGLIGENCE
         vs.                             )    (2) BREACH OF CONTRACT
16                                       )    (3) BREACH OF FIDUCIARY DUTY
    ADLI LAW GROUP, P.C., a California )      (4) EQUITABLE INDEMNITY
17  corporation;  DREW  SHERMAN,  an )
    individual;  and  DOES  1  through  100, )
18  inclusive                            )
                                         )    JURY TRIAL DEMANDED
19                Defendants.            )
20  ─────────────────────────────────────
21                            I.
22                      **THE PARTIES**
23       Plaintiffs allege:
24       1.    Plaintiff WBS, Inc. ("WBS") is a California corporation located in the County of Los
25  Angeles.
26       2.    Plaintiff Robert Blotzer ("Blotzer") is an individual and a resident of Los Angeles
27  County, California.
28       3.    Defendant Drew Sherman ("Sherman" or "defendant") is an individual and a resident

                              -1-

───────────────────────────────────────────────
              COMPLAINT FOR LEGAL MALPRACTICE

1  of Los Angeles County.

2       4.       Defendant Adli Law Group, P.C. ("Adli" or "Adli Law") is a California corporation,

3  located in Los Angeles County, California.

4       5.       Plaintiffs are ignorant of the true names and capacities of defendants Does 1 through

5  100, who are thus sued herein by such fictitious names. Plaintiffs are informed and believe, and on

6  such basis alleges, that the fictitiously-named defendants are in some manner liable for the matters

7  alleged herein, and when the fictitiously-named defendants' names, capacities and responsibility

8  have been ascertained, Plaintiffs will seek leave to amend this complaint to allege the same.

9                                    II.

10                          **SUMMARY OF ARGUMENT**

11      6.       This is a legal malpractice claim against Adli Law and Drew Sherman, counsel for

12  WBS, Inc., a holding company for the rock band "RATT." Plaintiff Robert Blotzer is the drummer

13  of RATT who hired Adli and Sherman to bring lawsuits on behalf of WBS against every other

14  member of "RATT" arguing that they are interfering with WBS's rights to perform as "RATT."

15  Prior thereto, it was undisputed that WBS owned all copyright and trademark rights to the band.

16  Through countless errors in judgment, professional negligence, failures to research law and facts,

17  and meritless positions taken by Adli and Sherman, they lost all intellectual property rights of WBS

18  and subjected the company to hundreds of thousands of dollars in judgments for fees, costs and

19  counter-claims of infringement.

20                                   III.

21                          **BACKGROUND FACTS**

22  **A.    Adli/Sherman's Illegal Takeover of WBS**

23      7.       WBS is a holding company for the rock band "RATT." Warren DeMartini is the lead

24  guitar player. Robert Blotzer is the drummer. They are the only shareholders. The lead singer of

25  RATT is Stephen Pearcy ("Pearcy"), and the bass player is Juan Croucier ("Croucier"). They do

26  not own any shares of WBS. As of September 2015, every member of the band understood that

27  WBS owned the trademark rights to "RATT."

28      8.       Blotzer retained Adli and Sherman to help with his rights in RATT so that he could

-2-

1  make a living. Adli and Sherman advised him to demote DeMartini as an officer and convert him

2  to a non-voting shareholder in RATT so Blotzer could take over RATT. He also advised Blotzer to

3  prevent Pearcy and Croucier from competing with their own "RATT tribute bands." Adli and

4  Sherman disregarded numerous corporate requirements in the takeover attempt, including failure to

5  provide proper notice to Demartini, appointing Sherman to the Board of Directors (a massive conflict

6  of interest) and voting for the takeover at an illegal shareholders and Directors meeting. DeMartini

7  filed an action seeking to undo those unauthorized acts which threatened to seriously damage the

8  band and its name. Attached as Exhibit "A" is a true and correct copy of the complaint. Sherman

9  and Adli also entered into a fee agreement whereby they would be paid a percentage of gross receipts

10  on all live concerts.

11  **B.**    **After the Illegal Takeover, Adli/Sherman Sued Croucier for Infringement**

12      9.    Following the takeover, Adli/Sherman filed a Complaint on behalf of WBS alleging

13  trademark infringement and related causes of action against Croucier. They alleged Croucier's

14  "RATT tribute band" was illegally using "RATT" trademarks owned by WBS. Adli/Sherman were

15  trying to clear the way for Blotzer's own "RATT tribute band" to make more money by promoting

16  themselves as the "real RATT" and preventing competition from Croucier's tribute band and any

17  others. DeMartini was always against this action, as he was trying to get the whole lineup back

18  together. The action by DeMartini was eventually settled and the illegal takeover was reversed, but

19  not before Adli/Sherman caused millions in damage to WBS by repeated acts of professional

20  negligence. A true and correct copy of the Croucier complaint filed by Adli/Sherman is attached as

21  Exhibit "B."

22  **C.**    **Adli/Sherman Not Only Lost the Claim Against Croucier, but They Lost Any And All**

23      **Trademark Rights of WBS in "RATT" to the "RATT Partnership," a Predecessor to**

24      **WBS**

25      10.    In a strange and perhaps karmic twist, Adli/Sherman not only failed in their crusade

26  against Croucier, but they lost WBS's interest altogether in "RATT" trademark rights. Again, this

27  is while Demartini was trying to prevent all of these improvident actions, and with Sherman

28  appointing himself to WBS's board of Directors to favor one shareholder over the other while

-3-

1  claiming to act as "corporate counsel." The Croucier litigation was summarily adjudicated as

2  follows:

3  > **A threshold issue in this matter is whether WBS has an ownership interest in
   **the RATT trademarks.** *See, Rearden LLC v. Rearden Commerce, Inc.*, 683 F. 3d

4  > 1190, 1202-3 (9th Cir. 2012) . . . The evidence is undisputed that Croucier was a
   > founding partner of the RATT Partnership. No reasonable factfinder could conclude

5  > that Croucier was expelled from the Partnership. It is undisputed that no partner in
   > the RATT Partnership could transfer or assign any part of his interest in the RATT

6  > Partnership without the unanimous consent of the other partners. Croucier has never
   > consented to the assignment of the RATT marks to WBS or to anyone else.

7  > Accordingly, there is no triable issue with respect to the validity of the assignment
   > of the RATT marks to WBS. **Because the assignment was invalid, WBS cannot**

8  > **make the threshold showing that it has an ownership interest in the marks, and**
   > **its trademark claims fail. Summary Judgment is therefore warranted in favor**

9  > **of Croucier and against WBS.** (Emphasis added)

10  A true and correct copy of the ruling is attached as Exhibit "C."

11       11.    Sherman submitted almost no evidence whatsoever, including failing to seek evidence

12  of any kind from Demartini. Sherman himself acknowledged his evidentiary absence long after

13  losing all trademark interests of WBS. In fact, Sherman sent an email to DeMartini's counsel

14  (attached as Exhibit "D") stating the following:

15  > "I wanted to run something by you to take to your client. Given that your client has
   > been ousted from the RATT Partnership and Juan and Pearcy continue to go out and

16  > perform, disparaging and damaging the brand, I think there is a way to unravel
   > everything and put our clients back in the ownership position of the trademarks, stop

17  > the RATT Partnership, and have the RATT Partnership actually pay WBS money.
   > **But the lynch pin to all that is wholly contingent on your client. Warren will**

18  > **have to sign a sworn statement or testify that he did consent/vote for Croucier's**
   > **expulsion back in 1997.** He does that and I can make a motion to set aside the

19  > summary judgment ruling in WBS v. Croucier based on new evidence that has been
   > the central focus of the district court matter and the appeal. I am sure Warren is not

20  > thrilled about being out of the brand he helped create 30 years ago and watching
   > those morons just crap the bed with it." (Emphasis added)

21

22       12.    At no time did Adli/Sherman seek any discovery from DeMartini to oppose the

23  summary judgment. Likewise, they never indicated even to Blotzer (let alone DeMartini) that WBS

24  was in any danger of losing rights. Sherman/Adli essentially opposed the motion without even

25  attempting to obtain the evidence needed to prevail. Moreover, they missed important defenses such

26  as abandonment or acquiescence because the trademark ended up in the hands of the RATT

27  Partnership, even though the RATT Partnership had not used the trademark in over two decades; all

28  members of the RATT Partnership were aware of that fact. Further, Sherman and Adli failed to rely

-4-

COMPLAINT FOR LEGAL MALPRACTICE

1   on the testimony of an attorney who had been involved with the band during a time when Croucier

2   was clearly leaving the band; this testimony would have shown that Croucier left the partnership and

3   had no rights to the trademark. Nevertheless, the issue of WBS's right to perform as "RATT" was

4   fully and finally resolved against WBS. WBS now has no right to perform as "RATT" due to the

5   unapproved actions of the defendants in violation of both ethics and minimal competency required

6   of attorneys in the State of California.

7        13.    It bears repeating that not a single member of RATT ever challenged WBS'

8   ownership of RATT trademarks in 20 years. During that time, hundreds of RATT shows were

9   performed by all band members of RATT. For decades no one ever challenged WBS's ownership,

10  until Sherman/Adli came in, brought suit against each of the other members of the band and lost all

11  rights for WBS. Moreover, an affirmation challenge to WBS's ownership would almost certainly

12  be defaulted by a "waiver" defense. The trademark is worth millions.

13  **D.    Despite Losing All Rights of WBS to "RATT," Adli/Sherman Then Sued the RATT**

14  **Partnership for Shows Done After the Croucier Summary Judgment**

15       14.    Once the trademarks were lost to the RATT Partnership, a predecessor entity to WBS,

16  Croucier, Pearcy and Demartini started doing RATT shows under the "RATT Partnership." All of

17  these shows were performed after the Croucier Summary Judgment. Obviously, these shows were

18  done explicitly based on the Federal Court ruling that "RATT Partnership" owned all rights to

19  "RATT."

20       15.    In another example of quantum incompetence, Adli/Sherman tried to re-ligate the

21  Federal Court ruling by suing the RATT Partnership in a separate action for unfair competition. They

22  made the following claims:

23       56.    The Partnership's acts of trademark infringement, false designation
         of origin and palming off, complained of herein constitute unfair competition with
24       WBS under the statutory laws of the State of California, particularly California
         Business & Professions Code § 17200 et seq.
25
         57.    WBS is informed and believes, and thereon alleges, that The
26       Partnership have derived and received, and will continue to derive and received
         property that would otherwise have been earned by WBS. By their actions, The
27       Partnership have injured and violated the rights of WBS and have irreparably injured
         WBS, and such irreparable injury will continue unless The Partnership are enjoined
28       by this Court.

-5-

COMPLAINT FOR LEGAL MALPRACTICE

1   A true and correct copy of that complaint is attached as Exhibit "E."

2      16.   Why Adli/Sherman continued to pursue claims they already lost is a mystery, but they

3 chose to do so with no basis whatsoever. Re-litigating losses is part of Adli/Sherman's normal

4 course of action. They move to reconsider every loss, regardless of the lack of any basis for the

5 motions, they file collateral actions on the same grounds ignoring res judicata and collateral estoppel.

6 It is a pattern and practice of professional negligence, driving up fees and pursuing losing causes to

7 continue to keep billing. During the entire time, Adli/Sherman continued to tell Blotzer that the case

8 was strong and on solid footing without concern for the danger to which they continued to subject

9 WBS. Moreover, Adli/Sherman also told Blotzer to keep doing shows with his own tribute band as

10 "RATT," failing to provide Blotzer with any information that he could be subjecting himself and

11 WBS to more jeopardy.

12 **E.   Adli/Sherman Also Filed Another Complaint Against Warren DeMartini Individually,**

13     **Claiming He Was "Personally" Responsible For Damages Due to Alleged Unfair**

14     **Competition by the "RATT Partnership" - - It was Summarily adjudicated against**

15     **WBS based on Collateral Estoppel.**

16      17.   Adli/Sherman then doubled down yet again, and filed an new claim to recover

17 damages against DeMartini for the same shows for which he sued the "RATT Partnership." Again,

18 this is long after losing all WBS trademark rights and having no basis to continue the losing crusade.

19 A true and correct copy of the claim against DeMartini is attached as Exhibit "F." Blotzer's

20 fiduciary duty and unfair competition causes of action both are premised on the notion that the

21 Croucier Summary Judgment either never happened or that it may be re-litigated in a new action,

22 even though the Croucier Summary Judgment was still on appeal. The allegations in Blotzer's

23 Cross-Complaint are as follows:

24                    **Breach of Fiduciary Duty Allegations**

25      21.   WBS is informed and believes, and thereon alleges, that in or about
late November or early December 2016, DeMartini, Pearcy, and Croucier met and

26   agreed to form a band called RATT, to have that band perform RATT's music, and
to actively compete against and damage the business of WBS.

27

28   \ \ \

COMPLAINT FOR LEGAL MALPRACTICE

28.    WBS has had at least three (3) contracts (live music performances in consideration for compensation) cancelled thus far, specifically because of DeMartini's competitive business with the new band.

29.    WBS has found that other promoters and venues are withdrawing offers of compensation for live performances because DeMartini's competitive business.

31.    WBS is informed and believes, and thereon alleges, that DeMartini is knowingly engaging in a business which actively competes with WBS and is diverting revenues from WBS to the competitive business from which DeMartini earns revenues.

### Unfair Competition Allegations

46.    WBS is informed and believes, and thereon alleges, that DeMartini's acts of breaching his fiduciary duty to WBS as complained of herein constitutes unfair competition with WBS under the statutory laws of the State of California, particularly California Business & Professions Code § 17200 et seq.

47.    WBS is informed and believes, and thereon alleges, that, by his actions, DeMartini has injured and violated the rights of WBS and has irreparably injured WBS, and such irreparable injury will continue unless Defendants are enjoined by this Court.

18.    Once again, these causes of action both allege that WBS has been harmed because the RATT Partnership performed shows (as "RATT") that interfere with WBS' ability to perform shows as RATT. However, *the Croucier Summary Judgment explicitly found that WBS has no ownership of any RATT trademarks*. Adli/Sherman were trying yet again to re-litigate these issues. This is a bad faith tactic done over and over, blatantly disregarding the required basis for reconsideration. Not surprisingly, it also was summarily adjudicated on grounds of collateral estoppel.

**F.    Adli/Sherman Lost the Unfair Competition Claim Against RATT Partnership For the Same Reason as in the Croucier Litigation -- WBS Owns No Trademark Rights to "RATT"**

19.    Not surprisingly, Judge Pregerson rejected Blotzer's attempt to re-litigate the Croucier Summary Judgment against the "RATT Partnership." The Federal Court ordered:

"This is the third time in a series of suits before this Court regarding the ownership of various trademarks related to the rock band 'RATT.'" . . . "The RATT Partnership contends that Blotzer and WBS already litigated, and lost, the issue of trademark ownership in the prior <u>Croucier</u> and <u>Pearcy</u> actions, and that Defendants are therefore barred from contesting that issue again in this action." . . . "The answer is yes.

-7-

1  Although Defendants put forth a new, common law-based theory about why WBS
   owns the RATT marks, the question whether WBS or the RATT Partnership owns
2  the marks was already litigated, and resolved, in Croucier and Pearcy."

3  A true and correct copy of the ruling is attached as Exhibit "G."

4      20.    Despite launching every absurd theory imaginable to continue to assert that WBS

5  owns the RATT trademark interests, Blotzer got the same result for the third time.

6  **G.    The Ninth Circuit Court of Appeal Put the Final Nail in the Coffin - - WBS Owns No**

7  **Protectible Interest in "RATT" Because of Adli/Sherman**

8      21.    The Ninth Circuit Court of Appeal shut the door for good on Adli and Sherman's

9  charade:

10     WBS contends that the district court erred by granting summary judgment to
       Croucier on the ground that WBS does not own the RATT trademarks. The district
11     court did not err. WBS admits in this litigation that Warren DeMartini was a partner
       in the RATT partnership in 1997, when Croucier was purportedly expelled. The
12     partnership agreement requires all current partners to unanimously consent to expel
       a partner. WBS has not put forth any evidence that DeMartini voted to expel
13     Croucier. The district court therefore correctly held that "no reasonable factfinder
       could conclude that Croucier was ever expelled from the Partnership." And because
14     Croucier was not expelled from the partnership, his vote was required to transfer
       rights in the RATT trademarks. Because Croucier did not vote to transfer the RATT
15     trademarks to WBS, that assignment is invalid. WBS has no rights in the RATT
       trademarks; summary judgment to Croucier was proper.
16
   A true and correct copy of the order is attached as Exhibit "H.
17

18 **H.    Adli/Sherman Subjected WBS to multiple judgments for Hundreds of Thousands of**

   **Dollars for Bad Faith Litigation tactics**
19
       22.    In the WBS v. Croucier action, Judge pregerson issued two orders for fees and costs,
20
   one in the amount of $232,927.50 and a second in the amount of $70,789.50. True and correct
21
   copies of the fee awards are attached as Exhibits "I" and "J." These orders were based on the specific
22
   finding that Adli/Sherman engaged in bad faith litigation tactics. The Court stated:
23
       "This Court has notwithstanding its initial denial of attorney fees, repeatedly
24     highlighted plaintiff's improper litigation conduct. . . . This trademark case stands out
       both the substantive weakness of the plaintiff's litigation position and the
25     unreasonable manner in which the case was litigated." (Id., Ex. "I" pages 4-6).

26 \ \ \

27 \ \ \

28 \ \ \

-8-

COMPLAINT FOR LEGAL MALPRACTICE

I.    <u>Adli/Sherman Subjected WBS to Liability for trademark Infringement/Counterfeiting</u>
<u>for Advising Blotzer to continue to do shows as "RATT" for at least a Year after losing</u>
<u>the Croucier Summary Judgment</u>

23.    Currently, WBS is without assets and still facing a default judgment for Blotzer continuing to do shows as RATT based on the advice of Adli/Sherman after losing Summary Judgment in the Croucier case. Blotzer did shows as RATT for an entire year, resulting in claims by the RATT partnership against WBS for both trademark infringement and counterfeiting. Moreover, Adli/Sherman were continuing to advise Blotzer to do shows for one reason: Adli/Sherman were paid their fees and costs from the revenue earned in the illegal shows. Once again, Adli/Sherman engaged in a massive conflict of interest intended solely for their own benefit. The default papers have been submitted by the RATT partnership requesting $2 million in statutory penalties for intentional infringement and counterfeiting.

**FIRST CAUSE OF ACTION**

**(For Professional Negligence [Legal Malpractice] Against All Defendants)**

24.    Plaintiffs reallege and incorporate Paragraphs 1 through 23 above, as though fully set forth herein.

25.    In September 2015, Plaintiffs retained Adli/Sherman to provide legal services to in connection with the matters set forth in paragraphs 6-23, thereby establishing an attorney-client relationship between the parties.

26.    As Plaintiffs' counsel, Adli/Sherman owed a duty of care to Plaintiffs, requiring them to exercise the knowledge, skill and ability ordinarily exercised by other similarly situated lawyers. Contrary to that duty, defendants were professionally negligent in the following ways:

(a)    Failing to comply with California Law in the WBS takeover.

(b)    Losing all trademark rights of WBS without informing the client of the risk and further failing to submit competent evidence.

(c)    Engaging in numerous conflicts of interest, including appointing Sherman to the WBS Board of Directors, failing to follow basic corporate notice requirements and choosing between shareholders in matters where they had serious conflicts.

-9-

1          (d)     Advising Blotzer to continue to infringe RATT trademarks and potentially

2 engaging in counterfeiting.

3          (e)     Advising Blotzer/WBS to do illegal shows after the Croucier Summary

4 Judgment and taking fees/costs from the illegal shows and failing to inform the clients of any of the

5 risks.

6          (f)     Bringing actions without legal justification, subjecting WBS and Blotzer to

7 adverse fees/costs awards in excess of $300,000 for bad faith litigation tactics.

8          (g)     Failing to competently bring and oppose numerous motions, including losing

9 virtually every action Adli/Sherman brought on summary judgment, including losing all WBS' rights

10 to "RATT" and failing to submit competent evidence.

11      27.    The negligent acts, omissions and blatant conflicts of interest of Adli/Sherman were

12 below the standard of care for comparable attorneys who practice in this community, especially

13 attorneys, like Adli/Sherman, who allegedly specialize in handling complex business trials.

14 Defendants' professional's negligence was a substantial factor in Plaintiffs' multiple losses in the

15 Demartini action, the Croucier action and the RATT Partnership action. The proper handling of

16 these actions would have prevented the numerous losses and judgments against WBS and Blotzer,

17 which are continuing to accrue.

18      28.    As a direct and proximate result of Defendants' incompetence and professional

19 negligence, Plaintiffs have suffered compensatory damages in an amount to be proven at trial, but

20 estimated to be in excess of $3 million. Defendants also committed fraud, oppression and malice

21 entitling plaintiffs to punitive damages.

22                          **SECOND CAUSE OF ACTION**

23               **(For Breach of Contract Against All Defendants)**

24      29.    Plaintiffs reallege and incorporate Paragraphs 1 through 23 above, as though fully

25 set forth herein.

26      30.    In September 2015, Plaintiffs retained Adli/Sherman to provide legal services to in

27 connection with the matters set forth in paragraphs 6-23, thereby establishing an attorney-client

28 relationship between the parties. The agreement implies a requirement of competent service,

-10-

1  honesty, loyalty.

2      31.     Defendants breached the agreement, both directly and, implied as follows:

3          (a)     Failing to comply with California Law in the WBS takeover.

4          (b)     Losing all trademark rights of WBS without informing the client of the risk
5  and further failing to submit competent evidence.

6          (c)     Engaging in numerous conflicts of interest, including appointing Sherman to
7  the WBS Board of Directors, failing to follow basic corporate notice requirements and choosing
8  between shareholders in matters where they had serious conflicts.

