Dariush Adli, Esq. State Bar No. 204959
ADLI Law Group P.C.
12400 Wilshire Blvd, Suite 12400
Los Angeles, CA 90025
Telephone: (213) 623-6546
Facsimile: (213) 623-6554
adli@adlilaw.com

In Pro Per

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| *In re:* | Adversary No. _____ |
| ADLI LAW GROUP, P.C., | Case No. 2:21-bk-18572-BB |
| *Debtor.* | Chapter 11 |
| | |
| DARIUSH G. ADLI, an individual, | **ADVERSARY VERIFIED COMPLAINT OBJECTING TO RECORDING NOTICE OF DEFAULT IN BREACH OF JULY 20, 2022, SETTLEMENT AGREEMENT AND FOR:** |
| *Plaintiff,*<br>*v.*<br>GREG K. JONES, Chapter 11 Trustee, | **(1) CANCELLATION OF WRITTEN INSTRUMENT- NOTICE OF DEFAULT** |
| *Defendant.* | **(2) CANCELLATION OF WRITTEN INSTRUMENT- DEED OF TRUST** |
| | **(3) BREACH OF CONTRACT** |
| | **(4) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** |
| | **(5) DECLARATORY AND INJUNCTIVE RELIEF** |

**COMPLAINT**

Plaintiff, Dariush Adli ("Plaintiff" or "Dariush") in pro per, hereby commences the adversary proceeding against Greg K. Jones ("Trustee," "former Trustee," or "Greg"), the appointed former Chapter 11 Trustee for the bankruptcy estate of the Adli Law Group P.C., and alleges causes of action for Cancellation of written Instrument, Breach of Contract , Breach of the Covenant of Good Faith and Fair Dealing, Declaratory and Injunctive Relief, and other claims arising out of the Trustees breach of the Settlement Agreement between the parties [See Exhibit "1" to DKT No. 216] wrongful initiation of foreclosure proceedings on Plaintiff's residence and other wrongful conduct described herein.

**JURISDICTION**

1. The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 in that this proceeding arises in and relates to the bankruptcy case filed in the United States Bankruptcy Court, Central District of California, Los Angeles Division, entitled In re: ADLI Law Group, P.C., Case No. 2:21-bk-18572-BB (the "Main Case").

2. The instant adversary proceeding is a "core" proceeding under 28 U.S.C. §157(b)(2)(A), (E), (F), (H) and (O). If any claim for relief contained herein is determined not to be a core proceeding, Plaintiffs consent to the entry of final judgment and orders by the Bankruptcy Court.

3. This adversary proceeding is filed pursuant to Federal Rules of Bankruptcy Procedure 7001.

4. Venue properly lies in the Central District of California in that this adversary proceeding arises in or is related to the Main Case.

**THE PARTIES**

5. At relevant times, Plaintiff was and is the President of ADLI Law Group, P.C. ("Debtor"), the debtor in the Main Case, and a resident of County of Los Angeles County, State of California.

6. Defendant was the duly appointed Trustee in the Main Case in March 2002 and remained in the role until March 2023, when the Chapter 11 Reorganization Plan (the "Plan") went into effect.

/ / /

/ / /

## STATEMENT OF FACTS

7. The Debtor is an operating law firm ("Firm"), established in 2010 and located at 12400 Wilshire Blvd., Suite 1460, Los Angeles, California. ADLI commenced its Chapter 11 case on November 10, 2021 [Doc 1.] The Debtor designated its case to proceed under subchapter V, on November 12, 2021. [Doc 8.]

8. The Debtor was initially managed by its sole shareholder, Dariush Adli ("Dariush"), as a debtor in possession. Dariush petitioned the Court for an order setting his compensation, which the Court issued on February 14, 2022, setting Plaintiff's monthly compensation at $36,450.00, retroactive to December 1, 2021 [Doc 157.] [Ex. 1]

9. On March 4, 2022, the Court granted an estate creditor's Motion to Remove Debtor in Possession ("DIP") and subsequently issued an order appointing Greg as trustee of Debtor's estate. [Doc 174.] Greg operated the Firm Trustee until March 2023 and took an active role in the Firm's day-to-day operations during his tenure as Trustee.

10. This complaint arises from the former Trustee's breach of the Settlement Agreement ("SA") between Plaintiff and the Trustee, which should limit Plaintiff's personal liability to pay the administrative claims of the Debtor's estate, and the commensurate breach of the covenant of good faith and fair dealing, preventing Dariush from realizing the benefit of the bargain he struck with the Trustee. The Trustee unilaterally withheld compensation owed to Plaintiff under Court order, did not properly allocate credit due Dariush under the SA, and has ignored the reasonable expectation of the parties to the SA ("Parties") at the time they entered the SA. Worse, despite the clear provision of the SA providing the bankruptcy court with exclusive jurisdiction to interpret the SA in the event of a dispute over its meaning, the former Trustee has initiated a non-judicial foreclosure sale on Plaintiff's residence, used as security for Plaintiff's obligations under the SA.  In making payment "demands" to Dariush that were not supported by a fair interpretation of the SA, and ignoring his own representation for the Plaintiff to wait until he got back to him to continue the settlement discussions and by premature recording of the Notice of Default, Greg has failed to act in good faith vis-à-vis the Plaintiff in this dispute.

11. Going back to the start, a dispute first arose in March 2022, shortly after Greg's

ADVERSARY COMPLAINT

appointment as Trustee, when the Trustee investigated the Debtor's books and records and noticed an item identified as "Loan to Shareholder" in Dariush's personal tax filings prepared by the Firm's CPA. The Trustee, took the position that the estate was entitled to be reimbursed for the "loans." Dariush objected to that interpretation, pointing out that these entries pertained to Dariush's personal tax itemization and reporting to the Internal Revenue Service and to the CA Franchise Tax Board by the Firm's CPA, who, beginning in about 2012, had designated part of Dariush's income as "deferred income" for the purpose of benefiting from tax deferment and lower tax rates, and not actual loans.

12.  Although the Trustee represented that the cumulative "loan" amounts totaled over $2.358 million, he admitted in the pleadings filed with this Court that the Estate's possible avoidance claims were limited to the non-W2 distributions made to Dariush during the 4-year statute of limitation period before the bankruptcy case was filed. According to the Debtor's 1120 S Corporate tax returns, those annual amounts were:

| | |
|---|---|
| 2017 (Nov. 21 to Dec. 31) | $36,861 |
| 2018 (Jan. 01 to Dec. 31) | $370,000 |
| 2019 (Jan. 01 to Dec. 31) | $310,000 |
| 2020 (Jan. 01 to Dec. 31) | $136,041 |
| Maximum Possible Liability for Set Aside of Income Payments: | $852,902 |

13. Moreover, the Firm had never been insolvent but had its operations disrupted when its landlord filed suit for the Firm's inability to continue with an office lease.  The Debtor moved into the premises in May 2020, at the height of the coronavirus pandemic and shutdown, and soon realized that due to loss of business and employees resulting from the pandemic, it could no longer afford the lease and vacated the premises after giving due notice to the landlord. The landlord filed suit and obtained a writ of attachment based on $3 million in rent that would have been due over the full 7-year term of the lease. Thus, if there was a likelihood of success on a claim to set aside income paid to Dariush, it would have been limited to distributions made after the landlord asserted a breach of lease, which would be no more than the $136,041 distributed in 2020.