9          (d)     Advising Blotzer to continue to infringe RATT trademarks and potentially
10  engaging in counterfeiting.

11          (e)     Advising Blotzer/WBS to do illegal shows after the Croucier Summary
12  Judgment and taking fees/costs from the illegal shows and failing to inform the clients of any of the
13  risks.

14          (f)     Bringing actions without legal justification, subjecting WBS and Blotzer to
15  adverse fees/costs awards in excess of $330,000 for bad faith litigation tactics.

16          (g)     Failing to competently bring and oppose numerous motions, including losing
17  virtually every action Adli/Sherman brought on summary judgment, including losing all WBS' rights
18  to "RATT" and failing to submit competent evidence.

19      32.     The negligent acts, omissions and blatant conflicts of interest of Adli/Sherman were
20  below the standard of care for comparable attorneys who practice in this community, especially
21  attorneys, like Adli/Sherman, who allegedly specialize in handling complex business trials.
22  Defendants' further overcharged, mis-charged, failed to advise clients of risk and took actions to the
23  detriment of their clients and put their own interest above the clients.

24      33.     As a direct and proximate result of Defendants' incompetence and professional
25  negligence, Plaintiffs have suffered compensatory damages in an amount to be proven at trial, but
26  estimated to be in excess of $3 million.

27  \ \ \

28  \ \ \

-11-

## THIRD CAUSE OF ACTION

### (For Breach of Fiduciary Duty Against All Defendants)

34.    Plaintiffs reallege and incorporate Paragraphs 1 through 23 above, as though fully set forth herein.

35.    In September 2015, Plaintiffs retained Adli/Sherman to provide legal services to in connection with the matters set forth in paragraphs 6-23, thereby establishing an attorney-client relationship between the parties. An attorney-client relationship is a fiduciary relationship. Defendants at all relevant times owed Plaintiffs a fiduciary duty. Defendants' fiduciary duties included:

(a)    Acting in the best interest of the client and putting the client's interests ahead of the attorneys' and law firm's interests;

(b)    Duties of care and loyalty;

(c)    Duty to fully and faithfully advise, counsel and represent Plaintiff loyally;

(d)    Keeping Plaintiff fully informed of all material or important events;

(e)    Reasonably and fairly charging for services;

(f)    Self-reporting mistakes, errors, malpractice, conflicts and offenses or violations that which the client would want to know or need to know; and

(g)    Self-reporting any fact or information that would or has exposed the client to risk or peril due to the attorneys' act or behavior that could or would have the effect of impairing the client's case.

36.    Plaintiffs reasonably expected and relied on their attorneys to discharge all of these duties. Because each of the Defendants held themselves out as best-in-class industry leaders, Plaintiffs expected the Defendants to exhibit the highest industry leading duties to him not just those of the reasonable attorney in Los Angeles. Defendants, and each of them, breached their fiduciary duties and obligations to Plaintiffs by doing all of the acts and omissions as herein alleged. Among other things, Defendants breached their duty by failing to act in the best interest of the client and putting the clients' interest ahead of the attorneys and firms interest, failing to represent client with care and loyally, failing to fully and faithfully advise, counsel and represent Plaintiffs, failing to keep

-12-

1  Plaintiffs informed of all material or important events, by · generally mismanaging and overbilling

2  in this case to such extent that Plaintiff was forced to incur excessive and unconscionable legal fees

3  and expenses, and failing to properly communicate with Plaintiff, including, but not limited to,

4  advising Plaintiff at the point of discovering their malpractice and by failing to disclose actionable

5  misconduct and for Plaintiff to obtain independent legal advice.

6      37.    As Plaintiffs' counsel, Adli/Sherman specifically engaged in the following

7  misconduct:

8          (a)    Failing to comply with California Law in the WBS takeover.

9          (b)    Losing all trademark rights of WBS without informing the client of the risk

10  and further failing to submit competent evidence.

11          (c)    Engaging in numerous conflicts of interest, including appointing Sherman to

12  the WBS Board of Directors, failing to follow basic corporate notice requirements and choosing

13  between shareholders in matters where they had serious conflicts.

14          (d)    Advising Blotzer to continue to infringe RATT trademarks and potentially

15  engaging in counterfeiting.

16          (e)    Advising Blotzer/WBS to do illegal shows after the Croucier Summary

17  Judgment and taking fees/costs from the illegal shows and failing to inform the clients of any of the

18  risks.

19          (f)    Bringing actions without legal justification, subjecting WBS and Blotzer to

20  adverse fees/costs awards in excess of $330,000 for bad faith litigation tactics.

21          (g)    Failing to competently bring and oppose numerous motions, including losing

22  virtually every action Adli/Sherman brought on summary judgment, including losing all WBS' rights

23  to "RATT" and failing to submit competent evidence.

24      38.    The negligent and disloyal acts, omissions and blatant conflicts of interest of

25  Adli/Sherman were in violation of their fiduciary duty to provide the highest legal of loyalty and

26  fidelity to their clients. Defendants' disloyalty was a substantial factor in Plaintiffs' multiple losses

27  in the Demartini action, the Croucier action and the RATT Partnership action. The proper handling

28  of these actions would have prevented the numerous losses and judgments against WBS and Blotzer,

-13-

COMPLAINT FOR LEGAL MALPRACTICE

1  which are continuing to accrue.

2      39.    As a direct and proximate result of Defendants' incompetence and professional

3  negligence, Plaintiffs have suffered compensatory damages in an amount to be proven at trial, but

4  estimated to be in excess of $3 million.  Defendants also committed fraud, oppression and malice

5  entitling plaintiffs to punitive damages.

6                          **FOURTH CAUSE OF ACTION**

7                    **(For Equitable Indemnify Against All Defendants)**

8      40.    Plaintiffs reallege and incorporate Paragraphs 1 through 23 above, as though fully

9  set forth herein.

10     41.    In September 2015, Plaintiffs retained Adli/Sherman to provide legal services to in

11 connection with the matters set forth in paragraphs 6-23, thereby establishing an attorney-client

12 relationship between the parties.

13     42.    As Plaintiffs' counsel, Adli/Sherman owed a duty of care to Plaintiffs, requiring them

14 to exercise the knowledge, skill and ability ordinarily exercised by other similarly situated lawyers.

15 Contrary to that duty, defendants were professionally negligent in the following ways:

16     (a)    Failing to comply with California Law in the WBS takeover.

17     (b)    Losing all trademark rights of WBS without informing the client of the risk and

18 further failing to submit competent evidence.

19     (c)    Engaging in numerous conflicts of interest, including appointing Sherman to the WBS

20 Board of Directors, failing to follow basic corporate notice requirements and choosing between

21 shareholders in matters where they had serious conflicts.

22     (d)    Advising Blotzer to continue to infringe RATT trademarks and potentially engaging

23 in counterfeiting.

24     (e)    Advising Blotzer/WBS to do illegal shows after the Croucier Summary Judgment and

25 taking fees/costs from the illegal shows and failing to inform the clients of any of the risks.

26     (f)    Bringing actions without legal justification, subjecting WBS and Blotzer to adverse

27 fees/costs awards in excess of $330,000 for bad faith litigation tactics.

28     (g)    Failing to competently bring and oppose numerous motions, including losing virtually

-14-

COMPLAINT FOR LEGAL MALPRACTICE

1  every action Adli/Sherman brought on summary judgment, including losing all WBS' rights to

2  "RATT" and failing to submit competent evidence.

3    43.    The negligent acts, omissions and blatant conflicts of interest of Adli/Sherman were

4  below the standard of care for comparable attorneys who practice in this community, especially

5  attorneys, like Adli/Sherman, who allegedly specialize in handling complex business trials.

6  Defendants' professional's negligence was a substantial factor in Plaintiffs' multiple losses in the

7  Demartini action, the Croucier action and the RATT Partnership action. The proper handling of

8  these actions would have prevented the numerous losses and judgments against WBS and Blotzer,

9  which are continuing to accrue. Specifically, WBS is subject to judgments of over $300,000 not

10  including a pending default judgment in the "RATT Partnership" action.

11    44.    At all times, the strategy and actions by defendants represented poor judgment and

12  incompetent advice and was the cause of numerous judgments against plaintiffs. As between

13  plaintiffs and Adli/Sherman, the latter was solely responsible for these judgments. As a direct and

14  proximate result of Defendants' incompetence and professional negligence, Plaintiffs have suffered

15  compensatory damages in an amount to be proven at trial.

16                                    **IV.**

17                                  **PRAYER**

18  WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as follows:

19    1.    For general damages according to proof, plus interest at the legal rate.

20    2.    For consequential and incidental damages according to proof;

21    3.    For exemplary and punitive damages according to proof;

22    4.    For attorneys' fees to the extent permitted by law and/or contract;

23    5.    For costs of suit herein; and

24    6.    For such other and further relief as is just and proper.

25                                Respectfully submitted,
                                   Friedman, Enriquez & Carlson, LLP
26

27                                By: _____
                                     Grant A. Carlson, Esq.
28                                   Attorneys for Plaintiffs

                                    -15-

# EXHIBIT 2

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Anthony Mohr

1 | **PARKER MILLS LLP**
David B. Parker (SBN 72192)
2 | parker@parkermillsllp.com
Mark A. Graf (SBN 107544)
3 | graf@parkermillsllp.com
800 W. 6th Street, Suite 500
4 | Los Angeles, California 90017
Telephone: (213) 622-4441
5 | Facsimile: (213) 622-1444

6 | Attorneys for Plaintiff
**GARY TOPOLEWSKI**

7 |

8 |

9 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

10 |

11 |

| GARY TOPOLEWSKI | Case No. 20STCV32929 |
|---|---|
| Plaintiff, | **COMPLAINT FOR DAMAGES FOR LEGAL MALPRACTICE** |
| v. | |
| ADLI LAW GROUP, A Professional Corporation; DARIUSH ADLI, an individual; JOSHUA EICHENSTEIN, an individual; DREW SHERMAN, an individual; and DOES 1-100, inclusive, | |
| Defendants. | |

19 | Plaintiff **GARY TOPOLEWSKI** alleges:

20 | 1.    Plaintiff is informed and believes that defendant **ADLI LAW GROUP** ("ALG") is

21 | and at all material times was a law firm and a professional corporation, organized and existing

22 | under the laws of the State of California with its principal place of business in the County of Los

23 | Angeles, State of California.

24 | 2.    Defendant **DARIUSH ADLI** is and at all material times was an individual residing

25 | in the County of Los Angeles, State of California, a practicing attorney and, on information and

26 | belief, a shareholder of defendant ALG and an agent and/or employee of defendant ALG

27 | practicing law in the course and scope of such agency and/or employment in the County of Los

28 | Angeles, State of California.

P
M  PARKER
   MILLS LLP
   TRIAL LAWYERS
   BUSINESS LAWYERS

1851314                                         1

1      3.      Defendant **JOSHUA EICHENSTEIN** is and/or at all material times was an

2 individual residing in the County of Los Angeles, State of California, a practicing attorney and, on

3 information and belief, an agent and/or employee of defendant ALG practicing law in the course

4 and scope of such agency and/or employment in the County of Los Angeles, State of California.

5      4.      Defendant **DREW SHERMAN** is and/or at all material times was an individual

6 residing in the County of Los Angeles, State of California, a practicing attorney and, on

7 information and belief, an agent and/or employee of defendant ALG practicing law in the course

8 and scope of such agency and/or employment in the County of Los Angeles, State of California.

9      5.      Defendants Adli, Eichenstein and Sherman are collectively referred to hereafter as

10 the "Individual Defendants."

11      6.      Plaintiff is presently without information and knowledge concerning the

12 true names and capacities of the defendants named as DOES 1 through 100, inclusive, and

13 therefore sues these defendants by such fictitious names. Plaintiff will amend his complaint to

14 allege their true names and capacities when ascertained. Plaintiff is informed and believes and

15 based thereon alleges that each fictitiously named defendant was and is in some manner legally

16 responsible for the events, breaches, and damages alleged in this complaint.

17      7.      Plaintiff is informed and believes and based thereon alleges that at all relevant

18 times each of the defendants was the agent, supervisor, managing agent, principal, alter ego,

19 employee, partner, director, officer, shareholder, parent company, subsidiary, member, manager,

20 affiliate, joint venturer, surety or other legal representative of each of the other defendants; that

21 each defendant was acting in such capacity and within the course and scope of such relationship

22 with the full knowledge and consent of each of the other defendants; that each defendant's conduct

23 was undertaken with the prior knowledge and approval of such acts by each of the other

24 defendants; and that these acts and omissions were approved, authorized and/or ratified by the

25 officers, directors, and/or managing or legal agents of each of the other defendants.

26      8.      Plaintiff was one of several defendants in an action filed by Aecom Energy &

27 Construction, Inc. in the United States District Court for the Central District of California, Case

28 No. 2:17-cv-05398-RSWL-SS (hereafter the "Underlying Action"). In or about May of 2018,

P
M PARKER
MILLS LLP
TRIAL LAWYERS
BUSINESS LAWYERS

1851314      2

COMPLAINT FOR DAMAGES FOR LEGAL MALPRACTICE

1  Plaintiff hired ALG to represent him in the Underlying Action and defendant ALG, the Individual
2  Defendants and defendants DOES 1-100 thereafter represented Plaintiff in the Underlying Action
3  and provided related legal services and advice to Plaintiff.

4      9.      As Plaintiff's attorney, each defendant was required to perform services for and
5  provide advice to Plaintiff with the reasonable care, skill, prudence, diligence, and fidelity as
6  attorneys of ordinary skill and capacity commonly possess and exercise in the performance of the
7  tasks which they undertake.

8      10.     Plaintiff is informed and believes and based thereon alleges that defendants, and
9  each of them, failed to exercise reasonable care, skill, prudence, diligence and/or fidelity in
10 performing legal services for and in providing legal advice to Plaintiff in the Underlying Action in
11 that, among other things, said defendants failed to adduce evidence and/or legal argument in
12 opposition to a motion for summary judgment filed by the plaintiff in the Underlying Action.

13     11.     As a direct, proximate and legal result of each defendant's breach of the duty of
14 care owed to Plaintiff, Plaintiff has suffered damages in an amount that exceeds the jurisdictional
15 minimum of this court and that include but are not limited to the imposition of a judgment against
16 Plaintiff in the Underlying Action in excess of $1 billion, attorneys' fees and costs that Plaintiff is
17 and was required to incur in order to remedy and/or mitigate the effects of the negligence of each
18 such defendant and additional amounts, to be proven at trial, that Plaintiff would not have incurred
19 but for the breach by each defendant of his, her and/or its duty of care owed to Plaintiff.

20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

P
M PARKER
  MILLS LLP
  [illegible]
  [illegible]

1851314                                    3
                    COMPLAINT FOR DAMAGES FOR LEGAL MALPRACTICE

1    **WHEREFORE,** Plaintiff prays for judgment against Defendants, and each of them, jointly

2    and severally, as follows:

3       1.      For compensatory damages in an amount according to proof;

4       2.      For costs of suit herein; and

5       3.      For such other and further relief as the Court may deem just and proper.

6    DATED: August 27, 2020                    **PARKER MILLS LLP**

7

8                                        By:  _____

9                                              David B. Parker
                                               Mark A. Graf
10                                             Attorneys for Plaintiff Gary Topolewski

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

1
**PARKER MILLS LLP**
David B. Parker (SBN 72192)
2
parker@parkermillsllp.com
Mark O. Suttle (SBN 146956)
3
suttle@parkermillsllp.com
800 W. 6th Street, Suite 500
4
Los Angeles, California 90017
Telephone: (213) 622-4441
5
Facsimile: (213) 622-1444
6
Attorneys for Claimant
**GARY TOPOLEWSKI**
7

8                **ARBITRATION – SIGNATURE RESOLUTION**

9

| | |
|---|---|
| 10  GARY TOPOLEWSKI | Ref. No. |
| 11          Claimant, | |
| 12  v. | **CLAIM FOR DAMAGES FOR LEGAL MALPRACTICE** |
| 13  ADLI LAW GROUP, A Professional Corporation; DARIUSH ADLI, an individual; JOSHUA EICHENSTEIN, an individual; | |
| 14  DREW SHERMAN, an individual; and DOES 1-100, inclusive, | |
| 15 | |
| 16          Respondents. | |

17

18          Claimant **GARY TOPOLEWSKI** alleges:

19          1.          Claimant is informed and believes that Respondent **ADLI LAW GROUP** ("ALG")

20   is and at all material times was a law firm and a professional corporation, organized and existing

21   under the laws of the State of California with its principal place of business in the County of Los

22   Angeles, State of California.

23          2.          Claimant is informed and believes Respondent **DARIUSH ADLI** is and at all

24   material times was an individual residing in the County of Los Angeles, State of California, a

25   practicing attorney and, on information and belief, a shareholder of Respondent ALG and an agent

26   and/or employee of Respondent ALG practicing law in the course and scope of such agency

27   and/or employment in the County of Los Angeles, State of California.

28

PARKER
MILLS LLP
TRIAL LAWYERS
BUSINESS LAWYERS

3.      Claimant is informed and believes that Respondent **JOSHUA EICHENSTEIN** is and/or at all material times was an individual residing in the County of Los Angeles, State of California, a practicing attorney and, on information and belief, an agent and/or employee of Respondent ALG practicing law in the course and scope of such agency and/or employment in the County of Los Angeles, State of California.

4.      Claimant is informed and believes that Respondent **DREW SHERMAN** is and/or at all material times was an individual residing in the County of Los Angeles, State of California, a practicing attorney and, on information and belief, an agent and/or employee of Respondent ALG practicing law in the course and scope of such agency and/or employment in the County of Los Angeles, State of California.

5.      Individual Respondents ADLI, EICHENSTEIN, and SHERMAN are collectively referred to hereafter as the "Individual Respondents."

6.      Claimant is presently without information and knowledge concerning the true names and capacities of the Respondents named as DOES 1 through 100, inclusive, and therefore sues these Respondents by such fictitious names. Claimant will amend his complaint to allege their true names and capacities when ascertained. Claimant is informed and believes and based thereon alleges that each fictitiously named Respondent was and is in some manner legally responsible for the events, breaches, and damages alleged in this Claim.

7.      Claimant is informed and believes and based thereon alleges that at all relevant times each of the Respondents was the agent, supervisor, managing agent, principal, alter ego, employee, partner, director, officer, shareholder, parent company, subsidiary, member, manager, affiliate, joint venturer, surety or other legal representative of each of the other Respondents; that each Respondent was acting in such capacity and within the course and scope of such relationship with the full knowledge and consent of each of the other Respondents; that each Respondent's conduct was undertaken with the prior knowledge and approval of such acts by each of the other Respondents; and that these acts and omissions were approved, authorized and/or ratified by the officers, directors, and/or managing or legal agents of each of the other Respondents.

P
M PARKER
MILLS LLP

TRIAL LAWYERS
BUSINESS LAWYERS

8.      Claimant was one of several defendants in an action filed by Aecom Energy & Construction, Inc. in the United States District Court for the Central District of California, Case No. 2:17-cv-05398-RSWL-SS (hereafter the "Underlying Action").  In or about May of 2018, Claimant hired ALG to represent him in the Underlying Action; and Respondent ALG, the Individual Respondents and Respondents DOES 1-100 thereafter represented Claimant in the Underlying Action and provided related legal services and advice to Claimant.

9.      As Claimant's attorney, each Respondent was required to perform services for and provide advice to Claimant with the reasonable care, skill, prudence, diligence, and fidelity as attorneys of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.

10.     Claimant is informed and believes and based thereon alleges that Respondents, and each of them, failed to exercise reasonable care, skill, prudence, diligence and/or fidelity in performing legal services for and in providing legal advice to Claimant in the Underlying Action in that, among other things, said Respondents failed to adduce evidence and/or legal argument in opposition to a motion for summary judgment filed by the Claimant in the Underlying Action.

11.     As a direct, proximate and legal result of each Respondent's breach of the duty of care owed to Claimant, Claimant has suffered damages in an amount that exceeds the jurisdictional minimum of this court and that include but are not limited to the imposition of a judgment against Claimant in the Underlying Action in excess of $1 billion dollars, attorneys' fees, and costs; and additionally the attorneys' fees and costs that Claimant is and was and will be required to incur in order to remedy and/or mitigate the effects of the negligence of each such Respondent, and additional amounts, to be proven at trial, that Claimant would not have incurred but for the breach by each Respondent of his, her and/or its duty of care owed to Claimant.

/ / /

/ / /

/ / /

/ / /

/ / /



1    **WHEREFORE,** Claimant prays for judgment against Respondents, and each of them, jointly

2    and severally, as follows:

3        1.    For compensatory damages in an amount according to proof;

4        2.    For costs of suit herein; and

5        3.    For such other and further relief as the Arbitrator may deem just and proper.