14. It would have been even more difficult for the Trustee to prove that past payments totaling $2.358 million were "loans" to Plaintiff. The Trustee had no documents, records, witnesses, or any

other evidence of an intent on behalf of Dariush to borrow from the Firm, or for the Firm to lend Dariush any sum of money, which would have supported treating any of these deferred tax payments as a loan.  Moreover, partial taxes on these incomes had been paid, as the CA Franchise Tax Board did not accept categorizing the distribution as a loan under state tax laws back in 2012, and required Dariush to pay taxes to the state of California each year thereafter.  Therefore, this "Loan to Shareholder" was purely a tax issue and not a bona fide loan.

15. At all times, the Chapter 11 Trustee was aware of Plaintiff's limited liability for these distributions and the difficulty a subsequent Chapter 7 trustee would have had to collect on that basis, should the Chapter 11 proceeding had been converted into a chapter 7 liquidation.

16. Alternatively, it would have been more beneficial for the estate to obtain Plaintiff's consent to make a personal contribution towards the payment of the administrative expenses incurred in preparing the Debtor's Chapter 11 Reorganization Plan.

17. With the focus on availability of sufficient funds to pay the administrative fees, Trustee thus initiated negotiations with Plaintiff and proposed to "resolve all claims" between Plaintiff and the Debtor's estate re the "Loan to Shareholder" issue in exchange for an agreed amount to be personally paid by Plaintiff. The Trustee made an initial proposal on March 29, 2022, that "*Dariush repays the Company $500,000 which will be **used as working capital and payment of administrative claims***…" and Dariush pay taxes on 50% of the remaining balance and repay the Firm the other 50% over 5 years. [Ex. 2. (emphasis added).]

18. On April 5, 2022, Greg sent Dariush an email confirming the estimated amount for administrative fees to be incurred in obtaining confirmation of a Chapter 11 Plan and <u>specifically proposing the amount of Dariush's contribution and source for funds</u>.  According to the Trustee:

> *"We estimate that we will need $500,000 on the Effective Date of the Plan to obtain confirmation.  In order to reach that number, we need a capital contribution of $200,000 from you, which amount will be placed in a Hahn & Hahn trust account.  Additionally, we will need you to waive payment since the beginning of the case through July 2022.  In the event that there is less than $500,000 cash available on the Effective Date, you will be responsible for funding the difference."*

19. The Trustee was not inclined to give Dariush much time to make a decision, demanding a response the very next day: "We will need a response by Wednesday, April 6." [Ex. 3.]

20. Over the next few days, Dariush prepared a counterproposal to Greg's demand and communicated it to Greg through the Firm's bankruptcy counsel Dean Rallis ("Dean"). The counterproposal had the administrative fees at $400K, instead of $500K, and limited Dariush's personal contribution to $100K, payable in two $50K installments, instead of the $200K demanded by Greg.  Dariush also countered that his Court ordered compensation not be "waived" but "suspended." Also, regarding a potential overage commensurate with Greg's "approximately," Dariush countered that "If the available cash on the effective date is less than $400,000, further funds will be contributed to the debtor in the amount of such shortfall. If the DIP account has more than $400,000, then the amount in excess will be paid to Dr. Adli up to his $100,000 contribution." [Ex. 4.]

21. On April 12, 2022, Greg responded to Dariush's counterproposal point by point, rejecting it and stating: "*I appreciate your input, but you do not seem to understand that the cost to confirm a plan will be **approximately $500,000**.  That amount is based on estimates of projected and accrued professional fees.  **The $500,000 is not negotiable**.*" (Emphasis added). In that same email, the Trustee threatened converting the case to Chapter 7 if he did not hear back from Dariush promptly: "Therefore, in sum, I decline your counter-offer. If we are not able to come to terms shortly, I will advise my counsel to take steps to convert the case to chapter 7." [Ex. 4.]

22. Plaintiff attempted to call and engage the Trustee in further discussions, but the Trustee would have none of it. In an email later that same day (April 12), acknowledging Dariush's voicemail earlier in the day, Greg said that he did not have time and wanted a prompt written response. [Ex. 5.] Plaintiff accepted the Trustee's proposal.

23. In early June 2022, the Trustee presented the Plaintiff with a draft settlement agreement. However, the settlement terms proposed Trustee had left an ambiguity on Plaintiff's obligation for administrative fees above $500,000.  Plaintiff raised this issue in an email to Debtor's counsel on June 8, 2022, wherein the Plaintiff exclaimed he "*…can't now be on the hook for an unspecified overage above and beyond [$500,000]. That would be an indefinite term that would doom the contract legally.*" [Ex. 6.]

24. Debtor's counsel, Dean Rallis, responded to Plaintiff, confirming the agreement:

> *"...you individually have agreed to (i) immediately (or very soon) fund $200,000 to be deposited in my firm's trust account, and (ii) fund any shortfall of the required $500,000 cash balance (**which includes your $200,000 contribution**) as of the effective date of the plan, all pending approval of the settlement by the Court. **Should the administrative expenses (including professional fees) exceed $500,000, you personally will not be responsible for such increase**...*
>
> ***Should professional fees be higher than projected when the settlement terms were addressed, ALG   (not you personally) will be responsible to pay such allowed fees as fixed by the Court***...

[Ex. 7 (emphasis added).]

25. On June 14, 2022, the estate's financial advisor Jeff Nerland of Armanino LLP, emailed the Trustee and his counsel with respect to Plaintiff's personal payment, asserting, "...*the calculation needs to include a working capital cushion of not less than $50,000... It makes no sense to leave the Company with no cash reserves at the Effective Date*." [Ex. 8.]

26. To assist in finalizing the settlement effort, Plaintiff retained his own legal counsel, Mark Markus, in late June to complete the negotiations with the Trustee and the bankruptcy professionals and to finalize the settlement agreement.

27. A proposed settlement agreement (**SA**) was circulated to the bankruptcy professionals by the Trustee's counsel, Timothy Yoo, pursuant to which Plaintiff would waive seven (7) months of compensation owed to him under the February 14, 2022, Court order and be required to pay an initial $200,000 deposit on a stated "*Cash Settlement Amount*" of $700,000. [Ex. 9.] The remaining $500,000 balance was secured by a Deed of Trust on the Plaintiff's residence. [Ex. 10.]

28. However, the express obligation for Plaintiff to pay the balance of the stated Cash Settlement Amount ***was only triggered*** in the event the bankruptcy case converted into a Chapter 7. On the other hand, the SA provided that if the Chapter 11 Plan was followed through and approved, the "***only***" amounts Plaintiff pays would be the $200,000 and "[if] *the estate's financial advisor determines that the $200,000 deposit plus the funds in the estate's operating account(s) will be inadequate to support a working capital cushion of $50,000 and pay, in full, the court approved fees and costs of all professionals... Dariush will pay the difference*..."

29. The draft SA proposed by the Trustee still obligated Plaintiff to pay some additional amounts-- even upon Plan approval—in the event the funds accumulated in the Firm's operating account and the $200,000 deposit initially paid by Plaintiff were inadequate to pay all professional fees and have at least $50,000 to operate the Firm.

30. However, there was ambiguity in the "*pay the difference*" (*i.e.,* "**Overage**") clause and the additional amount Plaintiff may be obligated to pay. Plaintiff understood the clause to address slight variations and uncertainties that inherently exist in the effort for a future result; as Greg had originally proposed, "***approximately $500K,***" [See, Paragraph 21]. Plaintiff sought confirmation that the payments set forth in the SA were, in fact, sufficient and good faith approximations of the amount required to pay the administrative claims.

31. Then in late June, 2022, prior to signing a final SA, the Trustee held a meeting with the bankruptcy professionals and Plaintiff's counsel to discuss finalizing the agreement with Dariush. The discussion included the estimated professional fees required to see the plan through confirmation. The "approximately $500,000" that the Trustee had presented to Dariush as "non-negotiable" [See, Paragraph 21], was confirmed to be a fair estimate of the anticipated total fees to be charged to prepare and obtain approval for the Plan.