6    DATED:  July 27, 2021                **PARKER MILLS LLP**

7

8                            By:  _____

9                                    Mark O. Suttle
                                Attorneys for Claimant Gary Topolewski

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

Robin Offner, Esq. (SBN 155838)
Karen B. King, Esq. (SBN 167568)
OFFNER & KING LLP
2411 Second Avenue
San Diego, California 92101
Telephone:      (619) 702-2301

Attorneys for STEVEN HELLINGS and THERESA HELLINGS

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO (CENTRAL DISTRICT)

| | |
|---|---|
| STEVEN HELLINGS, an individual, and THERESA HELLINGS, an individual, <br><br> Plaintiffs, <br> v. <br><br> ANDREA RUTH BIRD aka ANDREA BIRD, an individual, JONATHAN STEPHEN LANDIS, an individual, DARREN HABERMEHL, an individual, BIRD LAW GROUP, a California professional corporation, ADLI LAW GROUP, a California professional corporation, WALTON CHAN, an individual, SW VENTURES, LLC, a California limited liability company, and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. 37-2020-00044516-CU-BT-CTL <br><br> **VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF** <br><br> Filed:  December 4, 2020 <br> Judge:  Hon. Gregory W. Pollack <br> Department:   C-71 <br> Trial Date:      Not set |

1

**TABLE OF CONTENTS**

2    I.        THE PARTIES ........................................................... 5

3        A.    The Attorney Defendants ....................................... 5

4        B.    The Non-Attorney Defendants ................................. 6

5    II.       OVERVIEW ............................................................. 6

6    III.      BACKGROUNDS FACTS ............................................. 9

7        A.    Hellings and Chan become partners in a new business venture
              and retain Bird Law, Bird and Landis as their personal attorneys ......... 9

8
             1.    Hellings and Chan hired Bird, Landis and Bird Law as their personal
9                  attorneys ....................................................................... 9

10           2.    Hellings and Chan create two business entities:  SW Ventures and
                   WYS Consulting ..............................................................11
11
         B.    Hellings invests, is owed and/or commits more than $3,000,000
12            into SW Ventures..................................................................11

13           1.    The Bird Law Attorneys represented Hellings and SW Ventures in
                   connection with negotiating a long-term lease for SW Ventures that
14                 included Hellings' personally guaranteeing rents in excess of $2,000,000 ........ 12

15           2.    Hellings loaned more than $300,000 to SW Ventures; SW Ventures
                   executed a secured promissory note for much of those loans and now
16                 is in default of that promissory note ......................................13

17           3.    Hellings is owed more than $400,000 in back wages ...........................15

18           4.    Hellings has a $400,000 capital investment in SW Ventures .....................16

19       C.    Bird becomes general counsel of SW Ventures and claims to have
              acquired an equity interest in the company while continuing to
20            act as Hellings' personal attorney ...........................................16

21           1.    Bird became SW Ventures' general counsel without first obtaining
                   Hellings' informed written consent or advising him that her duty of
22                 undivided loyalty to him would be compromised by her new position ......16

23           2.    Bird proposed that she exchange unbilled claimed attorneys' fees for
                   equity in SW Ventures and now claims to have acquired an
24                 undocumented ownership interest in SW Ventures in exchange for
                   those unbilled fees ...........................................................17
25
         D.    Bird continued to represent Hellings, individually, after becoming
26            SW Ventures' general counsel ...............................................19

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

**E.**    **Bird developed additional conflicts of interest vis-à-vis Hellings by loaning money to SW Ventures pursuant to promissory notes drafted by Bird that included terms unfavorable to Hellings and SW Ventures** ………………………………………………….. 19

**F.**    **Hellings created and helped fund a potentially lucrative business infrastructure, and brought potentially lucrative deals to SW Ventures** ………………………………………………….22

  1.    At a cost of more than $1,000,000, Hellings created a working infrastructure for SW Ventures and SW Ventures opened its doors in March 2020 ……………………………………………………22

  2.    Hellings presented Chan and Bird with a lucrative opportunity (or opportunities) designed to infuse more than $2,000,000 into SW Ventures ……………………………………………………22

**G.**    **Bird and Chan, with the help of Landis, ADLI Law and Bird Law execute a plan to strip Hellings of his interest in SW Ventures for their own personal financial gain**…………………………………….....23

  1.    Bird unsuccessfully attempted to convert SW Ventures from a member-managed company to a manager-managed company, and to have herself appointed as a manager ……………………………… 23

  2.    Immediately after her failed attempt to convert SW Ventures to a manager-managed company, Bird usurped control of the company and announced an unauthorized "investigation" into Hellings…………. 26

  3.    While continuing to cause Hellings to believe that they were his attorneys, Bird, Landis, Bird Law and ADLI Law interviewed Hellings without first responding to his request as to whether he should consult independent counsel……………………………………………………28

  4.    Bird improperly noticed a meeting of SW Ventures' (illegitimate) board of managers at which she attempted to remove Hellings as an officer and employee of SW Ventures and misrepresented to Hellings the purpose of that meeting ……………………………………….. 30

  5.    Over Hellings' objection, Chan and Bird ineffectively voted to remove Hellings as SW Ventures' president and employee and from the (illegitimate) board of managers; no vote was had to expel Hellings from SW Ventures…………………………………………..32

  6.    Bird claims that Chan unilaterally determined to expel Hellings from SW Ventures ………………………………………………………33

  7.    Bird, Chan, Landis, ADLI Law and Bird Law hold a secret meeting to confirm Chan's claimed expulsion of Hellings and to appoint Chan as SW Ventures' chief executive officer …………………………………..33

3

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

H.    After claiming to have expelled Hellings from SW Ventures, Bird and
      Chan (1) blocked Hellings from access to SW Ventures' affairs,
      (2) attempted to capitalize on the lucrative potential deal with NewTropic
      that Hellings had brought to SW Ventures, (3) failed to pay either
      Hellings or Theresa the wages they are owed, and (4) caused
      substantial damages to Hellings and SW Ventures ........................... 34

I.    Chan begins self-dealing with SW Ventures' assets to pay his personal
      expenses ..................................................................................... 35

J.    Habermehl claims to have an ownership interest in SW Ventures .......... 36

K.    Landis, ADLI Law and Chan manipulate the public record regarding
      SW Ventures' and WYS Consulting's ownership to create a false record
      suggesting that Chan has the authority to sell SW Ventures' assets
      and lie to Hellings to conceal that activity...................................... 37

L.    Once Chan and Bird took complete control over SW Ventures, they
      engaged in business deals violating California law and SW Ventures'
      conditional use permit ...............................................................….38

M.    Landis, ADLI Law, Bird, Bird Law and Chan employ misrepresentations,
      threats and stall tactics................................................................38

      1.    Landis, ADLI Law, Bird and Bird Law admit to conflicts of interests
            and that they did not obtain a conflict of interest waiver .....................38

      2.    Landis, ADLI Law, Bird and Bird Law falsely claimed that Bird, Landis
            and Bird Law never represented Hellings .......................................39

      3.    Landis and ADLI Law threaten criminal, administrative and/or
            disciplinary charges to obtain an advantage in a civil dispute against
            Hellings in violation of California Rule of Professional Conduct 3.10 ...... 40

      4.    Landis, Bird, ADLI Law, Chan and SW Ventures induced Plaintiffs to
            delay filing the instant action by promising to provide documentation
            supporting the purported termination of Hellings' interest in SW Ventures
            only to fail to provide any such documentation................................ 41

      5.    Bird, Landis and ADLI Law provided a detailed verbal report that
            confirmed that there was no basis to oust Hellings from SW Ventures........42

N.    Hellings advanced $105,000 to SW Ventures to repay Pierre-Louis; after
      wrongfully purporting to expel Hellings from SW Ventures, Bird and Chan
      recouped Hellings' money but refused to return it to
      Hellings……………………………………………………………45

O.    SW Ventures and Chan agree that Hellings was improperly ousted from
      SW Ventures but continue to refuse to allow Hellings necessary access
      to SW Ventures' records and facility………………………………..46

4

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

Plaintiffs, STEVEN HELLINGS and THERESA HELLINGS, complain and allege:

## I.

## <u>THE PARTIES</u>

1.    Plaintiff STEVEN HELLINGS (hereinafter "Hellings") has at all relevant times been an individual residing in the State of California, County of Orange, and the husband of Plaintiff, THERESA HELLINGS.

2.    Plaintiff THERESA HELLINGS (hereinafter "Theresa") has at all relevant times been an individual residing in the State of California, County of Orange, and is the wife of Hellings.

**A.    The Attorney Defendants.**

3.    Plaintiffs are informed and believe and thereon allege that Defendant BIRD LAW GROUP (hereinafter "Bird Law") has at all relevant times been a California professional corporation engaged in the practice of law with its principal place of business in Orange County, California.

4.    Plaintiffs are informed and believe and thereon allege that Defendant ANDREA RUTH BIRD (hereinafter "Bird") has at all relevant times been an individual residing in the State of California, County of Orange, an attorney licensed to practice law in the State of California, an officer, director and employee of Bird Law, and, since in or about September 2019, claimed to be general counsel for Defendant SW VENTURES, LLC.  Bird also claims to be an owner of SW VENTURES, LLC.  Plaintiffs are informed and believe and thereon allege that, at all relevant times, Bird has also been known as ANDREA BIRD-STEINER.

5.    Plaintiffs are informed and believe and thereon allege that Defendant JONATHAN STEPHEN LANDIS (hereinafter "Landis") has at all relevant times been an individual residing in the State of California, County of Orange, and an attorney licensed to practice law in the State of California.  Plaintiffs are informed and believe and thereon allege that Landis is and/or was an officer, director and/or employee of Bird Law and, since at least 2019, has been an officer, director, employee and/or agent acting as Senior Counsel of Defendant ADLI LAW GROUP.

6.    Plaintiffs are informed and believe and thereon allege that Defendant ADLI LAW GROUP (hereinafter "ADLI Law") is a California professional corporation engaged in the practice

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1    of law with its principal place of business in the State of California, County of Los Angeles.

2    **B.    The Non-Attorney Defendants.**

3        7.    Plaintiffs are informed and believe and thereon allege that Defendant SW

4    VENTURES, LLC (hereinafter "SW Ventures") has at all relevant times since its formation been a

5    California limited liability company and is registered with the California Secretary of State with a

6    principal business address of 6755 Mira Mesa Boulevard, Suite 123-106, San Diego, California

7    92121.

8        8.    Plaintiffs are informed and believe and thereon allege that Defendant WALTON

9    CHAN (hereinafter "Chan") has at all relevant times been an individual residing in the State of

10   California, County of San Diego, has been an officer, director and/or employee of SW Ventures

11   since its formation and presently is a member of SW Ventures, either directly or through WYS

12   Consulting, LLC

13       9.    Plaintiffs are informed and believe and thereon allege that Defendant DARREN

14   HABERMEHL (hereinafter "Habermehl") has at all relevant times been an individual residing in

15   the State of California, County of Orange.

16       10.    Plaintiffs are ignorant of the true names and capacities of the defendants sued herein

17   as DOES 1 through 50, and therefore sue these defendants by such fictitious names. Plaintiffs will

18   amend the complaint to allege their true names and capacities when ascertained.

19       11.    Plaintiffs are informed and believe and thereon allege that at all times herein

20   mentioned, each of the defendants was the agent and/or employee of each of the remaining

21   defendants and that, in doing the things herein alleged, each defendant was acting within the course

22   and scope of their agency and/or employment.

23                                **II.**

24                             **OVERVIEW**

25       12.    This case involves Plaintiff Hellings' own attorneys and business partner wrongfully

26   attempting to strip him of his interest in a business in which he was an owner and substantial

27   investor, and which business owes Hellings hundreds of thousands of dollars.  Hellings invested in,

28   and was an employee, officer and owner, whether directly or indirectly, of SW Ventures, a

                                  6
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
                           OTHER RELIEF

1   company in the cannabis industry that was created by Hellings and his business partner, Chan.

2       13.    Much of the wrongful conduct alleged herein was perpetrated by Hellings' own

3   attorneys, Bird, Landis and Bird Law, whom Hellings and Chan hired as their personal attorneys.

4       14.    Bird was the ringleader.  Bird engaged in a series of transactions which gave rise to

5   numerous actual conflicts of interests vis-a-vis Hellings, including becoming a creditor of SW

6   Ventures and claiming to hold an undocumented ownership interest in the company.  Bird was

7   Hellings' attorney at the time she engaged in these transactions.  Bird never obtained informed

8   written consent or a conflict of interest waiver from Hellings; nor did she advise Hellings to obtain

9   independent counsel before engaging in the transactions giving rise to her various conflicts of

10  interest.

11      15.    After becoming financially entangled in SW Ventures and developing actual

12  financial conflicts of interest vis-a-vis Hellings, Bird orchestrated a scheme to expel Hellings from

13  SW Ventures for her own pecuniary gain.  That scheme included:

14          a.  Unsuccessfully attempting to convert SW Ventures from a member-managed

15              company to a manager-managed company;

16          b.  Having herself appointed to SW Ventures' invalid board of managers so that she

17              could purport to expel Hellings from SW Ventures;

18          a.  Insisting that Hellings submit to an interview by Bird, Landis, ADLI Law and

19              Bird Law, taking steps to cause Hellings to believe they were acting as his

20              attorneys in order to coerce him to submit to that interview, taking steps to

21              prevent Hellings from seeking independent counsel before submitting to the

22              interview, and then using the fruits of that interview as the purported basis to

23              purport to expel Hellings from SW Ventures;

24          b.  Deceiving Hellings in order to induce him to attend an improperly noticed

25              meeting of SW Ventures' invalid board of managers at which Bird claims to

26              have terminated Hellings' positions with SW Ventures;

27          c.  Declaring that Chan unilaterally expelled Hellings from SW Ventures; and

28          d.  Then blocking Hellings from access to the business which he owned and refusing

7

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

to provide him with his client files.

16.    Landis, ADLI Law, Chan, Bird Law and Habermehl actively participated in Bird's scheme to expel Hellings from SW Ventures.

17.    Landis and ADLI Law subsequently represented parties directly adverse to Hellings, including Bird and Chan, in a matter substantially related to the matter in which Hellings had retained Landis as his personal attorney.

18.    After blocking Hellings' access to SW Ventures' business affairs, Chan used SW Ventures' funds for his own personal benefit, including, upon information and belief, causing SW Ventures to take out one or more loans and using such loan funds to, *inter alia*, pay his personal credit card debt.

19.    After improperly ousting Hellings, Chan, Landis and, upon information and belief, ADLI Law manipulated the public record by omitting Hellings as a member of WYS Consulting in a Statement of Information filed with the California Secretary of Sate in order to give the false impression that Chan had the authority to transact in SW Ventures' assets in that WYS Consulting was listed with the California Secretary of State as SW Ventures' sole member.

20.    After filing the false Statement of Information with the California Secretary of State, Chan, Landis, ADLI Law and Bird attempted to conceal that false filing from Hellings by advising him that WYS Consulting was a "now defunct" company.

21.    Plaintiffs are informed and believe that, after creating a false public record suggesting that Chan solely controlled SW Ventures' assets, Chan made efforts to sell SW Ventures' assets for his own personal benefit without informing Hellings.

22.    After improperly purporting to oust Hellings from SW Ventures, Plaintiffs are informed and believe and thereon allege that Chan, Bird and Habermehl allowed commercial activity to be conducted at  SW Ventures' facility that violated California law and the terms of SW Ventures' conditional use permit and put SW Ventures' valuable commercial cannabis license at risk.

23.    Since the filing of their initial verified complaint, Plaintiffs have become aware of additional material facts that bear on their claims and therefore file this First Amended Verified

8

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1    Complaint. One such material fact is that SW Ventures and Chan have acknowledged in writing

2    that the purported ouster of Hellings from SW Ventures was improper and ineffective.

3         24.    Although Chan and SW Ventures have admitted that Chan's and Bird's purported

4    ouster of Hellings was invalid, Chan continues to assert sole and unbridled control over SW

5    Ventures and Chan continues to deny Hellings his rights as the president and as a member, whether

6    directly or indirectly, of SW Ventures, including refusing to provide Hellings access to SW

7    Ventures' records and facility.  Chan's continued failure to provide Hellings such access has put

8    and continues to put Hellings' and SW Ventures' interests in jeopardy in that, *inter alia,* Hellings is

9    informed and believes that Chan is allowing SW Ventures' facility and valuable commercial

10    cannabis license to be used illegally and without appropriate monetary benefit to SW Ventures.

11         25.    As a result of Defendants' conduct as alleged herein, Hellings has been damaged in a

12    sum in excess of $3,000,000.

13                                 **III.**

14                    **BACKGROUND FACTS**

15    **A.    Hellings and Chan become partners in a new business venture and retain Bird Law, Bird**
16         **and Landis as their personal attorneys.**

17         1.    Hellings and Chan hired Bird, Landis and Bird Law as their personal attorneys.

18         26.    Hellings and Chan decided to become partners in a new business venture in the

19    cannabis industry in or about 2017.

20         27.    In or about April 2018, Hellings and Chan formally retained Bird Law, Bird and

21    Landis as their personal attorneys to help them in a specific transaction (that eventually was

22    abandoned) and to provide general legal advice and services.  Bird Law, Bird and Landis are at

23    times collectively referred to herein as the "Bird Law Attorneys."

24         28.    The Bird Law Attorneys' representation of Hellings was formalized in a written

25    engagement agreement that Bird emailed to Hellings on or about April 13, 2018 under the subject

26    line "2018-04-12 Engagement Agreement (Chan-Hellings) between Andrea Bird and Steven

27    Hellings is Signed and Filed!" (hereinafter the "Hellings/Bird Law Engagement Agreement").

28         29.    The Hellings/Bird Law Engagement Agreement made clear that Hellings and Chan

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1    retained the Bird Law Attorneys in their individual capacities:

2        BIRD LAW GROUP, PC ("Attorney"), on one hand, and Walton Chan and Steve Hellings,
         on the other hand ("Client"), hereby agree that Attorney will provide legal services to Client
3        on the terms set forth below.

4        30.    Hellings and Chan are the only clients defined by the Hellings/Bird Law

5    Engagement Agreement.

6        31.    The Hellings/Bird Law Engagement Agreement provided both a specific and broad

7    scope of ongoing services for the Bird Law Attorneys' engagement:

8        2.  SCOPE OF SERVICES. Client hires Attorney to provide legal services in the
         following matter(s): (1) draft Letter of Intent ("LOI") from Client to potential
9        investment and assist with due diligence regarding potential investment ("PMG LLC
         Transaction"); (2) negotiation and drafting of LLC agreement in furtherance of PMG
10       LLC Transaction, if necessary; (3) hold Client funds in escrow in client trust account
         in furtherance of PMG LLC Transaction; and (4) provision of additional general
11       counsel legal advice as needed, including but not limited to, other contract drafting,
         negotiation, and review, cannabis law advice, employment law advice, intellectual
12       property advice, regulatory compliance, and advertisement review.

13       32.    The Hellings/Bird Law Engagement Agreement included signature lines for Bird

14   Law in the names of both Bird and Landis.

15       33.    The Bird Law Attorneys subsequently provided legal services and advice to Hellings

16   pursuant to the Hellings/Bird Law Engagement Agreement and continued to maintain an

17   attorney/client relationship with Hellings through in or about June 2020.

18       34.    The Bird Law Attorneys never informed Hellings in writing that their representation

19   of him had terminated.

20       35.    Hellings never executed any written modification to the Hellings/Bird Law

21   Engagement Agreement.

22       36.    Hellings never executed any informed written consent or conflict of interest waiver

23   to allow any of the Bird Law Attorneys to take positions, or represent parties, adverse to him.

24       37.    Plaintiffs are informed and believe and thereon allege that, in or about 2019, Landis

25   began working for ADLI Law in the capacity of ADLI Law's Senior Counsel.  Landis' fiduciary

26   duties including, *inter alia*, his duty of undivided loyalty, his duty to maintain client confidentiality

27   and his duty not to represent another person's interests in the same or a substantially related matter

28   in which that person's interests are materially adverse to Hellings are imputed to ADLI Law.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

38.     Landis continued to provide legal services and advice to Hellings after joining ADLI Law.  Hellings never executed any informed written consent or conflict of interest waiver allowing Landis or ADLI Law to take positions, or represent parties, adverse to him.

2.     <u>Hellings and Chan create two business entities:  SW Ventures and WYS Consulting.</u>

39.     Chan and Hellings caused the creation of SW Ventures, which was registered with the California Secretary of State as a member-managed limited liability company on April 23, 2018.

40.     On May 1, 2018, Landis and Bird Law Group signed and caused to be filed Articles of Organization with the California Secretary of State for WYS Consulting, LLC (hereinafter "WYS Consulting").  As reflected in the Articles of Organization filed with the California Secretary of State on May 1, 2018, WYS Consulting was a member managed limited liability company with Hellings and Chan as its two members.  Hellings owns at least forty percent (40%) of WYS Consulting. WYS Consulting never had an operating agreement.

41.     At all relevant times, Hellings has been president of SW Ventures and a member of the company, either directly or through WYS Consulting.  Hellings has not been permitted to perform his functions as SW Ventures' president from June 24, 2020 through, at least, the filing of this Verified First Amended Complaint.

42.     At all relevant times, Chan has been chief financial officer of SW Ventures and a member of the company, either directly or through WYS Consulting.

43.     Neither WYS Consulting nor SW Ventures ever had a valid operating agreement.

**B.     Hellings invests, is owed and/or commits more than $3,000,000 into SW Ventures.**

44.     Hellings made a series of investments in, and financial commitments to, SW Ventures that exceeded $3,000,000.  These investments and commitments included executing a personal guaranty for a commercial lease for the newly-formed SW Ventures, loaning hundreds of thousands of dollars to the company and investing hundreds of thousands of dollars in the company.

45.     The SW Ventures and WYS Consulting tax returns and/or financial records prepared by Chan in conjunction with Chan's accountant reflected that Hellings' loans and capital contributions as of the end of 2019 were in excess of $900,000.

/ / / /

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1.    <u>The Bird Law Attorneys represented Hellings and SW Ventures in connection with negotiating a long-term lease for SW Ventures that included Hellings' personally guaranteeing rents in excess of $2,000,000.</u>

46.    Shortly after being engaged by Hellings and Chan, Bird Law and Bird and/or Landis represented Hellings and SW Ventures in connection with negotiating a lease for a commercial facility for SW Ventures (the "SW Ventures Lease").