32. Accordingly, it was agreed by all professionals working on the Debtor's Plan and confirmed by Trustee that the accumulation of funds in the Firm's operating account plus Plaintiff's contribution of $200,000 would be sufficient to pay all administrative claims from the professionals working on the Plan.

33. During the time a settlement agreement was being negotiated by the Plaintiff and the Trustee, between March 2022 and July 2022, approximately $254,150 of non-trust funds had accumulated in the Debtor's operating account.  These funds would have otherwise been paid to Plaintiff for 7 months owed under the February 14, 2022, Court order setting his compensation. [Dkt. No. 216, p. 6, fn. 3] [Ex. 11.] However, it was necessary for these funds to remain in the operating account to reach a projected accumulation of $300,000 by the time the Chapter 11 Plan was approved.

34. Plaintiff additionally twice confirmed that, consistent with the "approximately $500K" budget demanded by the Trustee, any variation from that budget would be minimal.  First, before

-8-

signing the SA, Plaintiff had call with the Trustee, who confirmed that the accumulation of funds in the Firm's operating account plus the $200K to be deposited by Plaintiff "*should be enough*" for payment of the administrative and professional fees incurred in the approval of the Plan.

35. Second, Plaintiff's counsel confirmed that at the meeting of the professionals, all agreed that the projected $300,000 to accumulate in the Firm's operating and, combined with Plaintiff's contribution of $200,000, "*should be enough*, *more or less*" to cover the professional fees required to see the plan though Court approval.

36. In Plaintiff's counsel ascertained the parties' intent to have Plaintiff's payment obligations reduced with chapter 11 plan approval and revised paragraph 2 of the SA as follows:

A. Paragraph subsection 2(a) was revised to permit the $500,000 remaining balance on the Cash Settlement Amount "*to be paid 120 days after entry of an Order converting the case to Chapter 7…*"

B. Paragraph subsection 2(b) was revised to replace "*only*" in conjunction with Plaintiff's payment obligations, with the following language:

> *If the Debtor confirms [the "Plan"], the total Cash Settlement Amount and Dariush's obligations to pay will be **modified**, **reduced**, **and limited to the payments set forth below.***
>
> *(i)    On the effective date of the Plan, the $200,000 deposit will be applied to the Cash Settlement Amount and used to pay court approved administrative fees and costs; and,*
>
> *(ii)   [If] the $200,000 deposit plus the funds in the estate's operating account(s) will be inadequate to support a working capital cushion of $50,000 and pay, in full, the court approved fees and costs of all professionals and administrative claim holders on the Effective Date, Dariush will pay the difference (the "Balance   amount") to the Trustee on or before the Effective Date of the Plan.*
>
> [Ex. 12 (emphasis added.)]

37. These revisions were made by Plaintiff's counsel in collaboration with the Trustee's counsel and Debtor's counsel.  On July 20, 2022, the SA was signed by the Plaintiff and Trustee.

ADVERSARY COMPLAINT

38. Accordingly, because of the Trustee's representation that the $200,000 payment from Plaintiff would be sufficient, Plaintiff reasonably believed that the "Balance Amount" Plaintiff may be required to pay could be no more than $50,000. Plaintiff also understood the obligation to "*pay the difference*" should the Firm's operating accounts be underfunded was only expected to create a small increase to his total personal contribution when compared to the agreed upon default amount of $500K remaining to be paid should the case convert to a Chapter 7.

39. The conditional consideration agreed to by Plaintiff was $700,000 plus waiver of 7 months of compensation at $36,450 per month—more than Plaintiff's maximum liability in a hypothetical action to void the Firm's distributions to him, and *many* times more than the amount a Chapter 7 trustee would have been able to recover in a "loan to shareholder" suit. However, Plaintiff's agreement to be personally responsible for a larger amount upon the case converting to a chapter 7 was a compromise exchanged for the benefit of his obligation and the Cash Settlement Amount being "***modified, reduced, and limited***" to the payments set forth in paragraph 2(b) of the SA upon approval of the Plan.

40. Additionally, Plaintiff also agreed to waive seven payments owed by the estate from the Court ordered compensation of $36,450 a month. However, the Trustee unilaterally withheld more compensation without amending the SA or obtaining Plaintiff's consent. Specifically, the Trustee failed to pay the Court ordered compensation Plaintiff was due until October 2022, two months later than provided under SA, and even then, he unilaterally reduced the payment from the Court ordered amount of $36,450 to $20,000. In total, t**he compensation ordered by the Court and not received by Plaintiff totaled $426,750,** which was not consistent with the Trustee's estimate that accumulation in the Firm's operating account of $300,000 would be required.

41. It turned out later that the initial estimates for the professional fees represented by the Trustee were substantially wrong. In early 2023, prior to the Plan approval, Plaintiff received an email from Debtor's bankruptcy counsel, Dean Rallis, urging him to declare that he had agreed, retroactively and going forward, to a reduction in the Court ordered compensation, from $36,450 a month down to the $20,000 actually paid, and also declare that he had agreed for the payments to have begun in October 2022, as opposed to August 2022 as provided in the SA. Dean reasoned that such concession would make the Plan more likely to be approved by the Court. [Ex. 13]

42. Plaintiff rejected the suggestion and reminded Debtor's counsel that Plaintiff had objected to both the delay in commencement date of the Court ordered compensation and the unilateral reduction of the compensation amount by the Trustee. [Ex. 13]

43. On January 6, 2023, the Debtor's counsel, Dean Rallis, sent an email informing Plaintiff, of a huge overrun in the administrative fees.  According to Dean "…*the amount of estimated professional fees aggregates about $830,000. **This amount is notably higher than what was estimated a few months ago*.**" In that email, Debtor's counsel took the position Section 2(b)(ii) of the SA required "[Plaintiff] *would have to contribute about $500,000 by the Effective Date of the Plan*." [See, Ex. 14.]

44. Plaintiff strongly objected to Dean's interpretation of the SA and asserted he was "***enticed to sign the agreement** with the firm understanding that the $200K contributed by* [Plaintiff], *plus the $300K to be raised by the firm, would be enough, and any unexpected "overage" would be "minimal." **$500K in overage is not minimal**" (emphasis added). Dariush's response stated that "Me paying $500K in overage is not going to happen.," to which Dean responded, "I understand your position." In that same email I protested that" as of December 2022 I have been underpaid by over $150K [from my Court ordered compensation amount." [Ex. 14.]

45. The former Trustee never approached Plaintiff to amend the SA or to obtain Dariush's consent to any amount over the proposed "approximately $500K" which was agreed to as being sufficient to pay the administrative fees required to obtain approval of the Chapter 11 Plan. Plaintiff exclaimed that had he known about these amounts, he would have likely chosen the "fresh start" of the Chapter 7 case, which had been previously and repeatedly advocated as a viable option by Debtor's counsel, Dean Rallis.

46. Leading up to Plan approval, Debtor's counsel, Dean Rallis, had been leading the discussions with Plaintiff on the payment of professional fees. On January 23, 2023, the Trustee emailed Mr. Rallis with respect to resolving the payment of administrative claims (which then totaled $850,000) before the Plan is confirmed. The Trustee stated:

> *There will not be $850,000 in cash to pay the administrative claims on the Effective Date. We have **$200,000 in my trustee account**, and [the estate's financial advisor] has said that there may be **about $250,000 in the debtor's accounts that we can use to fund the remainder**. If we agree to payments over time, and those payments are coming from the*

> *debtor, then that will have to be dealt with in the projections going forward, **unless the payments are coming directly from Dariush**.*
>
> ***I know it is a tough issue, but have you gotten any feedback from Dariush on the payments?***

Debtor's counsel responded to the Trustee regarding the lack of available funds to stating:

> ***Dariush supports a suggested*** *(though not committed to yet by the professionals)* ***1-year payment plan*** *for any unpaid, court-approved professional fees.*

[Ex. 15 (emphasis added).]