47.    Although (a) the Hellings/Bird Law Engagement Agreement identified only Hellings and Chan as the Bird Law Attorneys' clients, (b) the Hellings/Bird Law Engagement Agreement made no mention of SW Ventures, and (c) SW Ventures never executed any engagement agreement with Bird Law, Bird, Landis and/or ADLI Law at any time before Hellings was improperly ousted from SW Ventures on or about June 25, 2020, the Bird Law Attorneys now assert that they at all times were representing and acting on behalf of SW Ventures, and not Hellings, including, *inter alia*, at the time they represented Hellings and SW Ventures in connection with negotiating the SW Ventures Lease.

48.    In fact, the Bird Law Attorneys were Hellings' attorneys at the time they advised Hellings in connection with negotiating the SW Ventures Lease.

49.    The SW Ventures Lease had a term of approximately seven (7) years and three (3) months and required payment of a monthly base rent of $26,917.50, for a total in excess of $2,000,000 in base rent alone.  The SW Ventures Lease also included a personal guarantee subjecting Hellings to potential personal liability in excess of $2,000,000.

50.    An attorney exercising the skill, prudence and diligence that members of the legal profession commonly possess and exercise would have advised Hellings of the perils of personally guaranteeing such a long-term and costly lease for a fledgling business on the terms set forth in that personal guarantee; however, none of the Bird Law Attorneys advised Hellings of any such perils.

51.    To the extent that the Bird Law Attorneys were representing SW Ventures' interests, as claimed by Landis and Bird, at the time they advised Hellings in connection with negotiating the SW Ventures Lease and the personal guarantee that Hellings signed:

a.    (1) Such representation was directly adverse to Hellings, and/or (2) entailed a significant risk that the Bird Law Attorneys' representation would be materially limited by their

1  responsibilities to, or relationship with, Hellings, and (3) the Bird Law Attorneys had a legal and/or

2  professional relationship with, and responsibility to, Hellings in connection with such lease;

3          b.      The Bird Law Attorneys had a duty to communicate and explain to Hellings

4  in writing the relevant circumstances and the material risks, including any actual and reasonably

5  foreseeable adverse consequences of their proposed course of conduct; however, the Bird Law

6  Attorneys failed to do so;

7          c.      The Bird Law Attorneys had a duty to obtain Hellings' informed written

8  consent and/or written conflict of interest waiver  with respect to their concurrently representing

9  SW Ventures and Hellings; however, the Bird Law Attorneys failed to do so; and

10         d.      Plaintiffs are informed and believe and thereon allege that the Bird Law

11  Attorneys did not reasonably believe that they would be able to provide competent and diligent

12  representation to each affected client.

13     2.      <u>Hellings loaned more than $300,000 to SW Ventures; SW Ventures executed a
secured promissory note for much of those loans and now is in default of that

14     promissory note.</u>

15     52.      Hellings made a series of loans to SW Ventures that exceeded the principal sum of

16  $300,000.

17     53.      Bird Law and Bird and/or Landis drafted separate secured promissory notes for

18  Hellings (hereinafter the "Hellings Note") and Chan to cover the monies that Hellings and Chan,

19  respectively, loaned to SW Ventures.

20     54.      The Hellings Note contains the following relevant terms:

21         a.      The entire outstanding principal balance and unpaid interest thereon

22                 became due and payable on September 1, 2019;

23         b.      Interest and principal on all amounts outstanding from time to time would

24                 accrue interest at the rate of sixty percent (60%) per annum, compounded

25                 annually, from each date of disbursement;

26         c.      During the pendency of any default, and from and after the September 1,

27                 2019 maturity date, interest would accrue on the amount of the unpaid

28                 principal balance at a rate equal to "twenty percent (5%)" [sic] in excess of

13

1    the sixty percent (60%) per annum rate that would otherwise be in effect, but

2    not to exceed the maximum amount permitted by law, and the note would be

3    payable on demand;

4        d.    The note was secured by the following assets held by SW Ventures:  Pinnacle

5    extraction system, including but not limited to the alcohol extraction skid;

6    heat exchangers; solvent recovery skid; Chemtech KD 30 pilot plant with

7    decarb vessels; all product and goods inventory;

8        e.    SW Ventures waived diligence, presentment for payment, demand, protest,

9    notice of nonpayment, notice of dishonor, notice of protest, and any and all

10    other notices and demands whatsoever, and agreed to remain bound until all

11    principal and interest was paid in full, notwithstanding any extensions or

12    renewals granted with respect to the note or the release of any party liable

13    thereunder;

14        f.    SW Ventures' failure to timely pay any amount due would constitute a

15    default and, upon such default, Hellings, at his option, could declare

16    immediately due and payable the entire unpaid principal balance together

17    with all interest plus any other sums owing at such time pursuant to the terms

18    of the note;

19        h.    SW Ventures consented to the exclusive jurisdiction of the San Diego County

20    Superior Court for any action arising out of the note; and

21        g.    Hellings could, but was not required to, secure the Hellings Note by filing a

22    UCC-1.

23        55.    Hellings has filed a UCC-1.

24        56.    Chan, Hellings and an individual named Michael Stewart executed the Hellings Note

25    on behalf of SW Ventures.

26        57.    On or about March 28, 2020, Chan, in his capacity as SW Ventures' chief financial

27    officer, provided Hellings a written ledger in which Chan set forth amounts Chan stated were owed

28    by SW Ventures to Hellings pursuant to the Hellings Note, and the dates such amounts were loaned

14

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1   by Hellings.

2       58.    The ledger SW Ventures and Chan, in Chan's capacity as SW Ventures' chief

3   financial officer, sent to Hellings on or about March 28, 2020 included the following entries

4   reflecting loans from Hellings in the principal sum of at least $199,356:

5           April 19, 2019:         $100,000
            May 20, 2019:           $40,000
6           May 23, 2019:           $17,250
            July 31, 2019:          $16,000
7           August 13, 2019:        $7,500
            August 23, 2019:        $5,000
8           September 4, 2019:      $4,451
            September 15, 2019:     $4,155
9           October 7, 2019:        $5,000
            Total:                  $199,356

10

11      59.    Hellings did in fact make the foregoing loans to SW Ventures; in fact, Hellings

12   loaned an aggregate of more than $300,000 to SW Ventures.

13      60.    SW Ventures has not repaid any portion of the sums Hellings loaned to SW Ventures

14   pursuant to the Hellings Note and is in default.

15      3.    <u>Hellings is owed more than $400,000 in back wages.</u>

16      61.    At or about the time that SW Ventures was formed, Chan and Hellings met to

17   discuss certain financial arrangements between them.  Also present for this and other related

18   discussions was the principal of PMG Enterprises, Inc. ("PMG"), Michael Stewart (hereinafter

19   "Stewart").  At the time of these discussions, Chan, Hellings and Stewart contemplated that PMG

20   would be a member of SW Ventures; thus, Stewart participated in meetings related to SW

21   Ventures' operations and financial dealings.

22      62.    In that both Chan and Stewart were intending on working other jobs while Hellings

23   would be devoting himself full-time to SW Ventures, Chan and Hellings expressly agreed that

24   Hellings would be paid a salary of $180,000 per year.  Hellings agreed to defer payment of such

25   salary and have his accrued salary paid in the future.  Thus, Chan and Hellings agreed that Hellings'

26   accrued salary would be paid to him as the first monies out before any returns of capital or loans

27   would be repaid such that there would be no repayment of any loans made by Chan or others until

28   such time as Hellings received his accrued pay.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

63.    Subsequently, Chan and Hellings agreed that Hellings would be paid based on a rate of $90 an hour rather than a fixed annual salary.

64.    In his capacity as SW Ventures' chief financial officer, Chan agreed that, as of December 31, 2019, Hellings was owed $400,000 in back pay.

65.    SW Ventures actually began paying Hellings in or about January 1, 2020. Hellings agreed that he would be paid a rate based on a salary of $150,000 per year beginning on January 1, 2020, with the balance of his salary deferred and accruing. SW Ventures paid some, but not all, of Hellings' salary after January 1, 2020.

66.    Theresa also worked for SW Ventures and is owed at least approximately $3,320.00 in unpaid wages.

4.    <u>Hellings has a $400,000 capital investment in SW Ventures.</u>

67.    Hellings made capital investments in SW Ventures and/or WYS Consulting that were recorded in SW Ventures' records in the amount of $400,000.

**C.    Bird becomes general counsel of SW Ventures and claims to have acquired an equity interest in the company while continuing to act as Hellings' personal attorney.**

68.    Bird became SW Ventures' general counsel and, in so doing, developed multiple conflicts of interest vis-a-vis Hellings.

1.    <u>Bird became SW Ventures' general counsel without first obtaining Hellings' informed written consent or advising him that her duty of undivided loyalty to him would be compromised by her new position.</u>

69.    Bird proposed that she become SW Ventures' general counsel, and did become SW Ventures' general counsel, in or about September 2019.

70.    At the time Bird became SW Ventures' general counsel, Bird had a legal and/or professional relationship with, and responsibility to, Hellings.

2.    Bird's representation of SW Ventures as its general counsel (a) violated Bird's duty of undivided loyalty to Hellings, (b) was directly or potentially adverse to Hellings, and/or (c) entailed a significant risk that Bird's representation would be materially limited by her responsibilities to or relationship with Hellings.

71.    Bird had a duty to communicate and explain to Hellings in writing the relevant

16

circumstances and the material risks, including any actual and reasonably foreseeable adverse consequences of her proposed course of conduct, and including the fact that her duty of undivided loyalty to Hellings could be compromised by her concurrent duty of loyalty to SW Ventures; however, she failed to do so.

72.    Bird had a duty to obtain Hellings' informed written consent and/or written conflict of interest waiver; however, she failed to do so.

73.    Bird had a duty to advise Hellings to seek independent counsel before becoming SW Ventures' general counsel while concurrently representing Hellings, however, she failed to do so.

74.    Plaintiffs are informed and believe and thereon allege that Bird did not reasonably believe that she would be able to provide competent and diligent representation to each affected client upon becoming SW Ventures' general counsel.

2.    <u>Bird proposed that she exchange unbilled claimed attorneys' fees for equity in SW Ventures and now claims to have acquired an undocumented ownership interest in SW Ventures in exchange for those unbilled fees.</u>

75.    In connection with Bird's becoming SW Ventures' general counsel, Bird proposed that she acquire an ownership interest in SW Ventures in exchange for legal fees that Bird claimed she was owed for services previously provided by Bird, Landis and/or Bird Law.

76.    Neither Bird, Landis nor Bird Law ever provided SW Ventures or Hellings with any invoice for the legal services that Bird claimed had been rendered and for which Bird sought to exchange for an ownership interest in SW Ventures.

77.    Neither SW Ventures nor Hellings ever executed any document conferring upon Bird any ownership interest in SW Ventures; Bird nevertheless has asserted that she owns, and/or has the right to own, an interest in SW Ventures as compensation for her purported unbilled legal services.

78.    Bird presently is claiming to be a member of SW Ventures and, upon information and belief, continues to claim an ability to assert control over its business and management with the full rights of a member.

79.    Bird is not, and never has been, a member of SW Ventures.

80.    By virtue of Bird's claiming to have acquired an ownership interest in SW Ventures:

17

(a) it was reasonably foreseeable that Bird's interests would be detrimental to Hellings' interests; and (b) Bird knowingly had a pecuniary interest adverse to Hellings' personal ownership and pecuniary interest in SW Ventures.

81.     To the extent Bird was seeking to have an ownership interest in SW Ventures, Bird had a duty to ensure that the terms of the transaction by which she sought to obtain such ownership interest were fair and reasonable to Hellings; however, the terms Bird proposed (and now claims conferred upon her an ownership interest in SW Ventures) were neither fair nor reasonable to Hellings.

82.     Bird had a duty to fully disclose to Hellings in writing the terms of the transaction through which she proposed to obtain and/or claimed to have obtained an ownership interest in SW Ventures, and Bird's role in such transaction, in a manner that should reasonably have been understood by Hellings; however, Bird failed to do so.

83.     Bird had a duty to advise Hellings in writing to seek the advice of independent counsel of his choosing, and to give him a reasonable opportunity to seek such advice, prior to claiming to have obtained an ownership interest in SW Ventures; however, Bird failed to do so.

84.     Hellings was not represented by independent counsel of his choice in the transaction through which Bird claims to have obtained an ownership interest in SW Ventures.

85.     Bird had a duty to communicate and explain to Hellings in writing the relevant circumstances and material risks, including any actual and reasonably foreseeable adverse consequences of the proposed transaction to Hellings; however, Bird failed to do so.

86.     Bird had a duty to obtain Hellings' informed written consent and/or written conflict of interest waiver regarding the terms of the proposed transaction by which she claims to have acquired an ownership interest in SW Ventures, and her role in such transaction; however, she failed to do so.

87.     Bird's claiming an ownership interest in SW Ventures violated Bird's duty of undivided loyalty to Hellings in that, *inter alia*, Bird claims to have acquired a pecuniary interest in SW Ventures that conflicted with Hellings' own pecuniary interest in SW Ventures.

88.     By virtue of Bird's claiming an ownership interest in SW Ventures, Bird had a direct

pecuniary motive to seek to expel Hellings from SW Ventures in that, *inter alia*, eliminating Hellings' interest would increase the value of her own claimed ownership interest in SW Ventures.

89.    Landis has claimed that some of the unbilled legal fees Bird sought to exchange for an ownership interest in SW Ventures were owed to Landis.  Landis therefore had a financial incentive to assist Bird in expelling Hellings from SW Ventures in that, *inter alia*, eliminating Hellings' interest would increase the value of Bird's claim to, an equity interest in, SW Ventures and the likelihood of Landis being paid the fees he claimed to be owed.

**D.    Bird continued to represent Hellings, individually, after becoming SW Ventures' general counsel.**

90.    Bird continued to act as Hellings' personal attorney after she became SW Ventures' general counsel.

91.    After she became SW Ventures' general counsel, Bird:

a.  Communicated to Hellings that he was her "client;"

b.  Provided Hellings with documentation confirming he was her client;

c.  Held herself out to third parties as Hellings' attorney; and

d.  Took actions expressly on behalf of Hellings as her client.

92.    Bird's continuing to act as Hellings' personal attorney and communicating to Hellings that he was her client, caused Hellings  reasonably to  believe that Bird was his attorney and would fulfill her fiduciary duties to him, including her duties of undivided loyalty and confidentiality.

**E.    Bird developed additional conflicts of interest vis-à-vis Hellings by loaning money to SW Ventures pursuant to promissory notes drafted by Bird that included terms unfavorable to Hellings and SW Ventures.**

93.    In the months following Bird's becoming SW Ventures' general counsel and claiming an ownership interest in the company, Bird developed additional conflicts of interest vis-à-vis Hellings and SW Ventures by becoming a creditor of SW Ventures and by causing SW Ventures to execute promissory notes that included terms unfavorable to SW Ventures and Hellings.

94.    Plaintiffs are informed and believe and thereon allege that, at all relevant times, Bird

19

has had a personal financial interest in a trust called the Jason Steiner Living Trust (hereinafter the "Steiner Trust").

95.     On or about October 19, 2019, while she was Hellings' personal attorney and was acting as SW Ventures' general counsel, Bird arranged for the Steiner Trust to loan up to $200,000 to SW Ventures.

96.     Bird drafted a promissory note corresponding to the loan Bird arranged for the Steiner Trust to make to SW Ventures (hereinafter the "Steiner Trust Note").

97.     Bird referred to the loans that were the subject of the Steiner Trust Note as "my loans."

98.     The Steiner Trust Note contained terms that were unfavorable to Hellings and SW Ventures, including, *inter alia*, (a) an interest rate of sixty percent (60%) per annum, compounded annually, and (b) a prepayment penalty that guaranteed at least $60,000 of interest if the loan was repaid within six months.

99.     Plaintiffs are informed and believe and thereon allege that none of the other promissory notes Bird had created for SW Ventures contained a prepayment penalty.

100.    On or about February 18, 2020, Bird drafted a first amendment to the Steiner Trust Note by which the Steiner Trust would loan up to $400,000 to SW Ventures (the "First Amendment to Steiner Trust Note"). The Steiner Trust Note and the First Amendment to Steiner Trust Note are collectively referred to as the "Steiner Notes."

101.    The First Amendment to Steiner Trust Note contained terms even more unfavorable to Hellings and SW Ventures than the Steiner Trust Note. The First Amendment to Steiner Trust Note contained the same sixty percent (60%) interest rate; however, it increased the potential prepayment penalty to at least $120,000. The First Amendment to Steiner Trust Note also gave the Steiner Trust the option to convert up to $200,000 of debt into equity in SW Ventures and did not permit SW Ventures to prepay the First Amendment to Steiner Trust Note unless the Steiner Trust elected to waive its right to convert the note into equity in SW Ventures.

102.    The Steiner Notes constituted business transactions with Bird's client.

103.    By virtue of the Steiner Notes: (a) it was reasonably foreseeable that Bird's personal

20

1    interests would be detrimental to Hellings and SW Ventures' own interests; and (b) Bird knowingly

2    acquired an ownership or other pecuniary interest adverse to Hellings and SW Ventures.

3        104.    Bird had a duty to ensure that the terms of the Steiner Notes were fair and reasonable

4    to Hellings and SW Ventures; however, those terms were neither fair nor reasonable to Hellings or

5    SW Ventures.

6        105.    Prior to execution of each of the Steiner Notes, Bird had a duty to fully disclose to

7    Hellings and SW Ventures in writing the terms of the Steiner Notes and Bird's role in each such

8    transaction, in a manner that should reasonably have been understood by Hellings and SW

9    Ventures; however, Bird failed to do so.

10        106.    Prior to execution of each of the Steiner Notes, Bird had a duty to advise Hellings

11    and SW Ventures in writing to seek the advice of independent counsel of their respective choosing,

12    and to give them a reasonable opportunity to seek such advice; however, Bird failed to do so.

13        107.    Neither Hellings nor SW Ventures were represented by independent counsel of their

14    respective choosing in the transactions that gave rise to the Steiner Notes.

15        108.    Prior to execution of each of the Steiner Notes, Bird had a duty to communicate and

16    explain to Hellings and SW Ventures in writing the relevant circumstances and material risks,

17    including any actual and reasonably foreseeable adverse consequences of the proposed transaction

18    to each of them; however, Bird failed to do so.

19        109.    Prior to execution of each of the Steiner Notes, Bird had a duty to obtain Hellings

20    and SW Ventures' informed written consent and/or written conflict of interest waiver regarding the

21    terms of the note and Bird's role in such transaction; however, Bird failed to do so.

22        110.    By virtue of the Steiner Notes, Bird violated her duty of undivided loyalty to

23    Hellings in that, *inter alia*, Bird's interests were directly adverse to Hellings and his own interests

24    as a creditor and owner of SW Ventures, and the Steiner Trust's ability to be repaid any monies it

25    loaned to SW Ventures was in direct conflict with Hellings' own ability to be repaid the monies he

26    had loaned to the company.

27        111.    By virtue of the Steiner Notes, Bird had a direct pecuniary motive to expel Hellings

28    from SW Ventures in that, *inter alia*, eliminating Hellings' interest in SW Ventures (a) would

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1  increase the likelihood that the Steiner Notes would be repaid, and (b) would increase the value of

2  the Steiner Trust's convertible interest in SW Ventures.

3  **F.      Hellings created and helped fund a potentially lucrative business infrastructure, and
          brought potentially lucrative deals to SW Ventures.**

4

5      1.      <u>At a cost of more than $1,000,000, Hellings created a working infrastructure for SW
              Ventures and SW Ventures opened its doors in March 2020.</u>

6      112.    SW Ventures' business plan was to use its capital investments to create a business

7  structure from which it could engage in the commercial cannabis business and attract lucrative

8  business partners. This process involved SW Ventures' spending more than $1,000,000 to build out

9  its facility before operations could commence.

10     113.    Hellings expended hundreds of hours creating the infrastructure for SW Ventures for

11  which he did not receive compensation.

12     114.    Hellings also devoted significant time successfully lobbying the City of Costa Mesa

13  to reduce the tax rate for SW Ventures' business from six percent to one percent, thereby

14  dramatically increasing the value of SW Ventures' business.

15     115.    As a result of Hellings' efforts, SW Ventures built a valuable infrastructure and

16  secured valuable licenses for the exploitation of commercial cannabis activity.

17     116.    SW Ventures first became operational in or about March 2020.

18     2.      <u>Hellings presented Chan and Bird with a lucrative opportunity or opportunities
              designed to infuse more than $2,000,000 into SW Ventures.</u>

19

20     117.    Hellings' responsibilities with SW Ventures included generating business for the

21  company.

22     118.    SW Ventures' lack of revenue while its infrastructure was being built created cash

23  flow problems for the company and Chan repeatedly requested that Hellings help him find a

24  strategy to exit SW Ventures that would allow him to recoup his investment in the company.

25     119.    Once SW Ventures became operational in or about March 2020, Hellings began

26  working to develop business arrangements through which SW Ventures could generate revenue and

27  Chan might recoup his investment.

28     120.    Among the potential deals Hellings would bring to SW Ventures, in or about March

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1    or April 2020, Hellings began negotiating with a third-party in the cannabis industry, NewTropic,

2    toward an agreement that would (a) infuse significant capital into SW Ventures, (b) potentially

3    allow Chan to have his interest in SW Ventures purchased for significant compensation, (c) provide

4    ongoing capital to SW Ventures, and (d) significantly expand SW Ventures' business growth.

5        121.    On or about April 29, 2020, Hellings emailed to Bird and Chan a business proposal

6    setting forth proposed terms for NewTropic to invest in SW Ventures.  The deal Hellings was

7    proposing potentially was worth more than $2,000,000 to SW Ventures and/or Chan.