47. The following day the Trustee emailed Debtor's counsel to inform him that he could not support the Plan submitted based on, *inter alia*, the uncertainty re the administrative costs:

> *I have spoken to [my counsel], and I don't think that we can take a position on the plan, given (i)* ***that the administrative claims issues we discussed last night are uncertain*** *and (ii) that the response to Judge Bluebond in requesting more money for creditors is only a 25/75% split in favor in excess profit in favor of Dariush. Further, since the claim objection budget only provides four months of funding, it is insufficient.*

[Ex. 16 (emphasis added).]

Debtor's counsel responded to the Trustee with respect to the uncertainty of the administrative claims (professional fees) stating:

> *Dariush supports a 1-year payment plan for any unpaid, court-approved professional fees.* ***No terms have been proposed or discussed as to how the unpaid fees will be paid.*** *The settlement agreement provides, in part...* [Paragraph 2(b), SA restated]...*
>
> *This provision should be the starting point on this topic.*

[Ex. 17 (emphasis added).]

48. Thus, neither the Trustee nor Debtor's counsel sought to finalize an agreement with the professionals for the Court approved fees to be paid over one-year; or even discuss how, from where, or from whom payments would be made. At this time, the Trustee had confirmed and it was only certain that the bankruptcy estate was in possession of the $200,000 deposit paid by the Plaintiff as well as approximately $250,000 accumulated in the Firm's operating account due to Plaintiff's waiver of compensation, which were earmarked for paying the administrative claims.

49. However, rather than discuss how these amounts held would be allocated or how the remaining balance on the fees would be paid, Debtor's counsel, Mr. Rallis, points the Trustee to Paragraph 2(b) of the SA which contains the "Overage" clause. There was no further discussion with Plaintiff on resolving the administrative claims prior to Plan approval.

50. At the next to last confirmation hearing held in February, 2023, which Dariush participated in, the Trustee raised the issue of administrative fees with the Court, stating that he wanted more assurance about payment of the fees. The Court promptly inquired whether the issue couldn't be worked out with the debtor. Dariush responded that the fees should be paid and payment will be worked out between the parties.

51. By an Order dated February 21, 2023, [Dkt. 355], the Court confirmed the *Debtors'* Fourth *Amended Plan of Reorganization for Small Business Under Chapter 11,* dated January 30, 2023. [Dkt. No. 344.] The "Effective Date" of the Plan occurred on March 8, 2023.

52. No administrative claims were addressed in the Plan and the Court ordered the deadline for filing a request for an allowance of an administrative was set to be thirty (30) calendar days after the Effective Date. By early May 2023, the Court had approved about half of the total professional fees, totaling $473,503, with another $488,139 pending approval for a hearing date of June 15, 2023.

53. Then, on May 11, 2023, the now former Trustee transmitted a sudden email to Plaintiff (not copying Debtor's counsel or Trustee's counsel), making a demand for Plaintiff to pay an amount never agreed upon nor supported by the terms of the SA. The former Trustee first gave a summary of the administrative expenses incurred with Plan:

a)    The four administrative claims allowed by the Court were:

      i.  Stradling Yocca Carlson & Rauth - ***$203,856***
      ii.  Levene, Neale, Bender, Yoo & Golbuchik - ***$95,657***
      iii.  Armanino LLP ($186,289 - $30,000 retainer held) - ***$156,289***
      iv.  Landau for NREA – TRC 700 LLC - ***$17,971***

b)    The two administrative claims for professional fees pending approval upon the

hearing on June 15, 2023 (if allowed) were

      v.  Hahn & Hahn – ***$482,699***
      vi.  Hahn Fife - ***$5,440.40***

54. Per the former Trustee, the amount of professional fees incurred for the preparation of the Plan and expected to be approved by the Court totaled **$961,912.40**. The demand made it the former Trustee's email confirmed he is holding $200,000 to be applied to these professional fees, but also asserted that "*based on the documentation and data provided"* to Jeff Nerland, the estate's financial advisor, "*the '$200,000 deposit plus the funds in the estate's operating accounts are inadequate to support a working cushion of $50,000 and pay in full, the court approved fees and costs of all professionals and other administrative claim holders on the Effective Date'."* The former Trustee thus unilaterally demanded that Dariush had "*a present obligation to pay the Balance Amount"* as the March 8, 2023, Effective Date of the Plan, pursuant to Paragraph 2(b) of the SA. [Ex. 18.]

55. The former Trustee's email to Dariush threatened "action" as "*representative of the estate*" unless Dariush paid the "*Balance Amount*" for the four approved administrative clams by June 1, 2023, and the two pending administrative claims by July 5, 2023. The former Trustee assumed that per the SA, the "Balance Amount" was equivalent to the sum of the "Remainder of Allowed Administrative Claims" and "Remainder of Pending Administrative Claims" (collectively "**Remainder Amounts**"). Remainder Amounts were the six administrative claims for professional fees with amounts adjusted for partial credit. When added together, the total adjusted amounts were $**759,586.92**. [*See, Id.*]

56. Former Trustee's demand was in error and not based on a fair interpretation of the SA. First, Plaintiff's obligation to pay the "Balance Amount" arises upon a determination of insufficient funds <u>by</u> the estate's financial advisor, not by the former Trustee's own conclusions from the documents and data only "provided" but not reviewed by the estate's financial advisor.

57. Second, the SA does not define the "Balance Amount" to be equal to the total multiple unpaid amounts owed on the administrative claims. Rather, Paragraph 2(b) of the SA limited Plaintiffs' obligations "*to the payments set forth*" in subsections (i) and (ii) of that paragraph. The only payments specifically "set forth" in these subsections are the initial $200,000 deposit provided by Plaintiff and the "working capital cushion of $50,000," which was required to be maintained in the Firm's operating account. [Dkt No. 216, p. 14 of 21, Ex. 1 p. 2.] Thus, a fair reading of the SA leads to a reasonable interpretation that <u>the "Balance Amount" refers to the deficiency in the working capital cushion</u>.

58. The former Trustee's demand was also inequitable.  Greg had represented to Debtor's counsel on January 23, 2023, he had $200,000 in his trustee account, and approximately $250,000 in the Debtor's accounts to "fund the remainder" owed for the administrative claims balance. However, the adjusted Remainder Amounts the former Trustee demanded Plaintiff to pay credited $202,325 on the total administrative expenses. Former Trustee fails to account for the remaining funds which accumulated in the Debtor's operating account. These funds were able to accumulate through Plaintiff's agreement to waive 7 months of compensation, were agreed under the SA to be used towards paying the court approved fees and cost, and should still total approximately $250,000.

59. The former Trustee's demand was further inequitable due to the wrongfully withholding additional amounts from the compensation ordered to paid to Plaintiff. The Trustee at the time delayed compensations payments to Plaintiff for an additional two months after the time agreed in the SA and reducing the Court ordered amount by $16,450, which totaled $171,600 of additional amounts withheld without Plaintiff's consent. This amount was in addition to the 7 months compensation waived by the Plaintiff under the SA, intended to remain in the operating account and applied towards the administrative claims. The former Trustee's failure to account for even a partial amount of the compensation withheld was not in good faith with respect to Dariush and has denied Plaintiff his benefit of the bargain he struck with Greg under the SA.