8        122.    Plaintiffs are informed and believe and thereon allege that, rather than have Hellings

9    continue to pursue the potentially lucrative business opportunity with NewTropic, Bird and Chan

10    hatched a scheme through which Bird and Chan could reap the benefits of Hellings' time, effort and

11    monetary investment in SW Ventures, and capitalize on the NewTropic potential deal and/or other

12    business opportunities for their own personal gain, by purporting to expel Hellings from SW

13    Ventures after Hellings had successfully created SW Ventures' infrastructure.

14    **G.**    **Bird and Chan, with the help of Landis, ADLI Law and Bird Law execute a plan to
strip Hellings of his interest in SW Ventures for their own personal financial gain.**

15

16        123.    After (a) Hellings caused SW Ventures to become operational, (b) Hellings brought

17    potentially lucrative deals to SW Ventures, and (c) Bird became inextricably conflicted through her

18    financial transactions with Hellings and SW Ventures, Bird orchestrated a scheme through which

19    she attempted to expel Hellings from SW Ventures.

20        1.    <u>Bird unsuccessfully attempted to convert SW Ventures from a member-managed
company to a manager-managed company, and to have herself appointed as a

21    manager.</u>

22        124.    SW Ventures was at all times a member-managed company, with the business and

23    affairs of the company managed by the members.

24        125.    Unanimous written consent of all of SW Ventures' members was required to convert

25    SW Ventures into a manager-managed limited liability company.

26        126.    Bird and Chan attempted to convert SW Ventures from a member-managed limited

27    liability company into a manager-managed limited liability company, to have Bird appointed as one

28    of SW Ventures' three managers, with Chan and Hellings as the other two managers, and to use

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1 Bird's new-found claimed authority to expel Hellings from SW Ventures.

2     127.    At the time Bird and Chan advanced converting SW Ventures to a manager-managed

3 company and Bird becoming a member of the board of managers:

4           e.    Bird and Chan had legal, business, financial, professional, fiduciary and/or

5               confidential relationships with Hellings; and

6           f.    Bird already had begun an undisclosed and unauthorized "investigation" of

7               Hellings that Bird and Chan would later use as a basis to purport to terminate

8               Hellings' interest in, and positions with, SW Ventures.

9     128.    On or about June 16, 2020, Bird emailed an agenda for a meeting of SW Ventures'

10 members scheduled for the following day, June 17, 2020, in which agenda *Bird recommended*

11 amending SW Ventures' operating agreement (which, in fact, did not exist) to convert the company

12 to a manager-managed company and have herself appointed to the board of managers.  The agenda

13 stated in pertinent part:

14     1.  General Counsel Report: Andrea Bird, General Counsel
     a. Amendments of SWV Amended and Restated Operating Agreement. Recommendations:
15

16       i. Amendment 1: Change from Member-Managed to Manager-Managed with 3
        Members of the Board of Managers

17           1.  Steve/Walton each appoint 1 manager (currently to remain as
              Steve/Walton)
18

19           2.  Steve/Walton jointly appoint 3rd manager (Andrea today to start)

20     129.    In her agenda, Bird expressly acknowledged that converting SW Ventures to a

21 manager-managed company "will require a new amended and restated operating agreement in form

22 because the current agreement is member-managed."

23     130.    SW Ventures' members never provided unanimous written consent to convert SW

24 Ventures into a manager-managed limited liability company or to amend SW Ventures' operating

25 agreement - which, in fact, did not exist.

26     131.    No operating agreement converting SW Ventures to a manager-managed company

27 was ever executed.

28     132.    Prior to seeking a vote on whether SW Ventures should be converted to a manager-

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1  managed company and whether Bird ought to be appointed to the board of managers, as advanced

2  by Bird and Chan, Bird had a duty to, *inter alia:* (a) obtain Hellings' informed written consent

3  and/or a written conflict of interest waiver, (b) communicate and explain to Hellings the relevant

4  circumstances and the material risks, including any actual and reasonably foreseeable adverse

5  consequences that those proposed transactions posed to him, (c) provide written disclosure of the

6  relationship to Hellings, and (d) disclose her conflicts of interests; however, Bird failed to do so.

7       133.    Prior to seeking a vote on whether SW Ventures should be converted to a manager-

8  managed company and whether Bird should be appointed to the board of managers, as advanced by

9  Bird and Chan, Bird and Chan had a duty to disclose to Hellings the material facts that, *inter alia*,

10  (a) Bird was conducting an "investigation" that might be used to expel Hellings from SW Ventures,

11  (b) Hellings was the target of such "investigation," and (c) there was a scheme in place to reap the

12  benefits of Hellings' time, effort and investment in SW Ventures by expelling Hellings; however;

13  Bird and Chan failed to do so.

14       134.    Plaintiffs are informed and believe and thereon allege that, in failing to disclose the

15  foregoing facts to Hellings, Bird and Chan intended to deceive Hellings.

16       135.    Hellings was ignorant of the existence of those facts that Bird and Chan failed to

17  disclose; Plaintiffs are informed and believe and thereon allege that Bird and Chan knew Hellings

18  was ignorant of such facts.

19       136.    On June 17, 2020, Hellings attended the meeting of SW Ventures' invalid board of

20  managers as directed by Bird.  Bird, Bird Law, Chan, and Habermehl also attended.  Bird and Bird

21  Law remained Hellings' personal attorneys at the time.

22       137.    On or about June 18, 2020, Bird circulated proposed minutes of the June 17, 2020

23  meeting.  Those minutes were not approved by all of SW Ventures' members. Indeed, not all of SW

24  Ventures' members were even provided notice of the meeting.

25       138.    SW Ventures' members never provided unanimous written consent to convert the

26  company to a manager-managed company.

27       139.    Bird's attempt to convert SW Ventures into a manager-managed company was

28  ineffective.  SW Ventures remained a member-managed company and any and all purported actions

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1    taken by the alleged managers at the June 17, 2020 meeting are void.

2        140.    In or about March 2021, both SW Ventures and Chan agreed in writing that SW

3    Ventures never was converted to a manager-managed company and all purported actions taken by

4    the alleged managers at the June 17, 2020 meeting are void.

5        2.    <u>Immediately after her failed attempt to convert SW Ventures to a manager-managed</u>

6    <u>company, Bird usurped control of the company and announced an unauthorized</u>
<u>"investigation" into Hellings.</u>

7        141.    Bird began asserting unauthorized control over SW Ventures the day after her failed

8    attempt to convert the company to a manager-managed company.

9        142.    On or about June 18, 2020, just one day after the June 17, 2020 meeting at which

10    Bird called for a vote to appoint herself as a manager of SW Ventures' (illegitimate) board of

11    managers, Bird sent an email to Hellings and others stating that she, Landis and Bird Law would be

12    conducting an "official investigation."  Landis was a Senior Counsel of ADLI Law at the time.

13        143.    That "official investigation" focused on a short-term commercial relationship,

14    discussed below, that Habermehl had brought to SW Ventures.

15        144.    Although Bird's June 18th email suggested that Bird's "investigation" had not yet

16    commenced, on August 31, 2020, Bird admitted that she had begun investigating Hellings no later

17    than on or about June 5, 2020.

18        145.    Bird concealed from Hellings the fact that she had been "investigating" him at the

19    time she advanced that SW Ventures be converted to a manager-managed company and that she be

20    appointed as a manager.

21        146.    As an example, Bird's agenda for the June 17, 2020 meeting at which she sought to

22    convert SW Ventures to a manager-managed company and have herself appointed as a manager,

23    failed to mention any "investigation."

24        147.    Bird had no authority to conduct any "investigation," and particularly not an

25    investigation into Hellings, who was her client and the president of SW Ventures.

26        148.    Hellings, the president of SW Ventures, repeatedly objected in writing to Bird's

27    conducting any "investigation" without proper approval.

28        149.    Over Hellings' objections, Bird continued her "investigation" without seeking such

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1    approval.

2        150.    Landis, ADLI Law and Bird Law assisted Bird in her "investigation" of Hellings.

3        151.    Bird had no authority to retain Landis, ADLI Law or Bird Law for any such

4    "investigation."

5        152.    Landis participated in the "investigation" in his capacity as Senior Counsel of ADLI

6    Law, while Corey Thomas participated as an employee and/or representative of Bird Law.

7        153.    Neither Bird, Landis nor Bird Law had terminated their representation of Hellings at

8    the time they "investigated" him.

9        154.    Bird, Landis, Bird Law and ADLI Law's "investigation" of Hellings was directly

10    adverse to Hellings and/or entailed a significant risk that the representation would be materially

11    limited by their responsibilities to or relationship with Hellings.

12        155.    At the time of their "investigation" Bird, Landis, Bird Law and ADLI Law, by virtue

13    of Landis' representation of Hellings, had a legal and/or professional relationship with, and

14    responsibility to, Hellings.

15        156.    Bird, Landis, Bird Law and ADLI Law had a duty to communicate and explain to

16    Hellings in writing the relevant circumstances and the material risks, including any actual and

17    reasonably foreseeable adverse consequences of their proposed course of conduct; however, they

18    failed to do so.

19        157.    Bird, Landis, Bird Law and ADLI Law had a duty to obtain Hellings' informed

20    written consent and/or written conflict of interest waiver prior to "investigating" him; however, they

21    failed to do so.

22        158.    Plaintiffs are informed and believe and thereon allege that Bird, Landis, Bird Law

23    and ADLI Law did not reasonably believe that they would be able to provide competent and

24    diligent representation to each affected client.

25        159.    Bird, Landis, Bird Law and ADLI Law's "investigation" of Hellings was

26    substantially related to the matter on which Bird, Landis and Bird Law had been retained by

27    Hellings in his individual capacity.

28        160.    Bird, Landis, Bird Law and ADLI Law had a duty to advise Hellings and SW

27

1    Ventures in writing to seek the advice of independent counsel of their respective choosing and to

2    give them a reasonable opportunity to seek such advice; however, they failed to do so.

3        161.    Hellings was not represented by independent counsel of his choosing in connection

4    with such "investigation."

5        3.    <u>While continuing to cause Hellings to believe that they were his attorneys, Bird,
         Landis, Bird Law and ADLI Law interviewed Hellings without first responding to</u>

6        <u>his request as to whether he should consult independent counsel.</u>

7        162.    Bird, Landis, Bird Law and ADLI Law requested that Hellings submit to an

8    interview that took place on June 23, 2020.

9        163.    Bird, Landis, Bird Law and ADLI Law took steps to ensure that Hellings would

10   submit to this interview (a) while under the continued belief that he enjoyed a confidential attorney-

11   client relationship with them, and (b) without the opportunity to seek independent counsel.

12       164.    On or about June 22, 2020 at or about 11:45 a.m., Hellings sent an email to Bird,

13   Landis (while Landis was working for ADLI Law) and Bird Law (a) making clear that he believed

14   that his attorney-client relationship with Bird was ongoing, and (b) inquiring whether he should

15   seek independent counsel in light of Bird's recent purported appointment to SW Ventures'

16   (illegitimate) board of managers:

17       I need to get formal guidance from you in terms of questions on my rights and
         responsibilities in the operating agreement.  I am asking this because you are now a
18       member of the board voting on some of these very issues.  Also I may want to ask
         questions in confidence and you may not be able to keep that confidence do (sic) to
19       your fiduciary responsibility to SW Ventures and the board as a whole.  Should I at
         his (sic) time seek my own outside council [sic] for these type of questions?
20

21       165.    Bird, Landis, ADLI Law and Bird Law had a duty to ensure that Hellings received a

22   timely and full response to his inquiries before Bird, Landis, Bird Law and ADLI Law proceeded to

23   interview Hellings as part of their purported "investigation."

24       166.    To the extent that they were not acting as Hellings' attorneys, Bird, Landis, Bird

25   Law and ADLI Law had a duty to advise Hellings that they were not representing him before

26   commencing their interview of Hellings; however, they failed to do so.

27       167.    Bird, Landis, ADLI Law and Bird Law had a duty to respond to Hellings' inquiry as

28   to whether he should consult with independent counsel before commencing their interview of him;

28

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

however, they failed to do so.

168.    Bird, Landis, Bird Law and ADLI Law's interview of Hellings was scheduled to take place at 2:00 p.m. on June 23, 2020 and actually commenced at 2:01 p.m. that day.

169.    Bird delayed until either 2:00 or 2:01 p.m., the precise time that Bird, Landis, Bird Law and ADLI Law's interview of Hellings began, to respond to Hellings' June 22, 2020 email.

170.    Hellings was unaware of Bird's email response at the time he submitted to Bird, Landis, Bird Law and ADLI Law's multi-hour interview.

171.    At the time Hellings submitted to their multi-hour interview, Hellings was under the reasonable belief that Bird, Landis, Bird Law and ADLI Law owed Hellings the duties that an attorney owes to their client and that he did not need to seek independent counsel.

172.    Had Hellings been aware that Bird, Landis, Bird Law and ADLI Law claimed they did not owe Hellings the duties that an attorney owes to their client, he would have sought independent legal advice before agreeing to submit to and/or submitting to their interview.

173.    On August 31, 2020, Bird admitted that Hellings indicated to her during the June 23, 2020 interview that he believed that Bird was acting as his lawyer.  Specifically, Bird stated that she provided Hellings with an oral *Upjohn* warning during the interview, to which Hellings responded "wait, are you my lawyer?"

174.    Upon Hellings' expressing to Bird, Landis, Bird Law and ADLI Law his belief that she (and Landis) were his attorneys, they had a duty (a) to advise Hellings to seek independent counsel, and (b) to provide him with the opportunity to do so.  However, Bird, Landis, Bird Law and ADLI Law failed to do so and continued interviewing Hellings.

175.    During the June 23, 2020 interview, it became apparent to Hellings that Bird, Landis, Bird Law and ADLI Law were seeking to damage his interests in SW Ventures; he therefore promptly requested the opportunity to consult independent counsel.

176.    Bird, Landis, Bird Law and ADLI Law declined Hellings' request and insisted that Hellings proceed with the interview.

177.    Throughout Bird, Landis, Bird Law and ADLI Law's multi-hour interview of him, Hellings repeatedly requested the opportunity to review certain records before responding to their

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1    questions.  Bird, Landis, Bird Law and ADLI Law refused to allow Hellings to review records

2    before responding to their questions, but assured Hellings that he would have the opportunity to

3    provide additional information and documents for consideration following the interview.

4         178.    As alleged more fully below, Bird, Landis, Bird Law and ADLI Law's assurance

5    was false.

6         179.    Following the conclusion of Bird, Landis, Bird Law and ADLI Law's multi-hour

7    interview of him, Hellings first read the email Bird had sent at 2:00 or 2:01 p.m.:

8         Hi Steve – We'll be calling you in a few minutes.

9         To answer your question: First, for the investigation, as general counsel and
         compliance officer, I represent the company, SW Ventures, not any person
10        individually. As outside counsel, Jon also represents the company, SW Ventures, not
         any person individually. The privilege belongs to the company, not any individual,
11        so our discussion will be privy to the company (ie the board), but not outside of the
         company.

12        As far as the As you mentioned [sic], my fiduciary responsibility is to the company,
13        and my duty is to the company. In terms of your strategy for your rights and
         responsibilities under the operating agreement, I'm happy to answer legal questions
14        about the operating agreement, and I can keep it confidential to the extent possible,
         but I can't promise to keep things confidential if keeping it confidential affects the
15        company's interests – so for anything you want to remain confidential, I do
         recommend consulting your own attorney. Likewise, I cannot keep anything Walton
16        tells me confidential if it negatively affects the company's interests.

17        180.    On August 31, 2020, Bird admitted that, during their interview of Hellings on June

18   23, 2020, Bird, herself, decided that Hellings was "done" at SW Ventures and that his interest in

19   SW Ventures would be terminated.

20        181.    Plaintiffs are informed and believe and thereon allege that Bird shared her decision

21   and intention with Landis and ADLI Law on June 23, 2020.

22        182.    SW Ventures never conferred upon Bird, Landis, Bird Law or ADLI Law the

23   authority to determine that Hellings' interest in SW Ventures would be terminated.

24        4.   <u>Bird improperly noticed a meeting of SW Ventures' (illegitimate) board of managers at
             which she attempted to remove Hellings as an officer and employee of SW Ventures and
25           misrepresented to Hellings the purpose of that meeting.</u>

26        183.    Bird and Chan attempted to remove Hellings from SW Ventures' (illegitimate) board

27   of managers and to remove him as an officer and employee of SW Ventures.

28        184.    Bird set a meeting of SW Ventures' (illegitimate) board of managers for June 24,

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

2020, the day immediately after Bird, Landis, Bird Law and ADLI Law's interview of Hellings.

185.    Bird set the meeting without providing Hellings proper notice of the meeting, nor the general nature of the business to be transacted, as required by California Corporations Code section 17704.07(h)(1).  In fact, Bird deceived Hellings in order to cause him to attend the meeting.

186.    On June 24, 2020 at 6:27 a.m., Hellings sent an email to Bird, Landis and Bird Law objecting to "any discussion of the investigation" and requesting that such discussion be delayed so he could have sufficient time to compile documentary evidence to present "a complete picture" of the issues into which Bird claimed she was investigating.  Hellings also needed time to seek independent counsel.

187.    In response to Hellings' email, Bird misrepresented the scope and purpose of that meeting thereby inducing Hellings to attend the improperly noticed meeting without having consulted such counsel and without the opportunity to compile such documentary evidence.

188.    Bird, Landis, Bird Law and ADLI Law had a duty to be honest and forthright with Hellings regarding the scope and purpose of the June 24, 2020 meeting; however, they were not honest and forthright with him.

189.    Although Bird has admitted that she personally decided that Hellings' interest in SW Ventures would be terminated during their interview of Hellings on June 23, 2020, Bird's email response to Hellings (upon which Landis and Bird Law were copied) represented that the purpose of the meeting was merely to give "bullet point recommendations and findings," "stat[e] that our investigation is ongoing" and "have a board vote to confirm that the board sanctions and supports doing a formal investigation."

190.    Plaintiffs are informed and believe and thereon allege that Bird, Landis, Bird Law and ADLI Law intentionally allowed Hellings to be misled by Bird's email so that Hellings would attend the improperly-noticed meeting despite his lack of opportunity to seek independent counsel or to compile documentary evidence.

191.    At or about 12:47 p.m., approximately thirty minutes before the June 24th meeting began, Bird circulated an untimely agenda for the meeting by email to Hellings, Landis, Chan and Bird Law.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

192.     Bird's untimely agenda made no mention of the fact that the purported removal of Hellings from his positions as an officer and employee of SW Ventures, and as a member of the (illegitimate) board of managers, was among the business to be transacted.

5.     <u>Over Hellings' objection, Chan and Bird ineffectively voted to remove Hellings as SW Ventures' president and employee and from the (illegitimate) board of managers; no vote was had to expel Hellings from SW Ventures.</u>

193.     On June 24, 2020, at or about 1:15 p.m., a meeting took place among Hellings, Chan, Bird, Landis, Bird Law and ADLI Law pursuant to Bird's improper notice.

194.     Although Bird, Landis, Bird Law and ADLI Law had assured Hellings during his June 23, 2020 interview that he would have the opportunity to provide additional information and documents for their consideration following that interview, Bird, Landis, Bird Law, ADLI Law and Chan refused to provide Hellings that opportunity.

195.     Hellings objected to any vote taking place at the June 24, 2020 meeting related to his removal from any position at SW Ventures because, *inter alia*, he had not been provided with notice of that proposed business.  Chan, Bird, Landis, Bird Law and ADLI Law ignored Hellings' objection and Bird and Chan proceeded to vote to remove Hellings as an officer and employee of SW Ventures and as a member of the (illegitimate) board of managers.

196.     No vote was held to expel Hellings as a member of SW Ventures.

197.     On June 25, 2020, Bird circulated minutes of the June 24, 2020 meeting.  According to Bird's minutes:

      a.     Bird moved to remove Hellings "as a member of the Board of Managers;"

      b.     Bird moved to remove Hellings from his positions "as an officer and employee" of SW Ventures;

      c.     Bird declared that Hellings did not have a right to vote on his removal, but noted that Hellings had expressed that he would vote "no;"

      d.     Bird and Chan voted to remove Hellings as a member of SW Ventures' (illegitimate) board of managers and as an officer and employee of the company;

      e.     Bird declared that the motions to remove Hellings as a member of the

32

1    (illegitimate) board of managers and as an officer and employee of SW

2    Ventures had passed unanimously;

3        f.    Bird acknowledged that Hellings expressed his desire to consult with his own

4            counsel; and

5        g.    Bird acknowledged that Hellings stated that he disagreed with the minutes

6            from the June 17, 2020 meeting at which Bird claimed that SW Ventures'

7            members had voted to convert the company to a manager-managed company.

8    198.    Bird and Chan's votes to remove Hellings as an employee and officer of SW

9 Ventures and as a member of the (illegitimate) board of managers were invalid and ineffective as

10 alleged herein.  Indeed, SW Ventures had no legitimate board of managers from which Hellings

11 could be removed.

12    199.    In or about March 2021, both SW Ventures and Chan admitted in writing that all

13 acts of the alleged managers that occurred on June 24, 2020 were null and void, including Bird and

14 Chan's vote to terminate Hellings as an officer and employee of SW Ventures.

15    6.    <u>Bird claims that Chan unilaterally determined to expel Hellings from SW Ventures.</u>

16    200.    As alleged above, Bird and Chan did not vote on the issue of expelling Hellings from

17 SW Ventures or otherwise purport to terminate his ownership interest in the company during the

18 June 24, 2020 meeting.

19    201.    On June 25, 2020, Bird sent an email to Hellings attaching her purported minutes of

20 the June 24, 2020 meeting and stating that "[Chan] has determined" that Hellings' interest in SW

21 Ventures was terminated.

22    202.    Bird and Chan did not notify Hellings that Chan was intending on rendering a

23 determination as to whether Hellings would be expelled from SW Ventures.