60. Furthermore, the former Trustee unreasonably contended that the "Balance Amount" (which the Trustee defines as the Remainder Amounts owed on the approved administrative claims) was due on the Effective Date of the Plan, *and* Plaintiff had been obligated to payment on or before March 8, 2023. However, the amount owed on the professional fees for the Plan did not *begin* to be determined until the Court heard the first application by a professional for Allowance and Payment of Fees and Reimbursement of Expenses, held May 3, 2023. [Dkt. No 376.]

61. In any event, the total administrative fees could not have been determined until at least June 15, 2023, upon hearing the application for fees from Debtor's counsel, Dean Rallis. Accordingly, the former Trustee's unilateral and arbitrary assertion that Plaintiff failed to perform his payment obligations on March 8, 2023, was without merit.

ADVERSARY COMPLAINT

62. At the time Greg made this demand on Dariush and threatened "action" if Dariush did not comply, the former Trustee was fully aware of the ambiguity and dispute regarding the amount under the SA for which Dariush was personally liable, as he himself had noted and commented on the ambiguity [e.g., Ex. 19, conceding "uncertainty" as to the "administrative claim issues."] Yet, disregarding this knowledge, he acted in bad faith by adopting a position vis-à-vis Dariush that was inconsistent with his prior position.

63. On May 13, 2023, Plaintiff responded to former Trustee contending that the full amount of the administrative expenses could not be determined until the Court rules on the June 15, 2023, hearing of the motion to approve fees, and only then could the amount due from Plaintiff personally be determined and that accordingly any "action" before such determination would be premature and a violation of the SA. [Ex. 20.]

64. Plaintiff never received a response from the former Trustee. However, on June 1, 2023, Greg had a short discussion with Plaintiff's counsel, Mark Marcus, during which he acknowledged that Plaintiff's maximum obligation under the SA would be $500K. The Trustee also told Mark that he had no intention of initiating "action" and that the tone of his email was meant to get Plaintiff's attention as he was "under pressure" for the payments.

65. On Monday, June 12, 2023, the former Trustee sent Mark another ultimatum, demanding a call and payment in the amount specified in his May 11th email, and, *once again*, threatening "action" if payment was not promptly received. Greg's email did not reference the agreed upon ceiling of $500K discussed with Mark on their prior call nor make any attempt to justify the demand being larger than the $500K that the former Trustee had agreed to be the ceiling on Dariush's personal liability under the SA [Ex. 21.]

66. On June 15, 2023, Plaintiff sent an email to his counsel setting forth a calculation of the *maximum* amount due under the SA; noting that under Section 2(a), Plaintiff's obligation upon the case converting to a Chapter 7 is $700K-- of which $200K had already been paid-- leaving $500K as the ceiling cap for the amount owed by Plaintiff personally. However, under Section 2(b), if the Chapter 11 Plan was approved, Plaintiff's obligation is "*modified, reduced and limited*." The only provision available to give effect to a "modification, limitation and reduction" is the money expected

to accumulate in the Firm's operating account, which was at time was predicted to be approximately $300K. Using the Trustee's reasoning, the Plaintiff contended his obligation at maximum would be $500K minus the anticipated amount available in the account. [Ex. 22.].  Mark responded "Got it. I am speaking with Greg tomorrow at 11:00 a.m." [Ex. 23.]

67. On June 16, 2023, Mark held the scheduled meeting with the former Trustee and conveyed Dariush's position on the maximum amount for which Dariush could personally be found to be responsible under the SA. According to Mark's report of the call, conveyed to Dariush in a phone call shortly after his call with Greg, Mark had taken 10-15 minutes to go over the SA and explain my position, and that Greg had listened attentively, before responding substantively. [See Paragraph 68.]

68. Immediately after the call with Greg, Mark sent Dariush an email reporting what was discussed minutes earlier.  In his memo, Mark reported that Greg had "for the most part [] fully expected and anticipated everything [Mark] said and stated that for the most part agreed with [Plaintiff's] positions on those (maybe not on the exact numbers, but the overall credits [Plaintiff] should be getting and the basic expectations [he] had at the inception of the agreement)." [Ex. 24.]

69. On that same call, Greg told Mark that he "will relay this to all the professionals and then get back to me on how they expect to proceed."  Greg further stated "[the professionals] will likely want to get updates on the operations of ALG, since he no longer has access to the bank account data, to see what is likely available from the business to assist in paying professionals on an ongoing basis." [Ex. 12.] Mark later informed Dariush that on the June 16 call, Greg had said that he would get back to Mark "probably later today."

70. Despite his promise to get back to Mark, Greg did not do so until August 7, 2023, almost *two months* after the June 16th phone call with Mark.

71. On August 7, 2023, when Greg finally did reach out to Mark, he did not follow up on his promise to get back to Mark to continue the negotiations where they had left off, but rather to repeat his May 11 demand along with another ultimatum for payment within two days and otherwise threatening to record a Notice of Default on Plaintiff's Residence, used as security for the SA.

72. The August 7th ultimatum to Dariush stated: "Attached please find a notice of default that the professionals intend to record by Wednesday, August 9 if we do not get an adequate response to

the demand set forth below." [Ex. 25.]

73. Greg's August 7, 2023, email to Mark was not in good faith as he knew that he had promised seven weeks earlier to get back to Mark to continue the substantive discussions conducted on June 16, but chose to ignore that promise and the substantive discussions that had taken place, and instead fell back on the same demand he had made on May 11, 2023, without further discussion or explanation.

74. Mark responded to Greg the next day, reminding the former Trustee that he never got back to him as he had promised to do in their previous (June 16th) call. [Ex. 26.] Mark also cautioned the Trustee against proceeding with his premature threat of "action," noting that the SA requires any dispute under the SA to be submitted to the bankruptcy court for determination.

75. Mark's email to Greg included a proposal for calculating the amount Plaintiff will agree to be personally responsible for based on the SA, which was calculated starting with the $500K ceiling and crediting Plaintiff for all Court ordered compensation which was never paid to him. The email specified Plaintiffs offer to pay the calculated balance "within three business days of an accord on this" [Ex. 27.]  The proposal also included a plan to pay the full administrative fees allowed by the Court, stating: "As for the payment of the remainder of administrative claims, Adli Law Group can make payments of $10,000 per month, to increase as the Firm's financial condition permits, ***until those court-allowed claims are paid in full***." [Id. (emphasis added).]

76. Greg responded to Mark's email the next day, confirming receipt of Dariush's proposal and stating that he had submitted the proposal to the "Administrative Claimants" for consideration. He denied remembering having made any concessions to Mark in their last, June 16 call as to Plaintiff's position, stating that he "*did not recall agreeing to any of Dariush's arguments on anything, other than the total amount at issue in the settlement agreement is $700K*" [Ex. 27.]

77. In response to the former Trustee's assertion that he "did not recall agreeing" to Plaintiff's points, Dariush emailed Greg that same day, attaching Mark's contemporaneous memo of the discussion between Mark and Greg on June 16.  In his email to Greg, Dariush's made clear that he was providing the memo to Greg to help with the resolution of the dispute [Ex. 28.]

78. The former Trustee did not respond to Plaintiff's email and went ahead and recorded a

Notice of Default ("NOD") the very next day, starting the 90-day clock for recording a Notice of Trustee's Sale and effectuating a foreclosure on Plaintiff's residence, without ever submitting the dispute to the bankruptcy court for dispute resolution, as provided under SA.

79. The former Trustee wrongfully attests in the recorded NOD that $500,000 was owed by the Plaintiff as of March 8, 2023. However, the SA only provides for the specific amount of $500,000 to be paid on a conversion of the case to the Chapter 7.