24    203.    Chan did not have the right to unilaterally expel Hellings from SW Ventures and

25 terminate his interest in the company.

26    7.    <u>Bird, Chan, Landis, ADLI Law and Bird Law hold a secret meeting to confirm
Chan's claimed expulsion of Hellings and to appoint Chan as SW Ventures' chief</u>

27    <u>executive officer.</u>

28    204.    Bird, Chan, Landis, ADLI Law and Bird Law held a secret meeting of SW Ventures'

33

1    invalid board on July 1, 2020.  Neither Hellings nor all of SW Ventures' members were provided

2    notice of this meeting.

3    205.    In the secret July 1, 2020 meeting, Bird and Chan voted to ratify Chan's decision to

4    remove Hellings "from his membership of SW Ventures" and to appoint Chan as SW Ventures'

5    chief executive officer.

6    206.    Bird, Chan, Landis, ADLI Law and Bird Law concealed the minutes of this meeting

7    from Hellings.

8    207.    The actions of Bird and Chan to ratify the purported removal of Hellings "from his

9    membership of SW Ventures" and to appoint Chan as SW Ventures' chief executive officer were

10   void acts.

11   208.    In or about March 2021, both SW Ventures and Chan admitted in writing that all of

12   the actions taken at the secret July 1, 2020 meeting were null and void, including the vote to ratify

13   Chan's decision to remove Hellings "from his membership of SW Ventures" and to appoint Chan as

14   SW Ventures' chief executive officer.

15   **H.    After claiming to have expelled Hellings from SW Ventures, Bird and Chan (1)
       blocked Hellings from access to SW Ventures' affairs, (2) attempted to capitalize on
16     the lucrative potential deal with NewTropic that Hellings had brought to SW Ventures,
       (3) failed to pay either Hellings or Theresa the wages they are owed, and (4) caused
17     substantial damages to Hellings and SW Ventures.**

18   209.    After Bird announced that Hellings had been expelled from SW Ventures and his

19   interest in the company terminated, Bird and Chan blocked Hellings' access to company-related

20   information and the SW Ventures facility.

21   210.    After Bird announced that Hellings had been expelled from SW Ventures and his

22   interest in the company terminated, Bird and Chan sought to capitalize on the proposed NewTropic

23   deal that Hellings had presented to them at or around the end of April 2020.  Bird contacted

24   NewTropic and attempted to broach with NewTropic resurrecting that deal.  However, NewTropic

25   refused to pursue or discuss any long-term business relationship with Bird or SW Ventures as

26   NewTropic's interest in a deal had depended on Hellings' continued  involvement with SW

27   Ventures.

28   211.    At the time Bird and Chan purported to terminate Hellings' employment with SW

34

1    Ventures, Hellings was owed more than $400,000 in wages.  Hellings has not been paid those

2    wages.  Nor has Theresa been paid the wages she is owed.

3        212.    The purported summary expulsion of Hellings from SW Ventures orchestrated by

4    Defendants has had catastrophic financial consequences to both Hellings and SW Ventures.

5        213.    As Hellings was responsible for generating business opportunities for SW Ventures,

6    Hellings' purported expulsion severely damaged SW Ventures' business prospects.  SW Ventures

7    has received almost no income since Hellings was wrongfully ousted.

8        214.    In addition, Hellings' purported summary termination, *inter alia*:  (a) caused

9    Hellings to remain personally liable for approximately $2,000,000 in rents pursuant to his personal

10    guarantee of the SW Ventures Lease, while depriving him of any ability to control SW Ventures'

11    compliance with its rent obligations or to otherwise protect himself from incurring liability under

12    that guarantee, (b) purported to cause Hellings to lose his substantial capital investment, and (c)

13    substantially decreased the likelihood that SW Ventures could or would pay its debts to Hellings.

14    **I.    Chan begins self-dealing with SW Ventures' assets to pay his personal expenses.**

15        215.    Bird and Chan's purporting to expel Hellings from SW Ventures, terminate his

16    interest in the company and block his access to SW Ventures' affairs allowed Chan to use SW

17    Ventures' funds and assets for Chan's personal benefit.

18        216.    Plaintiffs are informed and believe and thereon allege that certain SW Ventures'

19    financial statements and transaction reports reveal that Chan has transacted in SW Ventures' assets

20    for his own personal benefit.

21        217.    As one example, Plaintiffs are informed and believe and thereon allege that an SW

22    Ventures transaction report reflects that SW Ventures borrowed $50,023.96 on August 7, 2020 and

23    that, three days later, SW Ventures paid $52,998.88 toward Chan's personal credit card debt.

24        218.    Plaintiffs are informed and believe and thereon allege that Chan has used SW

25    Ventures' assets for significantly more personal transactions.

26        219.    Plaintiffs are informed and believe and thereon allege that, *inter alia*:

27            a.    At the time of the transfers, Hellings was a creditor of SW Ventures by virtue

28                of, *inter alia*, his unpaid wages and sums loaned pursuant to the Hellings

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

Note;

    b.    The SW Ventures/Chan transfers were made with the intent to hinder, delay or defraud SW Ventures' creditors, including Hellings;

    c.    Such transfers were to an insider, Chan, who received the transfers with knowledge of SW Ventures' intent by virtue of his position as SW Ventures' chief financial officer and the fact that Chan orchestrated the transfers;

    d.    SW Ventures was insolvent or became insolvent shortly after the transfers;

    e.    At the time of the transfers, SW Ventures' debts were greater than its assets;

    f.    SW Ventures did not receive reasonably equivalent value for the transfers;

    g.    At the time of the transfers, SW Ventures knew it was facing claims by creditors, including Plaintiffs; and

    h.    At the time of the transfers, SW Ventures was engaged in, and/or was about to engage in, a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction and/or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay those debts as they became due.

**J.    Habermehl claims to have an ownership interest in SW Ventures.**

220.    After Hellings' improper purported ouster from SW Ventures, Landis, ADLI Law, Bird and Chan advised Hellings' attorney that Habermehl had been promised an ownership interest in SW Ventures.

221.    On or about February 24, 2021, Hellings, through his attorney, sent a letter to Habermehl requesting that Habermehl advise whether he claimed an ownership interest in SW Ventures.

222.    Habermehl failed to respond to this letter.

223.    Plaintiffs are informed and believe and thereon allege that Habermehl does claim to have an ownership interest in, and/or to be a member of, SW Ventures.

224.    Hellings disputes that Habermehl has any ownership interest in, or is a member of, SW Ventures.

36

**K.   Landis, ADLI Law and Chan manipulate the public record regarding SW Ventures' and WYS Consulting's ownership to create a false record suggesting that Chan has the authority to sell SW Ventures' assets and lie to Hellings to conceal that activity.**

225.   At the time of Hellings' improper purported ouster from SW Ventures, Hellings remained a full member of WYS Consulting, which controlled SW Ventures.

226.   Landis and ADLI Law were aware that Hellings was a member of WYS Consulting as, *inter alia*, Landis had filed the company's initial Articles of Organization identifying Hellings as a member.

227.   On or about July 3, 2020, Landis, while working for ADLI Law and while representing Chan, executed and caused to be filed a Statement of Information with the California Secretary of State for WYS Consulting that omitted Hellings as a member.

228.   Then, on November 12, 2020, Chan executed and caused to be filed a Statement of Information with the California Secretary of State that identified WYS Consulting as SW Ventures' only member, omitting another of SW Ventures' members, RAMM Ventures, LLC.

229.   The two aforementioned false filings with the California Secretary of State created a false public record suggesting that Chan, as the purported sole owner of WYS Consulting, and WYS Consulting, as the purported sole owner of SW Ventures, had the unilateral right to sell SW Ventures and/or its assets.

230.   Plaintiffs are informed and believe and thereon allege that Chan thereafter attempted to sell, and/or negotiated with third parties to sell, SW Ventures and/or its assets without providing any notice of those efforts to Hellings.

231.   In fact, Landis and ADLI Law, and Chan through Landis, misrepresented the status of WYS Consulting to Hellings.  On or about July 24, 2020, Landis and ADLI Law sent a letter to Hellings (via Hellings' counsel) stating that WYS Consulting was a "now defunct" company. Landis, ADLI Law and Chan knew this to be false since, just three weeks earlier, they had executed and caused to be filed a Statement of Information with the California Secretary of State showing that WYS Consulting was an active company.

////

////

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

**L.    Once Chan and Bird took complete control over SW Ventures, they engaged in business deals violating California law and SW Ventures' conditional use permit.**

232.    By the improper purported ouster of Hellings, Chan and Bird arrogated to themselves complete control over SW Ventures.

233.    Upon information and belief, Chan and Bird breached their fiduciary duties to SW Ventures by entering into one or more deals allowing third parties to operate at the SW Ventures' facility in a manner that violated California law and SW Ventures' condition use permit, thereby putting SW Ventures' valuable commercial cannabis license and conditional use permit at risk.

234.    Chan and Bird's allowing third parties to operate at the SW Ventures facility in violation of California Law and the company's conditional use permit has decreased the value of SW Ventures.

**M.    Landis, ADLI Law, Bird, Bird Law and Chan employ misrepresentations, threats and stall tactics.**

235.    After his wrongful purported ouster from SW Ventures, Hellings hired independent counsel who engaged in a series of communications with Bird, Landis and ADLI Law between on or about July 16, 2020 and on or about September 11, 2020.  Landis and ADLI Law represented and spoke on behalf of Bird, Chan and SW Ventures in those communications.

    1.    Landis, ADLI Law, Bird and Bird Law admit to conflicts of interests and that they did not obtain a conflict of interest waiver.

236.    On or about July 24, 2020, Landis and ADLI Law sent a letter to Hellings (via Hellings' counsel) stating (1) that Landis and ADLI Law were representing SW Ventures, Chan and Bird, and (2) that Hellings "is an adverse party."

237.    The matter in which Landis and ADLI Law stated that they were representing SW Ventures, Chan and Bird is substantially related to the matter in which Landis, Bird and Bird Law were retained by Hellings pursuant to the Hellings/Bird Law Engagement Agreement.

238.    Even the Hellings/Bird Law Engagement Agreement expressly prohibited Landis from representing Bird, Chan and SW Ventures in this matter in which Bird, Chan, Bird Law and SW Ventures are adverse to Hellings:

/ / / /

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

In undertaking the concurrent representation of each of you, we cannot and will not advise either of you as to any matters upon which an actual conflict of interest develops among more than one Client.

&ast;&ast;&ast;

[A]s another example, if a dispute arose amongst clients as to ownership rights in a created entity, the situation, if unresolved, could create a conflict of interest which would require Attorney to withdraw from representation and which would require each Client to seek new counsel.

&ast;&ast;&ast;

In the event that any conflict, dispute or disagreement arises between Clients, or between Client(s) and any other client of the Firm, Attorney shall decline to represent any of you in any manner in connection with that dispute or disagreement, but shall continue to represent you and the opposing client of the Firm in non-disputed matters.

239.    Notwithstanding the express language of the Hellings/Bird Law Engagement Agreement, Landis and ADLI Law undertook to represent Chan, Bird and SW Ventures, adverse to Hellings, in a dispute "as to ownership rights in a created entity."

240.    Landis and ADLI Law had a duty to obtain Hellings' informed written consent before representing Bird, Chan and SW Ventures; however, they failed to do so.

241.    In their July 24, 2020 letter, Landis and ADLI Law, in their capacity as counsel for Bird, admitted that Bird had a conflict of interest with Hellings in that she "has a financial interest in this matter."

242.    On August 31, 2020, Landis and Bird represented that the only document of which they were then aware in which either of them advised Hellings that Bird and/or Landis were not acting as his attorney was the Hellings/Bird Law Engagement Agreement.

243.    Bird further stated that she would confirm whether any such additional documents existed and, if so, provide them to Hellings' counsel.

244.    Neither Bird nor Landis have provided Hellings' counsel any such additional documents in which Hellings was advised that Bird and/or Landis were not acting as his attorneys.

2.    <u>Landis, ADLI Law, Bird and Bird Law falsely claimed that Bird, Landis and Bird Law never represented Hellings.</u>

245.    Hellings formally engaged Bird Law, Bird and Landis pursuant to the Hellings/Bird Law Engagement Agreement that expressly identified Hellings as their client, as alleged above.

246.    Bird subsequently held herself out to Hellings and others as Hellings' attorney.

39

247.    Bird and Landis, including while Landis was Senior Counsel for ADLI Law, provided legal advice to Hellings from 2018 into 2020.

248.    On or about July 16, 2020, Hellings' counsel requested that Bird, Landis, Bird Law and ADLI Law provide Hellings the "totality of [their] file related to" their representation of Hellings "in connection with the formation of SW Ventures and his involvement in that entity."

249.    Bird and Landis did not provide Hellings with his client file.

250.    Notwithstanding the express language of the Hellings/Bird Law Engagement Agreement, Bird, Landis, Bird Law and ADLI Law asserted in Landis and ADLI Law's letter dated July 24, 2020 that Bird and Landis "do not, and have never, represented Mr. Hellings in his personal capacity."

251.    Bird, Landis, Bird Law and ADLI Law's claim that Bird and Landis "do not, and have never, represented Mr. Hellings in his personal capacity" was false.

252.    Bird and Bird Law subsequently admitted after the instant lawsuit was filed that Bird and Bird Law did represent Hellings, however, they now claim that their representation of Hellings ended in or about May 2018.  Bird and Bird Law have not identified any document or communication reflecting that their representation of Hellings ended in or about May 2018 and no such documentation exists.

3.    Landis and ADLI Law threaten criminal, administrative and/or disciplinary charges to obtain an advantage in a civil dispute against Hellings in violation of California Rule of Professional Conduct 3.10.

253.    In their letter dated July 24, 2020, Landis and ADLI Law attempted to bully Hellings into walking away from his substantial investment in SW Ventures in exchange for essentially no meaningful compensation.

254.    Landis and ADLI Law's letter further stated that SW Ventures was providing Hellings this "chance to recoup funds … without elevating matters to potential involvement of regulatory or law enforcement authorities."

255.    Plaintiffs are informed and believe and thereon allege that Landis and ADLI Law's letter constituted a threat to present criminal, administrative and/or disciplinary charges to obtain an advantage in a civil dispute within the meaning of California Rule of Professional Conduct 3.10.

40

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

4. <u>Landis, Bird, ADLI Law, Chan and SW Ventures induced Plaintiffs to delay filing the instant action by promising to provide documentation supporting the purported termination of Hellings' interest in SW Ventures only to fail to provide any such documentation.</u>

256.    From July 24, 2020 until September 11, 2020, Landis, ADLI Law, Bird, SW Ventures and Chan repeatedly promised to provide Hellings with the evidence they claim supported the purported termination of Hellings' interest in SW Ventures.

257.    For example, in Landis and ADLI Law's July 24, 2020 letter, Landis, ADLI Law, and their clients, Bird, Chan and SW Ventures, stated that they would provide Hellings with "documentation of Mr. Hellings' actions for which he was removed upon execution of a confidentiality agreement."

258.    Plaintiffs did execute a confidentiality agreement as requested and Bird and Landis told Plaintiffs' counsel that Chan and Bird would execute the confidentiality agreement and provide a counter-signed copy along with, *inter alia*, documents supporting Hellings' purported expulsion from SW Ventures and Bird's and Habermehl's claimed right to an ownership interest in SW Ventures.

259.    After nearly two months of stalling, on September 11, 2020, Landis and ADLI Law represented that they would provide promised documentation by September 14, 2020.

260.    Although Defendants repeatedly represented that they would provide Plaintiffs with documents regarding their purported termination of Hellings' interest in SW Ventures, they have not done so.

261.    Based upon, *inter alia*, Chan, Bird, Landis and ADLI Law's drawn out and unfulfilled promises to execute the agreed-upon confidentiality agreement and provide Hellings with documents supporting the purported termination of his interest in SW Ventures, Plaintiffs are informed and believe and thereon allege that those defendants' promises were merely a tactic designed to cause Plaintiffs to compromise their rights and delay filing the instant action in order for Chan, Bird and Habermehl to exploit SW Ventures for their personal benefit and for Chan to secretly seek to sell SW Ventures and/or its assets.

/ / / /

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

5.    <u>Bird, Landis and ADLI Law provided a detailed verbal report that confirmed that there was no basis to oust Hellings from SW Ventures.</u>

262.    At Bird, Landis and ADLI Law's request, they had a lengthy telephone call with Plaintiffs' attorneys on August 31, 2020.

263.    In that call, Bird, Landis and ADLI Law purported to describe the evidence upon which Bird and Chan relied in ousting Hellings from SW Ventures.

264.    Bird, Landis and ADLI Law stated that Hellings was ousted due to his having allegedly allowed a third party, Mr. Rendhel Pierre-Louis, and his associates (hereinafter "Pierre-Louis"), to engage in gray or black-market cannabis activity from SW Ventures' facility.

265.    Providing some background information related to SW Ventures' relationship with Pierre-Louis:

266.    After SW Ventures opened its doors, Habermehl introduced Pierre-Louis to SW Ventures as a source of potential business for SW Ventures on or about May 8, 2020. This date coincided with Bird's putting into motion her plan to oust Hellings from SW Ventures.

267.    Hellings conducted a reasonable investigation into Pierre-Louis' bona fides, including relying upon Habermehl's recommendation of Pierre-Louis.  After conducting such reasonable investigation, Hellings negotiated a verbal  contract with Pierre-Louis on behalf of SW Ventures by which Pierre-Louis would be allowed to process cannabis and sell product at SW Ventures' facility for a fee.

268.    As part of the deal to which Hellings agreed on behalf of SW Ventures, Pierre-Louis paid a $105,000 advance to SW Ventures, which funds were used by SW Ventures to pay a deposit to a company called Family Florals for future product supplies. Chan was aware of the deal with Pierre-Louis and the fact that Pierre-Louis advanced $105,000 to SW Ventures to fund the Family Florals contract.

269.    Pierre-Louis began lawfully selling product from SW Ventures' facility on or about May 16, 2020.

270.    In order to ensure compliance with the California Code of Regulations, SW Ventures used a "track and trace" software program called Metrc.  Hellings took reasonable steps to ensure

42

1   that product sold by Pierre-Louis was entered into Metrc and that Metrc verified that such product

2   was being sold only to licensed customers.

3       271.    SW Ventures' working relationship with Pierre-Louis was brief.  After about a week

4   of Pierre-Louis' selling product from SW Ventures' facility, Hellings became concerned, but could

5   not confirm, that one of the licensed cannabis distributors to which Pierre-Louis was selling

6   product, Kanna Kingdom, might be distributing product into the gray or black market.

7       272.    Hellings never knowingly participated in any gray or black-market activity.

8       273.    Upon becoming suspicious of Pierre-Louis, Hellings attempted to terminate SW

9   Ventures' business relationship with Pierre-Louis.

10      274.    When Hellings attempted to terminate SW Ventures' relationship with Pierre-Louis,

11  Pierre-Louis began threatening Hellings and refused to leave SW Ventures' facility.

12      275.    Hellings therefore sought Bird's assistance in terminating SW Ventures' relationship

13   with Pierre-Louis.  Hellings attempted to discuss his concerns about Pierre-Louis with Bird during

14  the week of May 26, 2020; however, Bird was not readily available to speak with him until on or

15  about June 2, 2020.

16      276.    On or about June 2, 2020, Hellings made clear to Bird that he wanted to terminate

17  SW Ventures' business relationship with Pierre-Louis.

18      277.    Hellings blocked Pierre-Louis' access to the SW Ventures facility by disabling a key

19  fob Pierre-Louis had been provided.

20      278.    Bird then took control of SW Ventures' relationship with Pierre-Louis and, over

21  Hellings' objection, (a) caused Pierre-Louis' access to SW Ventures' facility to be restored, (b)

22  continued to allow Pierre-Louis to operate at the facility, and (c) negotiated with Pierre-Louis

23  toward a written contract by which Pierre-Louis could continue using the SW Ventures facility to

24  process and/or sell cannabis products.

25      279.    On August 31, 2020, Bird, Landis, (and Chan through Landis) admitted:

26          a.      By on or about June 2, 2020, Hellings had insisted to Bird that SW Ventures

27                  immediately terminate its relationship with Pierre-Louis;

28          b.      By on or about June 2, 2020, Bird had been advised that Pierre-Louis might

43

be selling to a distributor that *might* be engaged in gray or black-market activity; and

    c.    After on or about June 2, 2020, "everyone" at SW Ventures (presumably including Bird, Chan and Habermehl) *except Hellings* agreed that SW Ventures should formalize a deal with Pierre-Louis; however, Hellings (and only Hellings) insisted that SW Ventures immediately remove Pierre-Louis from SW Ventures' facility.

280.    Notwithstanding Hellings' insistence that SW Ventures immediately terminate its relationship with Pierre-Louis, Bird, Chan and Habermehl permitted Pierre-Louis to continue selling cannabis product that they were aware might enter the gray or black market until some days later.

281.    Bird and Chan subsequently used Hellings' interactions with Pierre-Louis as a pretext to execute their plan to oust Hellings from SW Ventures.

282.    Plaintiffs are informed and believe and thereon allege that, after ousting Hellings from SW Ventures, Chan, Bird and Habermehl entered into an arrangement with one of Pierre-Louis's cohorts to operate at SW Ventures' facility for their own financial gain and in a manner that violated California law and SW Ventures' conditional use permit.

283.    Bird, Landis and ADLI Law stated that Hellings was ousted due to his having allegedly allowed Pierre-Louis, to engage in gray or black-market cannabis activity from SW Ventures' facility, as alleged above.