80. Moreover, the former Trustee's May 11, 2023 email to Plaintiff's counsel did not make a demand for Plaintiff to pay $500,000, but rather demanded that Plaintiff pay the "Balance Amount" which the Trustee had calculated to total $759,586.92. Greg made this demand amount despite his belief that "the total amount at issue" in the SA was the $700,000 Cash Settlement Amount, of which $200K had already been paid. Accordingly, the amount demanded by the former Trustee was improper and he failed to follow proper procedure and due process as the amount represented in the NOD is also inconsistent with the Greg's past representations on the amount he stated Plaintiff would owe.

81. Plaintiff alleges that the former Trustee has clearly acted in bad faith with respect to Dariush by misrepresenting the amount in the NOD as well as not accounting for the funds which had been withheld from Plaintiff and should still be accumulating in the Firm's operating account. Moreover, Greg knowingly mislead Plaintiff and his counsel, prior to when the NOD was recorded, by representing he would communicate to the professionals and then get back to Plaintiff on "how they expect to proceed" to have their fees paid. Plaintiff reasonably relied on that representation and thus the former Trustee was estopped from proceeding with the foreclosure action.

82. Plaintiff reasonably relied on the representation that the former Trustee would assist in resolving this matter by engaging in good faith to come up with a counteroffer. However, the former Trustee never followed up on his own representation or otherwise reciprocated Plaintiff's communications or good faith attempts to resolve this matter.

/ / /

/ / /

/ / /

/ / /

## II.

## CAUSES OF ACTION

### FIRST COUNT

### (CANCELLATION OF WRITTEN INSTRUMENT- NOTICE OF DEFAULT)

83. Plaintiff realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs above.

84. In the Ninth Circuit, a bankruptcy court must apply federal common law choice of law rules, which follows the approach of the Restatement (Second) of Conflict of Laws, "The method for the foreclosure of a mortgage on land and the interests in the land resulting from the foreclosure are determined by the local law of the situs." *Restatement (Second) of Conflict of Laws § 229 (1971).*

85. There exists a written instrument purporting to be a '*Notice of Default and Election to Sell on Deed of Trust*' recorded August 10, 2023, as Instrument No. 20230528815 of the official records in the Recorder's Office of Los Angeles County, California (the "**NOD**"). [A copy of the recorded NOD is attached to this complaint as **Exhibit A**.]

86. This NOD initiates a non-judicial foreclosure on Plaintiff's residence in Malibu, California, used as security for Plaintiff's obligations under the SA. The propriety and lawfulness of the NOD is therefore determined under California law.

87. The NOD provides "**IMPORTANT NOTICE**" that Plaintiff's residence "**MAY BE SOLD WITHOUT ANY COURT ACTION**." The NOD gives further notice:

> "That default has been declared by [the Trustee] … the current beneficiary under that certain Deed of Trust and Assignment of Rents dated as of July 20, 2022… and that…
>
> The Deed of Trust secures the payment of and the performance of certain obligations, including but not limited to, the obligations set forth in that certain [**SA**] executed by Dariush G. Adli (the "Original Borrower"), with **a face amount of $700,000.00** (the "Original Obligation") … and that…
>
> …the Borrower has failed to perform obligations pursuant to or under the [SA] and/or the Deed of Trust, specifically: failed to pay the balance of the principal sum…" [stated to be "**$500,000.00**"] "…which became due on the Full Payment Deadline…"  [stated to be "**March 8, 2023**"].

88. The NOD recorded on Plaintiff's property is inconsistent with the agreed method and manner of handling a dispute under the SA. The former Trustee's contention that Plaintiff is in default of an obligation under the SA does not permit a foreclosure on the lien secured by Plaintiff's residence "WITHOUT ANY COURT ACTION." On the contrary, Paragraph 9 of the SA provides:

> "The parties hereto agree that the **United States Bankruptcy Court** for the Central District of California **shall have sole and exclusive jurisdiction**, sitting without a jury, to hear and determine any disputes that arise under or on account of this agreement" (emphasis added.)

89. Hence, the former Trustee has acted outside his authority and wrongfully declared Plaintiff's default under the SA without any determination by the bankruptcy court and in violation of the terms of the SA itself. Accordingly, the recorded NOD resulting from the Trustee's wrongful act is void or voidable as to the Plaintiff.

90. Additionally, the former Trustee, in his capacity as the Chapter 11 Trustee for the bankruptcy estate of the Debtor, has withheld compensation the Court ordered Debtor to pay the Plaintiff, and has withheld more compensation than the amount agreed by Plaintiff under the SA, with the stated intent of applying those amounts to administrative claims and professional fees owed by the Debtor. The total compensation Trustee has withheld from the Debtor amounts to $426,750, which includes a withholding of $171,500 (corresponding to the period following the signing of the SA) to which Plaintiff never provided consent.

91. Furthermore, the former Trustee caused the NOD to be recorded on Plaintiff's residence stating "$500,000.00" as the balance due from Plaintiff under the SA, while at the same time knowing that the bankruptcy estate was in possession of funds or had appropriated funds belonging to Plaintiff which should be applied to the balance owed by Plaintiff under the SA.

92. Accordingly, the former Trustee knowingly recorded the NOD stating an incorrect amount owed by Plaintiff, and further knew that the correct amount owed by Plaintiff was substantially less than the amount stated therein. The NOD is therefore void or voidable as to the Plaintiff on the grounds of false representation.

93. If the NOD is not cancelled or rescinded, Plaintiff faces the possible foreclosure and loss of his Malibu residence on an unlawful and inequitable bases.

94. Civil Code § 3412 states, "*A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled.*"

95. Plaintiff requests that the Court issue an order cancelling the NOD on the grounds that said written instrument i) was obtained in violation of SA between the Plaintiff and the then-Trustee of the Debtor's bankruptcy estate, ii) lacks jurisdiction to proceed without court action, and iii) misrepresents the amount owed by Plaintiff, and is thus void or voidable against Plaintiff.

96. Plaintiff has a reasonable apprehension that if the NOD is left outstanding, it may cause serious and irreparable injury through the loss of his home residence.

### SECOND COUNT

### (CANCELLATION OF WRITTEN INSTRUMENT- DEED OF TRUST)

97. Plaintiff realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs above.

98. There exists a written instrument purporting to be a '*Deed of Trust*' recorded on July 29, 2022, as Instrument No. 20220770691 of official records in the Recorder's Office of Los Angeles County, California, (the "**DOT**") and affecting title to the real property at 20471 Royal Stone Drive, Malibu, California 90265 (Plaintiff's "**Residence**") the known residence of Dariush G. Adli and Soheila Adli. [A copy of the recorded DOT is attached to this complaint as **Exhibit B**.]

99. Should the Plaintiff default on the terms of the SA, the DOT confers the power-of-sale to a third-party trustee authorized to conduct a nonjudicial foreclosure on the Residence on behalf of the beneficiary (*i.e.,* estate of the Debtor) and collect any outstanding amount owed under the SA.

100. The former Chapter 11 Trustee contends he has exercised the power of sale on behalf of the Debtor's estate and has recorded the NOD to initiate a nonjudicial foreclosure on the Residence.

101. The statements made in the NOD represent the DOT "*secures the payment of and the performance of… the obligations set forth in* [the SA] …***with a face amount of \$700,000.00[1] (the "Original Obligation") and approved by the Bankruptcy Court pursuant to its order entered on August***

---

[1] Of which, \$200K has been paid.

*31, 2022.*" [*See,* Exhibit A, emphasis added.]