284.    Engaging in black market cannabis sales is a violation of California law.

285.    In the event Bird or Chan believed that Hellings or anyone else had engaged in black market cannabis activity at the SW Ventures facility, they were required by law to report such activity to the Bureau of Cannabis Control and local law enforcement.  Plaintiffs are informed and believe and thereon allege that no one at SW Ventures reported any such conduct to the Bureau of Cannabis Control or local law enforcement.

286.    Bird and Landis (and Chan through Landis), also admitted on August 31, 2020 that, as of August 31, 2020:

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

a. They were unable to identify any financial transaction that would constitute a breach of Hellings' fiduciary duty to SW Ventures other than Bird's (erroneous) claim that Hellings did not have the authority to accept an advance from Pierre-Louis; and

b. The only evidence that they claimed confirmed any gray or black-market activity by Pierre-Louis was adduced through Bird, Landis and ADLI Law's interview of Hellings and that, upon Hellings' statements in that interview, Bird decided to oust Hellings from SW Ventures (in fact, even Bird herself on August 31, 2020 made clear that Hellings merely suspected that Pierre-Louis *might* have been engaging in gray market cannabis activity and thereafter insisted that SW Ventures desist all activity with Pierre-Louis).

**N.    Hellings advanced $105,000 to SW Ventures to repay Pierre-Louis; after wrongfully purporting to expel Hellings from SW Ventures, Bird and Chan recouped Hellings' money but refused to return it to Hellings.**

287.    As alleged above, Pierre-Louis advanced $105,000 to SW Ventures that SW Ventures used to fund a contract with Family Florals.

288.    At or about the time Hellings attempted to terminate SW Ventures' relationship with Pierre-Louis, Pierre-Louis demanded to be repaid the $105,000.

289.    SW Ventures did not have the $105,000 to repay Pierre-Louis because that money had already been paid to Family Florals.

290.    On or about June 5, 2020, Hellings advanced $105,000 to SW Ventures for SW Ventures to repay Pierre-Louis.

291.    After purporting to expel Hellings from SW Ventures, SW Ventures sold the Family Florals contract to NewTropic for $100,000.

292.    On August 31, 2020, Bird stated that the $100,000 received from NewTropic may have been paid to Chan rather than to SW Ventures and promised to provide Hellings with documentation confirming the disposition of those funds, but she failed to do so.

293.    The $100,000 that NewTropic paid to SW Ventures and/or Chan for the Family Florals contract can be traced directly to the $105,000 that Hellings advanced to SW Ventures on or

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1  about June 5, 2020 and belongs to Hellings.

2      294.    SW Ventures and Chan have failed and refused to return that money to Hellings.

3  **O.    SW Ventures and Chan agree that Hellings was improperly ousted from SW Ventures
4  but continue to refuse to allow Hellings necessary access to SW Ventures' records and
facility.**

5      295.    After the instant lawsuit was filed, SW Ventures hired a new attorney to, *inter alia*,

6  "conduct an inquiry into the membership of SW Ventures, LLC."

7      296.    On March 26, 2020, SW Ventures circulated a memorandum (the "SW Ventures'

8  Membership Memo") that set forth its position related to SW Ventures' ownership and the validity

9  of Bird's and Chan's ouster of Hellings.

10     297.    In the SW Ventures' Membership Memo, SW Ventures set forth the following

11  positions:

12          g.   Bird's attempt to convert SW Ventures into a manager-managed limited liability

13              company was ineffective and SW Ventures at all times remained a member-

14              managed company;

15          h.   SW Ventures' members as of March 26, 2021, were WYS Consulting and

16              RAMM Ventures, LLC;

17          i.   WYS Consulting's members are Hellings and Chan with Chan owning a

18              (roughly) sixty percent (60%) interest and Hellings owning a (roughly) forty

19              percent (40%) interest;

20          j.   Neither Bird nor Habermehl ever acquired a membership interest in SW

21              Ventures;

22          k.   SW Ventures does not have a valid operating agreement with any governance

23              provisions; and

24          l.   All actions of SW Ventures' purported board of managers, including the

25              purported actions at the June 24, 2020 and July 1, 2020 meeting as herein

26              alleged, are null and void.

27     298.    On March 30, 2021, Chan, through his attorney, asserted in writing that he agreed

28  with the conclusions and assertions in the SW Ventures' Membership Memo.

46

299.    Thus, as of March 30, 2021, both SW Ventures and Chan acknowledge that Hellings' purported ouster from his positions with SW Ventures was void and invalid.

300.    Chan and SW Ventures are in possession of the records of SW Ventures and WYS Consulting.

301.    Despite the fact that SW Ventures and Chan have acknowledged that the actions purporting to oust Hellings were null and void, they have failed to provide Hellings with access to SW Ventures' records and facility or to recognize Hellings' rights as the president of SW Ventures.

302.    Hellings has requested in writing to inspect and copy the records of SW Ventures pursuant to, *inter alia*, California Corporations Code section 17704.10.

303.    Plaintiffs are informed and believe and thereon allege that Chan, and SW Ventures while being controlled by Chan, have not provided Hellings with access to SW Ventures' records and facility in order to shield Chan from evidence that he has breached his duty to SW Ventures by, *inter alia*, allowing unlawful operations in SW Ventures' facility.

304.    As a result of Defendants' tortious conduct alleged herein, Hellings was required to act in the protection of his interests in SW Ventures and was forced to lose time and incur attorneys' fees and other expenditures in order to protect his interest.

**FIRST CAUSE OF ACTION**

**PROFESSIONAL NEGLIGENCE**

**(Hellings Against Bird, Landis, Bird Law, ADLI Law and Does 1-50)**

305.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

306.    In acting as counsel for Hellings and providing legal services to Hellings, including, *inter alia*, the acts and omissions alleged herein, Bird, Landis, Bird Law and ADLI Law failed to provide those services in accordance with the standards of care applicable to attorneys practicing law in the State of California, including, *inter alia*, failing to exercise due care to protect Hellings' best interests, breaching their duties of competence, loyalty, communication, disclosure, honesty and candor, violating California's Rules of Professional Conduct and failing to use such skill, prudence and diligence as members of the profession commonly possess and exercise.

307.    The foregoing professional negligence by Bird Law, Bird, Landis and ADLI Law

caused damage to Hellings within the jurisdiction of this Court and in excess of $3,000,000.

<strong>SECOND CAUSE OF ACTION</strong>

<strong>CONSTRUCTIVE FRAUD</strong>

<strong>(Hellings Against Bird, Landis, Bird Law, ADLI Law, Chan and Does 1-50)</strong>

308.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

309.    Hellings had a fiduciary and/or confidential relationship with Bird, Landis, Bird Law and Chan at all relevant times beginning no later than in or about April 2018.

310.    Hellings had a fiduciary and/or confidential relationship with ADLI Law at all relevant times beginning no later than in or about 2019.

311.    At all relevant times, and at least through and including on or about June 24, 2020, Bird and Bird Law had a fiduciary obligation to disclose material facts to Hellings, including, *inter alia*, (a) that they purportedly were not representing Hellings in certain transactions and were not protecting his interests, (b)  the existence of certain conflicts of interest vis-à-vis Hellings as alleged herein, (c) that Hellings could not rely on their fulfilling their fiduciary duties to Hellings; (d) the information regarding Bird's and Bird Law's purported "investigation" of Hellings, and (e) Bird's own dealings with Pierre-Louis and the scheme to reap the benefits of Hellings' time, effort and monetary investment in SW Ventures for Bird and Chan's own personal gain by stripping Hellings of his interest in the company.

312.    At all relevant times, and at least through and including on or about June 24, 2020, Landis had a fiduciary obligation to disclose material facts to Hellings, including, *inter alia*, (a) that he purportedly was not representing Hellings in certain transactions, (b) the existence of certain conflicts of interest vis-à-vis Hellings as alleged herein, (c) information regarding Landis' purported "investigation" of Hellings, and (d) the scheme to reap the benefits of Hellings' time, effort and monetary investment in SW Ventures for Bird and Chan's own personal gain by stripping Hellings of his interest in the company.

313.    At all relevant times from in or about 2019, and at least through and including on or about June 24, 2020, ADLI Law had a fiduciary obligation to disclose material facts to Hellings, including, *inter alia,* (a) that ADLI Law purportedly was not representing Hellings in certain

48

transactions, (b) the existence of certain conflicts of interest vis-à-vis Hellings as alleged herein, (c) certain information regarding ADLI Law's purported "investigation," and, (d) the scheme to reap the benefits of Hellings' time, effort and monetary investment in SW Ventures for Bird and Chan's own personal gain by stripping Hellings of his interest in the company.

314.    At all relevant times and at least through and including on or about June 24, 2020, Chan had a fiduciary obligation to disclose material facts to Hellings, including, *inter alia,* (a) the scheme to reap the benefits of Hellings' time, effort and monetary investment in SW Ventures for Bird and Chan's own personal gain by stripping Hellings of his interest in the company, (b) Chan's self-dealing with SW Ventures' assets, (c) Chan's manipulation of the public record regarding WYS Consulting and SW Ventures, (d) Chan's attempts to sell SW Ventures and/or its assets for Chan's own benefit and (e) Chan's unlawful use of the SW Ventures license and facility.

315.    Defendants failed to disclose such facts to Hellings as alleged herein.

316.    Plaintiffs are informed and believe and thereon allege that, in failing to disclose the facts that Defendants failed to disclose, Defendants intended to deceive Hellings.

317.    Hellings relied upon Defendants' representations alleged herein and the fact that they would disclose to him the material facts including, *inter alia*, the material facts herein alleged.

318.    As a result of Defendants' constructive fraud, Hellings has been damaged in an amount within the jurisdiction of this Court and in excess of $3,000,000.

319.    The above-described conduct of Defendants was willful, fraudulent and malicious, and was intended to cause injury to Hellings.  Defendants are therefore liable for exemplary or punitive damages.

**THIRD CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**(Hellings Against Bird, Landis, Bird Law, ADLI Law, Chan and Does 1-50)**

320.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

321.    As legal counsel to Hellings, Bird, Landis, Bird Law and ADLI Law each owed Hellings the duties of a fiduciary.

322.    As a co-member of SW Ventures and/or WYS Consulting, Chan owed Hellings the

49

1   duties of a fiduciary.

2       323.    As purported members of SW Ventures' (illegitimate) board of managers, Bird and

3   Chan owed Hellings the duties of a fiduciary.

4       324.    By their acts and omissions alleged herein, Defendants, and each of them, breached

5   their respective fiduciary duties to Hellings.

6       325.    The forgoing breaches of fiduciary duty by Defendants caused damage to Hellings

7   within the jurisdiction of this Court and in excess of $3,000,000.

8       326.    The above-described conduct of Defendants was willful, fraudulent and malicious,

9   and was intended to cause injury to Hellings.  Defendants, and each of them, are therefore liable for

10   exemplary or punitive damages.

11                          **FOURTH CAUSE OF ACTION**

12                  **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

13          **(Hellings Against Bird, Landis, Bird Law, ADLI Law, Chan and Does 1-50)**

14      327.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

15      328.    Bird, Landis, Bird Law, ADLI Law and Chan each aided and abetted their co-

16   defendants' breaches of their respective fiduciary duties to Hellings.

17      329.    By aiding and abetting their fellow fiduciaries' breaches of fiduciary duty as alleged

18   herein, Defendants caused damage to Hellings within the jurisdiction of this Court and in excess of

19   $3,000,000.

20      330.    The above-described conduct of Defendants was willful, fraudulent and malicious,

21   and was intended to cause injury to Hellings.  Defendants are therefore liable for exemplary or

22   punitive damages.

23                          **FIFTH CAUSE OF ACTION**

24                          **BREACH OF CONTRACT**

25              **(Hellings against Bird, Landis, Bird Law and Does 1-50**

26      331.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

27      332.    Hellings, on the one hand, and the Bird Law Attorneys, on the other hand, entered

28   into the Hellings/Bird Law Engagement Agreement by which the Bird Law Attorneys agreed to

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

provide legal services to Hellings.

333.    Pursuant to the Hellings/Bird Law Engagement Agreement, the Bird Law Attorneys agreed, *inter alia*, (a) that they would not advise a client as to any matters upon which an actual conflict of interest developed among more than one client, (b) that they would not advise a client as to any matters upon which an actual conflict of interest developed among a client and another client, and (c) that, in the event that any conflict, dispute or disagreement arose between clients, or between client(s) and any other client, they would decline to represent any of the clients in connection with that dispute or disagreement.

334.    Hellings has performed all conditions, covenants and promises required on his part under the Hellings/Bird Law Engagement Agreement, except for any performance excused by the acts and omissions of the Bird Law Attorneys.

335.    Bird breached the Hellings/Bird Law Engagement Agreement by, *inter alia,* (a) representing SW Ventures with respect to the SW Ventures Lease, and (b) representing SW Ventures in connection with the purported "investigation" and purported expulsion of Hellings.

336.    Landis breached the Hellings/Bird Law Engagement Agreement by, *inter alia,* (a) representing SW Ventures with respect to the SW Ventures Lease, (b) representing SW Ventures in connection with the purported "investigation" and purported expulsion of Hellings, (c) representing SW Ventures, Bird, Bird Law and Chan in connection with the instant dispute regarding Hellings' ownership and other interests in SW Ventures and (d) assisting Chan by executing a Statement of Information falsely claiming Chan to be the sole member of WYS Consulting and causing that document to be filed with the California Secretary of State's office.

337.    Bird Law breached the Hellings/Bird Law Engagement Agreement by, *inter alia,* (a) representing SW Ventures with respect to the SW Ventures Lease, and (b) representing SW Ventures in connection with the purported "investigation" and purported expulsion of Hellings.

338.    Hellings has been damaged by Bird, Landis and Bird Law's breaches of contract in an amount to be proven at trial and in excess of $3,000,000.

/ / / /

/ / / /

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

**SIXTH CAUSE OF ACTION**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Hellings Against Bird, Landis, Bird Law and DOES 1 through 50)**

339.   Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

340.   Hellings entered into the Hellings/Bird Law Engagement Agreement by which the Bird Law Attorneys agreed to provide legal services to Hellings.

341.   Hellings has performed all conditions, covenants and promises required on his part under the Hellings/Bird Law Engagement Agreement, except for any performance excused by the acts and omissions of the Bird Law Attorneys.

342.   Hellings is informed and believes and thereon alleges that the Bird Law Attorneys have unfairly interfered with Hellings' rights to receive the benefits of the Hellings/Bird Law Engagement Agreement as herein alleged.

343.   Hellings has been damaged by the Bird Law Attorneys' breaches of the implied covenant of good faith and fair dealing in an amount to be proven at trial and in excess of $3,000,000.

**SEVENTH CAUSE OF ACTION**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Hellings Against Chan and DOES 1 through 50)**

344.   Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

345.   Hellings entered into various business agreements with Chan related to WYS Consulting and SW Ventures.

346.   Hellings has performed all conditions, covenants and promises required on his part under those agreements related to WYS Consulting and SW Ventures, except for any performance excused by the acts and omissions of Chan.

347.   Hellings is informed and believes and thereon alleges that Chan has unfairly interfered with Hellings' rights to receive the benefits of the agreements related to WYS Consulting and SW Ventures as herein alleged.

348.   Hellings has been damaged by Chan's breaches of the implied covenant of good

52

faith and fair dealing in an amount to be proven at trial and in excess of $3,000,000.

**EIGHTH CAUSE OF ACTION**

**DECLARATORY RELIEF:  IMPOSITION OF CONSTRUCTIVE**

**AND/OR RESULTING TRUST ($100,000)**

**(Hellings Against SW Ventures, Chan and Does 1-50)**

349.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

350.    Hellings contends that, *inter alia*, the $100,000 received from NewTropic in exchange for the Family Florals contract should be declared to be held in trust, whether constructive or resulting, for the benefit of Hellings.

351.    Hellings is informed and believes and thereon alleges that SW Ventures and Chan contend that some or all of those assets belong to SW Ventures and/or Chan.

352.    Hellings desires a declaration of the parties' respective rights and duties with respect to such $100,000.  Specifically, Hellings seeks a declaration that all such $100,000 belong to Hellings and that SW Ventures and Chan hold such $100,000 as constructive and/or resulting trustees for Hellings, as well as any and all additional relief the Court deems appropriate.

353.    Such declarations are necessary and appropriate at this time under the circumstances in order that the parties may determine their respective rights and duties with respect to the $100,000.  The unsettled state of affairs with respect to this issue has and will continue to prejudice the rights of Hellings.

**NINTH CAUSE OF ACTION**

**CONVERSION**

**(Hellings Against SW Ventures, Chan and Does 1-50)**

354.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

355.    At all relevant times, Hellings has been the owner of, and had a right to possession to, the $100,000 paid by NewTropic.

356.    SW Ventures and Chan have wrongfully converted those funds to their own unauthorized use.

357.    Hellings has been damaged by SW Ventures and Chan's tortious conversion of such

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1    funds in an amount to be proven at trial and in the amount of at least $100,000.

2    358.    The above-described conduct of SW Ventures and Chan was willful, fraudulent and

3    malicious, and was intended to cause injury to Hellings.  SW Ventures and Chan are therefore liable

4    for exemplary or punitive damages.

5    **TENTH CAUSE OF ACTION**

6    **BREACH OF PROMISSORY NOTE**

7    **(Hellings Against SW Ventures and Does 1-50)**

8    359.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

9    360.    Hellings and SW Ventures entered into a lawful written contract consisting of the

10    Hellings Note in which SW Ventures agreed to pay Hellings the principal sum of any funds

11    disbursed in accordance with the Hellings Note up to $400,000.00, with interest thereon.

12    361.    Hellings loaned SW Ventures at least $199,356 pursuant to the Hellings Note.

13    362.    Hellings has performed all of his obligations under the Hellings Note.

14    363.    SW Ventures has breached the terms of the Hellings Note by failing to repay the

15    note or any of the interest thereon.

16    364.    Hellings has been damaged by SW Ventures' breach of the Hellings Note in an

17    amount to be proven at trial and in the principal sum of at least $199,356 plus interest thereon.

18    <u>**ELEVENTH CAUSE OF ACTION**</u>

19    <u>**MONEY HAD AND RECEIVED**</u>

20    **(Hellings Against SW Ventures and Does 1-50)**

21    365.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

22    366.    SW Ventures became indebted to Hellings in the sum of at least $554,000 for money

23    had and received by SW Ventures for its use and benefit.

24    367.    Hellings has demanded payment from SW Ventures.  Despite Hellings' demand, no

25    portion of the $554,000 has been repaid.

26    368.    There is now due and owing from SW Ventures to Hellings at least $554,000 plus

27    interest thereon.

28    / / / /

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

**TWELFTH CAUSE OF ACTION**

**MONEY PAID OR LENT**

(Hellings Against SW Ventures and Does 1-50)

369.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

370.    SW Ventures has become indebted to Hellings in the sum of at least $554,000 for money paid or lent by Hellings to SW Ventures at its request.

371.    Hellings has demanded payment from SW Ventures.  Despite Hellings' demand, no portion of the at least $554,000 has been repaid.

372.    There is now due and owing from SW Ventures to Hellings at least $554,000 plus interest thereon.

**THIRTEENTH CAUSE OF ACTION**

**QUASI CONTRACT / UNJUST ENRICHMENT / RESTITUTION**

(Hellings Against SW Ventures, Chan and Does 1-50)

373.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

374.    SW Ventures and Chan have knowingly received and accepted Hellings' $105,000 and the $100,000 from NewTropic, and Hellings' unpaid labor, as herein alleged under circumstances in which it would be unjust, and at the expense of Hellings, for SW Ventures and Chan to retain such sums.

375.    SW Ventures and Chan have been unjustly enriched to Hellings' detriment and damage and Hellings is entitled to restitution in an amount to be proven at trial and in the sum of at least $100,000.

**FOURTEENTH CAUSE OF ACTION**

**FAILURE TO TIMELY PAY WAGES DUE UPON TERMINATION OF EMPLOYMENT**

(Hellings Against SW Ventures and Does 1-50)

376.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

377.    California Labor Code sections 201 and 202 requires SW Ventures to pay its employees all wages due immediately upon termination of employment.  Labor Code section 203 provides that if an employer willfully fails to timely pay such wages the employer must, as a

55

penalty, continue to pay the subject employee's wages until the back wages are paid in full or an action is commenced.  The penalty cannot exceed thirty (30) days of wages.

378.    Hellings was entitled to all accrued wages and compensation due, immediately upon the purported termination of his employment with SW Ventures; however, SW Ventures has failed and refused to pay such wages and compensation.

379.    As a consequence of SW Ventures' willful conduct in failing to pay wages and compensation earned, Hellings is entitled to thirty (30) days' wages as a penalty, together with interest thereon and attorneys' fees and costs pursuant to Labor Code sections 218.5 and 1194, Code of Civil Procedure section 1021.5 and/or any other applicable statute.

## FIFTEENTH CAUSE OF ACTION

### FAILURE TO TIMELY PAY ALL WAGES DUE UPON TERMINATION OF EMPLOYMENT

### (Theresa Against SW Ventures and Does 1-50)

380.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

381.    Theresa is entitled to all accrued wages and compensation due; however, SW Ventures has failed and refused to pay such wages and compensation.

382.    As a consequence of SW Ventures' willful conduct in failing to pay wages and compensation earned, Theresa is entitled to thirty (30) days' wages as a penalty, together with interest thereon and attorneys' fees and costs pursuant to Labor Code sections 218.5 and 1194, Code of Civil Procedure section 1021.5 and/or any other applicable statute.