102. The "Original Obligation" of $700,000[2] and "face amount" in the DOT equates to the agreed Cash Settlement Amount under Paragraph 2 of the SA. However, the Cash Settlement Amount would equal the $700,000.00[3] "face amount" only when expressly required to be paid under Paragraph 2(a) of SA, "*after entry of an Order converting the Case to Chapter 7.*"

103. However, when the Court confirmed the Debtor's Chapter 11 Plan on February 21, 2023, paragraph 2(b) of SA took effect, which provides that "*the total Cash Settlement Amount and Dariush's obligations to pay will be modified, reduced, and limited*…" to a certain payment amount which is now disputed by the parties.

104. However, for paragraph 2(b) to have affect, the amount obligated to be paid by Plaintiff must be 1) *modified* from the original $700,000.00[4] face amount; 2) *reduced* from that face amount; and 3) *limited* to the payment obligations which have been changed from and less than the $700,000 face amount, which was the Original Obligation under the DOT, and of which $200K has been paid.

105. Thus, Plaintiff's payment of the $700,000.00 Original Obligation (of which $200K has already been paid) was only enforceable under the express terms of Paragraph 2(a) of the SA if there was an Order converting the Debtor's bankruptcy case to a Chapter 7. Because there was never such an order issued by the Court, and there was instead Court approval of the Debtor's Chapter 11 Plan, the condition for Paragraph 2(a) to be enforced was never met.

106. Accordingly, the DOT with a face amount of $700,000[5] is void or voidable as to Plaintiff because the contractual condition for the DOT to be enforceable has not been meet. Nevertheless, the former Trustee is seeking to enforce the power-of-sale under the DOT on behalf of the estate.

107. In addition to contractual condition for the enforceability of the DOT not being met, at the time the former Trustee sought to enforce the power-of-sale, he no longer had the representative capacity as the Chapter 11 Trustee for the Debtor's estate. As of the effective date of the Plan, on March 8, 2023, the control and title of the Debtor's estate was returned to the possession and control

---

[2] Id.
[3] Id.
[4] Id.
[5] Id.

of the Plaintiff as the President of the Firm.

108. Plaintiff has a reasonable apprehension that if the DOT is left outstanding it will cause serious injury to the Plaintiff through former's Trustee's efforts to enforce the power-of-sale under the DOT in breach of the SA and without the requisite representative capacity.

109. Plaintiff requests that the Court make an order cancelling the DOT on the grounds that the former Trustee is seeking to enforce the power-of-sale when the contractual condition for its enforceability has not been meet and when the former Trustee no longer has the requisite representative capacity as the Chapter 11 Trustee.

### THIRD COUNT

### (BREACH OF CONTRACT)

110. Plaintiff realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs above.

111. The Settlement Agreement (SA) is a valid and enforceable contract, which provides the rights and obligations of the parties shall be governed by the laws of the State of California.

112. As is alleged in the previous paragraphs, the former Trustee has engaged in wrongful conduct, including making demands for payment that exceed the amount owed by Plaintiff under the SA, failing to pay the agreed Court ordered compensation owed to Plaintiff, making a determination of Plaintiff's obligation to pay the "Balance Amount" under the SA without basis, and commencement of a non-judicial foreclosure on the Plaintiff's Residence.

113. Each incident of the former Trustee's wrongful conduct constituted a material breach of the SA. Each of these incidents arose from disputes within the exclusive jurisdiction of the bankruptcy court, but refused to be submitted to the bankruptcy court by the former Trustee.

114. Plaintiff has performed or tendered performance of his obligations under the Settlement Agreement; and/or the performance of his obligations have been waived.

115. Under the terms the SA, Plaintiff's waiver of his Court ordered compensation was limited to seven payments of $36,450 a month. The Trustee beached these terms by withholding two additional months or payments and unilaterally reducing the Court ordered monthly payment amount from

$36,450 to $20,000.  As a result of this breach of the SA, Plaintiff has suffered $171,600 in damages.

116. Plaintiff has suffered harm and damages and will continue to suffer harm and damages as a result of the Trustee's ongoing material breaches of the SA. Further, if Trustee continues to proceed with a wrongful nonjudicial foreclosure on Plaintiff's residence in breach of the terms of the SA, Plaintiff will require injunctive relief to enjoin the nonjudicial foreclosure action and/or an order from this Court to rescind or cancel the NOD, to prevent irreparable harm.

117. The Settlement Agreement provides the prevailing party shall be awarded attorneys fee and costs. Plaintiff has incurred/will incur attorneys fees and costs in the prosecution of this matter.

## **FOURTH COUNT**

### **(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)**

118. Plaintiff realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs above.

119. In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

120. Plaintiff and the former Trustee are parties to the Settlement Agreement (SA), wherein there exists a covenant of an implied promise of good faith and fair dealing.

121. As alleged in the previous paragraphs, the former Trustee had consistently provided Plaintiff with the estimate that "approximately $500,000" would be required to pay the administrative claims on the Effective Date of the Plan, which could be achieved with $200,000 capital contribution from Plaintiff and a waiver of the Court ordered compensation due him through July 2022. [*See*, *e.g.*, Ex. 26 and Ex. 27.] Pursuant to the former Trustee, this amount was firm and non-negotiable. [*Id.*]

122. It was further discussed with the former Trustee and confirmed with the Debtor's counsel, Plaintiff would be responsible to pay the difference of anu shortfall from the required $500,000 cash balance (which includes Plaintiff's $200,000 contribution) that if more than $500,000 was required, Plaintiff's will not be personally responsible. [*See,* Ex. 18.]

123. Plaintiff has performed, tendered performance, or excused from his obligations under the

SA by paying the required $200,000 deposit and waving 7 months of compensation. Accordingly, Plaintiff did what was required of him to reach the $500,000 amount to pay the professionals.

124. However, when the administrative and professional fees arose above the agreed upon amount, the Trustee made no effort to renegotiate new terms or to obtain Plaintiff's consent that the amounts had substantially exceeded the represented and agreed upon amounts.

125. After Plan approval, on May 11, 2023, the Trustee made a demand for immediate payment of six administrative claims for professional fees, with amounts adjusted for approximately $200,000 credit to pay down the balance. The adjusted Remaining Amounts for the administrative claims for which the Trustee demanded payment from Plaintiff, totaled $**759,586.92**. [*See,* Ex. 7.]

126. The former Trustee demanded the amount of $759,586.92 and threated enforcement of the DOT in bad faith when he believed and later reasoned that $700,000 was the maximum owed by Plaintiff under the SA, leaving at most $500,000 balance after Plaintiff's contribution of $200,000.

127. The former Trustee further acted in bad faith when he unilaterally declared that Dariush had "*a present obligation to pay the Balance Amount"* as the March 8, 2023, Effective Date of the Plan, pursuant to Paragraph 2(b) of the SA. [Ex. 7.] the former Trustee's demand was unreasonable because the Court had not approved administrative fees by the Effective Date. The former Trustee's demand was further unreasonable with the context of the SA, which allotted 120 days for payment of the $700,000 maximum (of which $200K had already been paid) upon the case converting to Chapter 7, yet the former Trustee believed the same amount would be immediately due upon approval of a Chapter 11.

128. Former Trustee further acted in bad faith by making a demand for payment and failing to account for the remaining funds which accumulated in the Debtor's operating account. These funds were able to accumulate through Plaintiff's agreement to waive 7 months of compensation, were agreed under the SA to be used towards paying the court approved administrative fees.