## SIXTEENTH CAUSE OF ACTION

### TO RECOVER FRAUDULENT TRANSFER (Cal. Civ. Code § 3439 *et seq.*)

### (Hellings Against SW Ventures, Chan and Does 1-50)

383.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

384.    Plaintiffs are informed and believe and thereon allege that SW Ventures made the herein described transfers to Chan (a) with the actual intent to hinder, delay, or defraud creditors of SW Ventures, including Plaintiffs, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer and SW Ventures either: (1) was engaged in, or was about to engage in, a

56

1  business or a transaction for which its remaining assets were unreasonably small in relation to the

2  business or transaction, and/or (2) SW Ventures intended to incur, or believed or reasonably should

3  have believed that it would incur, debts beyond SW Ventures' ability to pay as they became due.

**SEVENTEENTH CAUSE OF ACTION**

**DECLARATORY RELIEF (BIRD AND HABERMEHL'S CLAIMED OWNERSHIP**

**AND/OR MEMBERSHIP INTEREST IN SW VENTURES)**

**(Hellings against SW Ventures, Bird, Habermehl and Does 1-50)**

8  385.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

9  386.    Plaintiffs contend that neither Bird nor Habermehl, respectively, have held any

10  ownership or membership interest in SW Ventures at any time.

11  387.    Plaintiffs are informed and believe and thereon allege that Bird and Habermehl,

12  respectively, contend that they have in fact held and do hold such ownership and/or membership

13  interest in SW Ventures.

14  388.    An actual controversy has arisen and now exists between Plaintiffs, on the one hand,

15  and Bird and Habermehl on the other hand, concerning the parties' respective rights and duties with

16  respect to Bird and Habermehl's respective claimed ownership and/or membership interests in SW

17  Ventures.

18  389.    Plaintiffs desire a judicial determination of the parties' respective rights and duties

19  with respect to Bird and Habermehl's respective claimed ownership and/or membership interests in

20  SW Ventures.

21  390.    A judicial determination is necessary and appropriate at this time under the

22  circumstances in order that the parties may determine their respective rights and duties with respect

23  to such issue. The unsettled state of affairs with respect to these issues has and will continue to

24  prejudice the rights of Hellings.

25  ////

26  ////

27  ////

28  ////

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

**EIGHTEENTH CAUSE OF ACTION**

**DECLARATORY RELIEF / (HELLINGS IS PRESIDENT OF SW VENTURES AND HAS RIGHT OF ACCESS TO ITS RECORDS AND FACILITY)**

**(Hellings against SW Ventures, Chan and Does 1-50)**

391.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

392.    Plaintiffs contend that Hellings is the president of SW Ventures with the rights attendant to his position as president, including, *inter alia,* to full access to SW Ventures records and facility.

393.    Plaintiffs are informed and believe and thereon allege that SW Ventures and Chan refuse to recognize Hellings as SW Ventures' president and/or Hellings' rights as SW Ventures' president, including, *inter alia*, Hellings' right to full access of SW Ventures' records and facility.

394.    An actual controversy has arisen and now exists between Plaintiffs, on the one hand, and SW Ventures and Chan, on the other hand, concerning the parties' rights and duties with respect to the office of president of SW Ventures.

395.    Plaintiffs desire a judicial determination that Hellings is the president of SW Ventures with all rights attendant thereto, including, but not limited to, the right to access SW Ventures' records and facility.

396.    A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may determine their respective rights and duties with respect to such issue. The unsettled state of affairs with respect to these issues has and will continue to prejudice the rights of Plaintiffs.

**NINETEENTH CAUSE OF ACTION**

**ENFORCEMENT OF INSPECTION RIGHTS**

**(Hellings against SW Ventures, Chan and Does 1-50)**

397.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

398.    As a member of WYS Consulting and as an owner of SW Ventures through WYS Consulting, Hellings has the right to inspect and copy records of those companies as set forth in, *inter alia,* California Corporations Code section 17704.10.

58

399.    Hellings has requested that SW Ventures and Chan permit him to inspect and copy records of the company pursuant to, *inter alia*, California Corporations Code section 17704.10.

400.    Although Chan has indicated he is willing to permit such inspection and copying, as of the filing of this First Amended Complaint, SW Ventures and Chan have not done so.  Chan and SW Ventures refusal to comply with Hellings' request is without justification.

## TWENTIETH CAUSE OF ACTION

## DECLARATORY RELIEF (ALTER EGO LIABILITY OF CHAN)

### (Hellings against Chan, SW Ventures and Does 1-50)

401.    Plaintiffs incorporate all of the foregoing allegations as though fully set forth herein.

402.    There exists a unity of interest and ownership among SW Ventures and Chan such that any individuality and separateness between those defendants has ceased and Chan is the alter ego of SW Ventures, in that Chan has, *inter alia*, (a) arrogated such control over SW Ventures that he unilaterally purported to expel Hellings without providing notice or voice to SW Ventures' members, (b) concealed SW Ventures' true ownership, including causing the execution and/or filing of Statements of Information portraying a false ownership of SW Ventures and WYS Consulting, (c) secretly used SW Ventures' funds for his personal expenses without authorization, (d) exercised total control over SW Ventures, its assets and its facility, (e) secretly entered into illegal agreements for the use of SW Ventures' facility and licenses for his own personal benefit without consulting with SW Ventures' members or its president, (f) secretly attempted to sell SW Ventures' assets for his own and exclusive financial benefit, (g) unilaterally and without notice to SW Ventures' members declared himself SW Ventures' chief executive officer, and (h) exercised total dominion and control over SW Ventures' assets and monies without authorization or notice to SW Ventures' members and officers.

403.    Adherence to the fiction of the separate existence between Chan and SW Ventures would permit an abuse of the corporate privilege and would sanction fraud, promote injustice and produce an inequitable result in that, *inter alia*, it would be inequitable for Chan to have taken the benefit of Hellings' and others' time and financial investment under the color of those investments having been for the benefit of SW Ventures only for Chan to wrongfully usurp SW Ventures and its

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1    assets for his sole benefit.

2    404.    An actual controversy has arisen and now exists between Hellings and Chan as to

3    whether Chan is the alter ego of SW Ventures.

4    405.    Hellings desires a judicial determination that Chan is the alter ego of SW Ventures

5    and, accordingly, that Chan and SW Ventures are jointly and severally liable to Hellings for any

6    and all damages suffered by Hellings and for all amounts owed to Hellings as alleged herein.

7    **<u>PRAYER FOR RELIEF</u>**

8    WHEREFORE, Plaintiffs pray for relief as follows:

9    <u>On the First Cause of Action for Professional Negligence</u>:

10    1.    For actual compensatory, consequential, incidental and/or special damages in an

11    amount to be proven at trial and in excess of $3,000,000.00, including, *inter alia*, a claim for lost

12    time, attorneys' fees and other expenditures suffered or incurred pursuant to the tort of another

13    doctrine;

14    <u>On the Second Cause of Action for Constructive Fraud</u>:

15    1.    For actual compensatory, consequential, incidental and/or special damages in an

16    amount to be proven at trial and in excess of $3,000,000.00, including, *inter alia*, a claim for lost

17    time, attorneys' fees and other expenditures suffered or incurred pursuant to the tort of another

18    doctrine;

19    2.    For exemplary or punitive damages;

20    <u>On the Third Cause of Action for Breach of Fiduciary Duty</u>:

21    1.    For actual compensatory, consequential, incidental and/or special damages in an

22    amount to be proven at trial and in excess of $3,000,000.00, including, *inter alia*, a claim for lost

23    time, attorneys' fees and other expenditures suffered or incurred pursuant to the tort of another

24    doctrine;

25    2.    For exemplary or punitive damages;

26    <u>On the Fourth Cause of Action for Aiding and Abetting Breach of Fiduciary Duty</u>:

27    1.    For actual compensatory, consequential, incidental and/or special damages in an

28    amount to be proven at trial and in excess of $3,000,000.00, including, *inter alia*, a claim for lost

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1    time, attorneys' fees and other expenditures suffered or incurred pursuant to the tort of another

2    doctrine;

3          2.     For exemplary or punitive damages;

4    <u>On the Fifth Cause of Action for Breach of Contract</u>:

5          1.     For actual compensatory, consequential, incidental and/or special damages in an

6    amount to be proven at trial and in excess of $3,000,000.00;

7    <u>On the Sixth Cause of Action for Breach of Covenant of Good Faith and Fair Dealing</u>:

8          1.     For actual compensatory, consequential, incidental and/or special damages in an

9    amount to be proven at trial and in excess of $3,000,000.00;

10   <u>On the Seventh Cause of Action for Breach of Covenant of Good Faith and Fair Dealing</u>:

11         1.     For actual compensatory, consequential, incidental and/or special damages in an

12   amount to be proven at trial and in excess of $3,000,000.00;

13   <u>On the Eighth Cause of Action for Declaratory Relief</u>:

14         1.     For a judicial declaration that the $100,000 received from NewTropic belongs to

15   Hellings;

16         2.     For imposition of a constructive trust and/or resulting trust for the benefit of Hellings

17   over such $100,000;

18   <u>On the Ninth Cause of Action for Conversion</u>:

19         1.     For actual compensatory, consequential, incidental and/or special damages in an

20   amount to be proven at trial and at least $100,000;

21         2.     For exemplary or punitive damages;

22   <u>On the Tenth Cause of Action for Breach of Promissory Note</u>:

23         1.     For actual compensatory, consequential, incidental and/or special damages in an

24   amount to be proven at trial and at least $199,356;

25   <u>On the Eleventh Cause of Action for Money Had and Received</u>:

26         1.     For actual compensatory, consequential, incidental and/or special damages in an

27   amount to be proven at trial and at least $554,000;

28   / / / /

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

On the Twelfth Cause of Action for Money Paid or Lent:

1.    For actual compensatory, consequential, incidental and/or special damages in an amount to be proven at trial and at least $554,000;

On the Thirteenth Cause of Action for Quasi Contract / Unjust Enrichment / Restitution:

1.    For damages and/or restitution in an amount to be proven at trial and at least $100,000, including, *inter alia,* damages and/or restitution to compensate Hellings for labor he provided to SW Ventures;

On the Fourteenth Cause of Action for Failure to Timely Pay Wages:

1.    For damages in an amount to be proven at trial and at least $400,000;

2.    For all penalties as allowed by law and/or pursuant to statute;

3.    For reasonable, statutory attorneys' fees and costs of suit pursuant to Labor Code sections 218.5 and/or 1194 and/or and any other applicable provision of law;

On the Fifteenth Cause of Action for Failure to Timely Pay Wages:

1.    For damages in an amount to be proven at trial and at least approximately $3,320.00;

2.    For all penalties as allowed by law and/or pursuant to statute;

3.    For reasonable, statutory attorneys' fees and costs of suit pursuant to Labor Code sections 218.5 and/or 1194 and/or and any other applicable provision of law;

On the Sixteenth Cause of Action to Recover Fraudulent Transfer:

1.    For a judicial declaration that the transfers from SW Ventures to Chan alleged herein be set aside and declared void as to Hellings to the extent necessary to satisfy Hellings' claims against SW Ventures and that Chan be ordered to convey said transfers to SW Ventures and that that money be ordered held in trust for the benefit of Hellings;

2.    For an order compelling SW Ventures and Chan to convey to Hellings the aggregate sum of the transfers, in an amount to be proven at trial and not less than $52,998.88, to be held in trust for the benefit of Hellings;

3.    That the aggregate sum of the transfers, in an amount to be proven at trial and not less than $52,998.88, be attached in accordance with the provisions of sections 481.010 through 493.060 of the Code of Civil Procedure;

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND OTHER RELIEF

1          4.      For a money judgment in the aggregate sum of the transfers, in an amount to be

2     proven at trial and not less than $52,998.88;

3     On the Seventeenth Cause of Action for Declaratory Relief:

4          1.      For a judicial declaration that neither Bird nor Habermehl hold any ownership and/or

5     membership interest in SW Ventures;

6     On the Eighteenth Cause of Action for Declaratory Relief:

7          1.      For a judicial declaration that Hellings is the president of SW Ventures with all

8     rights attendant thereto, including, but not limited to, the right to access SW Ventures' records and

9     facility;

10         2.      Compensation for lost time, attorneys' fees and other expenditures suffered or

11    incurred pursuant to the tort of another doctrine;

12    On the Nineteenth Cause of Action to Enforce Inspection Rights:

13         1.      For a judgment enforcing SW Ventures and Chan's duty to deliver the documents,

14    information and financial statements requested by Hellings;

15    On the Twentieth Cause of Action for Declaration Relief:

16         1.      For a judgment declaring that Chan is the alter ego of SW Ventures and, accordingly,

17    that Chan and SW Ventures are jointly and severally liable to Hellings for any and all damages

18    suffered by Hellings and for all amounts owed to Hellings;

19         On all causes of action:

20         1.      For attorneys' fees and costs of the suit as allowed by law and/or pursuant to

21    contract;

22         2.      For pre-judgment and post-judgment interest as allowed by law and/or pursuant to

23    contract; and

24         3.      For such other and further relief as the Court deems just and proper.

25                                          OFFNER & KING, LLP

26

27    Dated:  May 4, 2021                    By: _____

28                                              Robin Offner, Esq.
                                               Attorneys for STEVEN HELLINGS and
                                        63     THERESA HELLINGS

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1

## **VERIFICATION**

2

I, Steven Hellings, declare:

3

      I am a plaintiff in this action.  I have read the foregoing first amended complaint and I know

4

its contents.  The matters stated in the foregoing document are true of my own knowledge, except as

5

to those matters which are stated therein on information and belief, and as to those matters, I believe

6

them to be true.

7

      I declare under penalty of perjury under the laws of the State of California that the foregoing

8

is true and correct and that this verification is executed this __4th__ day of May, 2021 at

9

Oakland_____ [city], ___California_____ [state].

10

11

_____

12

Steven Hellings

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

1

## VERIFICATION

2   I, Theresa Hellings, declare:

3      I am a plaintiff in this action. I have read the foregoing first amended complaint and I know

4 its contents. The matters stated in the foregoing document are true of my own knowledge, except as

5 to those matters which are stated therein on information and belief, and as to those matters, I believe

6 them to be true.

7      I declare under penalty of perjury under the laws of the State of California that the foregoing

8 is true and correct and that this verification is executed this _4th_ day of May, 2021, at

9 _Costa Mesa_ [city], _CA_ [state].

10

11

12                     Theresa Hellings

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY AND
OTHER RELIEF

# EXHIBIT 5

Electronically FILED by Superior Court of California, County of Los Angeles on 01/22/2022 Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton, Deputy Clerk
Case 2:21-bk-18572-BB   Doc 131   Filed 01/24/22   Entered 01/24/22 16:39:17   Desc
Main Document   Page 109 of 113
21STCV02730
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Teresa Beaudet

| | |
|---|---|
| 1 | Bernard C. Jasper (SBN 118479) |
| 2 | **JASPER LAW** |
| | 1440 N. Harbor Blvd., Suite 900 |
| 3 | Fullerton, CA 92835 |
| 4 | Telephone: (714) 321-2401/ Facsimile: n/a |
| | ben@jasperlawfirm.com |
| 5 | Attorneys for Plaintiff JONATHAN BETUEL |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

**CENTRAL DISTRICT – STANLEY MOSK COURTHOUSE**

| | | |
|---|---|---|
| JONATHAN BETUEL, | ) | Case No. 21STCV02730 |
| | ) | |
| Plaintiff, | ) | **COMPLAINT FOR DAMAGES** |
| v. | ) | **(LEGAL MALPRACTICE)** |
| | ) | |
| DARIUSH GHAFFAR ADLI; DREW | ) | |
| HARRIS SHERMAN; ADLI LAW | ) | DEMAND FOR JURY TRIAL |
| GROUP, P.C.; and DOES 1 through 50, | ) | |
| inclusive, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

Plaintiff JONATHAN BETUEL alleges against Defendants DARIUSH GHAFFAR

ADLI, DREW HARRIS SHERMAN, ADLI LAW GROUP, P.C. and DOES 1 through 50 as

follows:

1.     The true names, capacities or involvement of defendants DOES 1 through 50 are

unknown to plaintiff who sues said defendants as authorized by Code of Civil Procedure

section 474.  Each defendant, whether specifically named or identified as a DOE, owed duties

to plaintiff and legally caused the injuries and damages to plaintiff as alleged in this complaint.

-1–

COMPLAINT FOR DAMAGES (Legal Malpractice)

2.      Each of the defendants is a person or entity either subject to the laws of vicarious liability, *e.g.*, agent, employee, partner, etc., or in a contract relationship, with the other defendants, and was at all times acting within the purpose, authority and scope of such relationship so that each defendant is liable for the actions of each other defendant.

3.      Defendant DARIUSH GHAFFAR ADLI ("ADLI") is an attorney licensed to practice law in California.  Defendant DREW HARRIS SHERMAN ("SHERMAN") is an attorney licensed to practice law in California.  Plaintiff is informed and believes that defendant ADLI LAW GROUP, P.C. is a business entity that employed defendants ADLI and SHERMAN.  Defendants agreed to represent and advise plaintiff in connection with financial disputes arising out of a business and employment relationship with Luma Pictures, Inc.

4.      As a result of the negligence of defendants in their representation of, and advice given to, plaintiff, including but not limited to the lawsuit filed as Los Angeles County Superior Court case number BC638231, plaintiff sustained damages in the approximate sum of no less than $17,210,000. The aforementioned damages comprise the difference in the judgment rendered in case number BC638231 and the judgment of $23,240,000 that would have been rendered in case number BC638231 but for defendants' negligence.  The judgment of $23,240,000 would have been collectible from the underlying defendant, Luma Pictures, Inc.

WHEREFORE, plaintiff prays for judgment against defendants, and each of them, for damages in the sum of no less than $17,210,000, according to proof, plus costs of suit and all other proper relief.

Dated: January 22, 2021

JASPER LAW

_____
Bernard C. Jasper
Attorney for Plaintiff JONATHAN BETUEL

Plaintiff demands a jury trial for all causes of action set forth herein.

Dated: January 22, 2021

JASPER LAW

_____
Bernard C. Jasper
Attorney for Plaintiff JONATHAN BETUEL

-22-

---

COMPLAINT FOR DAMAGES (Legal Malpractice)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:445 South Figueroa Street, 30th Floor, Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (ACTION IN NONBANKRUPTCY FORUM)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
     1/24/2022    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 1/24/2022  , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)               , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 1/24/2022 | Agnes Tualla | /s/ Agnes Tualla |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**1. Served by the Court via ECF:  Electronic Mail Notice List**

Richard D Buckley     richard.buckley@arentfox.com
Eryk R Escobar     eryk.r.escobar@usdoj.gov
Nicholas W Gebelt     ngebelt@goodbye2debt.com
Mark S Horoupian     mhoroupian@sulmeyerlaw.com,
mhoroupian@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com
Chi L Ip     filing@lawyer4property.com
Gregory Kent Jones (TR)     gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com
Karen King     kking@offnerking.com
Lewis R Landau     Lew@Landaunet.com
Dean G Rallis     drallis@hahnlawyers.com,
jevans@hahnlawyers.com;drallis@ecf.courtdrive.com
Kenneth N Russak     krussak@knrlaw.com, krussak@russaklaw.com
Dave Shenian     dshenian@clarkhill.com,
cfalls@clarkhill.com;daguilar@clarkhill.com;DJaenike@clarkhill.com;SRoberts@ClarkHill.co
m;jearle@clarkhill.com
Gerald N Sims     jerrys@psdslaw.com, bonniec@psdslaw.com
United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
Christopher K.S. Wong     christopher.wong@arentfox.com, yvonne.li@arentfox.com
Joshua del Castillo     jdelcastillo@allenmatkins.com


**2. Served via U.S. Mail**
Debtor:
Adli Law Group, P.C.
12400 Wilshire Blvd., Suite 1460 Los Angeles, CA 90025


**20 Largest Unsecured Creditors:**

Bank of the West
915 Wilshire Blvd., Suite 100
Los Angeles, CA 90017

Creditors Adjustment Bureau Inc.
14226 Ventura Blvd
Sherman Oaks, CA 91423

Clark Hill PLC
1055 W 7th St., #2400
Los Angeles, CA 90017

CVFI-444 S Flower LP
444 South Flower St, # 610
Los Angeles, CA 90071

Cogent Communications
PO Box 791087
Baltimore, MD 21279-1087

De Lage Landen Financial Services
1111 Old Eagle
School Road Wayne, PA 19087

Drew Sherman
23921 Sylvan St
Woodland Hills, CA 91367-1246

Evergreen Manor II Homeowners Assn
918 W Garvey Avenue
Monterey Park, CA 91754

John Keefe
c/o Howard King
1900 Avenue of the Stars, 25th Fl
Los Angeles, CA 90067

L Tech Network Services Inc.
9926 Pioneer Blvd., #101
Santa Fe Springs, CA 90670

NEWITY
1123 W Washington Blvd 3
Chicago, IL 60607

Skypanels Inc.
Ali Salomi Chadwick T
9019 Oso Ave., Suite E
Chatsworth, CA 91311

Thomson Reuters
PO Box 6292
Carol Stream, IL 60197-6292

Tony Sarkissian
Dancool HVAC Supply
833 Americana Way, Unit 501
Glendale, CA 91210

Kjar McKenna & Stockalper LLP
841 Apollo Street, Suite 100
El Segundo, CA 90245

Litigation Services
3960 Howard Hughes Pkwy, #700
Las Vegas, NV 89169

NREA-TRC 700 LLC
700 S Flower Street, Suite 450
Los Angeles, CA 90017

RSUI Landmark American Insurance Co.
c/o RSUI Group Inc.
945 E Paces Ferry Rd. Ste 1800
Atlanta, GA 30326-1160

Staples Center LA Arena Funding LLC
1111 S Figueroa St., Ste 3100
Los Angeles, CA 90015

TIB NA
The Independent Bankers Bank
1550 N Brown Road #150
Lawrenceville, GA 30043