129. The former Trustee further acted in bad faith by not accounting for all the compensation he had personally withheld from Plaintiff amounting to $426,750 (of which $171,600 corresponds to the period after the SA was signed). The former Trustee's failure to account for even a partial amount of the compensation withheld has denied Plaintiff his benefit of the bargain he struck with the Trustee

1  under the SA.

2  130. Accordingly, Greg's wrongful conduct as alleged herein violates the implied covenant

3  of good faith and fair dealing in contract and entitles Dariush to separate tort damages. As a result of

4  the former Trustee's breaches of the SA's implied covenant, Plaintiff is entitled to recover the value

5  of consideration exchanged but no benefit was received in return. Here, this consideration amounts to

6  the total compensation, the former Trustee withheld and failed to provide credit for Plaintiff.

7

8  **FIFTH COUNT**

9  **(DECLARATORY AND INJUNCTIVE RELIEF)**

10  131. Plaintiff realleges and incorporates by reference as though fully set forth herein each and

11  every allegation contained in the previous paragraphs above.

12  132. A real controversy and dispute exist between Plaintiff and the former Trustee about the

13  parties' rights and obligations under the Settlement Agreement (SA). Specifically, there is a dispute

14  on the amounts which were owed by Plaintiff upon approval of the Chapter 11 Plan, under the SA,

15  including, *inter alia*, Paragraph 2(b) of the SA.

16  133. A real controversy and dispute further exist as to Paragraph 2(b) of the SA and whether

17  upon approval of the Chapter 11 Plan, Plaintiff had a reasonable expectation that his total obligation

18  would be limited to approximately $500,000 and the Firm responsible for remaining professional fees.

19  134. A real controversy and dispute also exist on whether the former Trustee is equitable

20  estopped from recording the Notice of Default (NOD) on August 10, 2023, when; on August 7, 2023,

21  the former Trustee requested a response or he intended to file the NOD; then on August 8, 2023, he

22  received a response and Plaintiff's proposal to resolve unpaid professional fees incurred with the

23  Chapter 11 Plan; then on August 9, 2023 he confirmed the receipt and submission of Plaintiff's

24  proposal to the "administrative claimants" for consideration; then giving no response until August 11,

25  2023— a day after the NOD was recorded—only to provide Plaintiff with a copy of the recorded NOD.

26  135. Section 9(e) of the Settlement Agreement provides that the parties agree that this Court

27  shall have sole and exclusive jurisdiction, sitting without a jury, to hear and determine any disputes

28  that arise under or on account of the agreement.

136. Plaintiff requests a determination by the Court of the parties' rights and duties under the Settlement Agreement.

137. Plaintiff has suffered harm and damages and will continue to suffer harm and damages due to the Trustee's wrongful actions. If the Trustee continues his wrongful actions, including actions relating to the non-judicial foreclosure of Plaintiff's Residence, in addition to declaratory relief, the Plaintiff will require injunctive relief to enjoin the wrongful non-judicial foreclosure action and/or an order from this Court to rescind or cancel the NOD, to prevent irreparable harm.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief from the Bankruptcy Court as follows:

1. For an Order for Cancellation or Rescission of the written instrument:

    '*Notice of Default and Election to Sell on Deed of Trust*' recorded on August 10, 2023, as Instrument No. 20230528815 of the official records in the Recorder's Office of Los Angeles County, California

2. For an Order for Cancellation or Rescission of the written instrument:

    '*Deed of Trust*' affecting title to the Plaintiff's Residence recorded on July 29, 2022, as Instrument No. 20220770691 of the official records in the Recorder's Office of Los Angeles County, California

3. For an award of damages for breach of the July 20, 2022, Settlement Agreement (SA) in the amount of $171,600.00 representing the additional unpaid amounts owed to Plaintiff under the February 14, 2022 'Order Setting Insider and Compensation' which the former Trustee withheld from Plaintiff without consent and in breach of term SA.

4. For an Order declaring Plaintiff is the prevailing party in a dispute arising under the SA and award of reasonable attorney fees pursuant to Paragraph 9(e) of the SA and California Civil Code § 1717(a), payable from the former Chapter 11 Trustee, Gregory K Jones, due

to his willful breach of the SA.

5.  For an award of restitution damages in amount up $426,750.00 (payable to Plaintiff or credited towards amounts owed under the SA) representing compensation ordered to be paid to Plaintiff and withheld as a result of the former Trustee's beach of the covenant of good faith and fair dealing implied in the SA by failing to account or credit those amounts to the obligations under SA and denying Plaintiff's benefit of the bargain.

6.  For an Order for Declaratory Relief and a declaration from this Court resolving the dispute arising under the SA as follows:

    a.  The obligation under Paragraph 2(a) of the SA, for Plaintiff to pay the $500,000 remaining balance on the original $700,000 Cash Settlement Amount upon Debtor's Case converting to Chapter 7, is **moot** and **unenforceable**;

    b.  The obligation under Paragraph 2(b) of the SA, for Plaintiff to make "*modified, reduced and limited*" payments on the Cash Settlement Amount upon confirmation of the Chapter 11 Plan, is interpreted to mean Plaintiff's initial $200,000 deposit plus any short fall on the $300,000 expected to accumulate in Debtor's operating account and required to pay the balance of the $500,000 estimate on funds required on the Effective Date of the Plan, **according to the expectation of the parties** at the time of entering the SA

    c.  Alternatively, or in conjunction with the above, the term "*Balance Amount*" under Paragraph 2(b)(ii) of the SA is given a **strict interpretation** to mean Plaintiff's payment obligation is the difference in the balance of the $50,000 working capital cushion minus the shortfall on the amount required to pay all administrative claims, limited and up to the full working capital cushion

    d.  Alternatively, and distinct from the above, the term "*Balance Amount*" under Paragraph 2(b)(ii) may be interpreted to mean Plaintiff's obligation to pay the difference of the $500,000 balance owed on the Cash Settlement Amount after accounting for Plaintiff's **bargained for benefit** and crediting for all amounts of the compensation owed under the February 14, 2022 'Order Setting Insider Compensation' and withheld by the former Trustee.

7.  For an Order for Prohibitory Injunctive Relief to enjoin the Gregory K. Jones, the former Chapter 11 Trustee for the Debtor's bankruptcy estate, from pursuing or enforcing a nonjudicial foreclosure on Plaintiff's Residence.

8.  For an Order for Mandatory Injunctive Relief, compelling Gregory K. Jones, the former Chapter 11 Trustee, to deliver to Dariush Adli a full reconveyance of the July 29, 2022, Deed of Trust securing obligation in favor Gregory K. Jones in his capacity as the Chapter 11 Trustee of the Debtor's Bankruptcy Estate.

Adli Law Group PC

DATED:  April 18, 2023              By:    /s/ Dariush G. Adli
                                           Dariush Adli, Ph.D., Esq.
                                           President

ADVERSARY COMPLAINT

## <u>VERIFICATION OF COMPLAINT AND CERTIFICATION</u>

Pursuant to 28 U.S.C. § 1746, Plaintiff Dariush G. Adli, having first been duly sworn and upon oath, verifies, certifies, and declares as follows:

1.     I am a Plaintiff in this civil proceeding.

2.     I have read the above-entitled civil Adversary Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.

3.     I believe that this Adversary Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.

4.     I believe that this Adversary Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any such Defendant(s), or create a needless increase in the cost of litigation to any such Defendant(s), named in the Adversary Complaint.

5.     I have filed this civil Adversary Complaint in good faith and solely for the purposes set forth in it.

6.     Each and every exhibit or chart I have provided to my attorneys, copies of which may be attached to this Adversary Complaint or incorporated therein, is a true and correct copy of the original.

I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct. Executed September 25, 2023 at Los Angeles, California.

_____
Dariush G. Adli